## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ESAM ABDELGADIR, RITA DOS SANTOS and
JOSEPH SHIKHMAN – PUTATIVE CLASS
REPRESENTATIVES AND THOSE SIMILARLY
SITUATED,                                              **Case No. 14-cv-9857 - GHW**

              Plaintiffs,

      v.

TELEXELECTRIC, LLLP; TELEX MOBILE,                     <u>**DEMAND FOR TRIAL BY JURY**</u>
HOLDINGS, INC.; JAMES M. MERRILL; CARLOS
N. WANZELER; STEVEN M. LABRIOLA; JOSEPH
H. CRAFT, a/k/a JOE H. CRAFT; CRAFT
FINANCIAL SOLUTIONS, LLC; CARLOS COSTA;
KATIA WANZELER; SANDERLEY RODRIGUES
DE VASCONCELOS; WWW GLOBAL BUSINESS,
INC.; SANTIAGO DE LA ROSA; RANDY N.
CROSBY; FAITH R. SLOAN; DANIIL SHOYFER;
GERALD P. NEHRA, individually and doing business
as LAW OFFICES OF NEHRA AND WAAK;
GERALD P. NEHRA ATTORNEY AT LAW, PLLC;
RICHARD W. WAAK, individually and doing
business as LAW OFFICES OF NERHA AND
WAAK; RICHARD W. WAAK, ATTORNEY AT
LAW, PLLC; PRICEWATERHOUSECOOPERS,
LLP; BANK OF AMERICA CORPORATION,
BANK OF AMERICA, NA; TD BANK, NA;
FIDELITY CO-OPERATIVE BANK, doing business
as FIDELITY BANK; MIDDLESEX SAVINGS
BANK; WELLS FARGO & COMPANY; WELLS
FARGO BANK, NA; SYNOVUS FINANCIAL
CORPORATION, SYNOVUS BANK; FMR, LLC,
also known as FIDELITY INVESTMENTS;
GLOBAL PAYROLL GATEWAY INC.;
INTERNATIONAL PAYOUT SYSTEMS, INC.;
PROPAY, INC., doing business as PROPAY.COM;
BASE COMMERCE, LLC, doing business as
PHOENIX PAYMENTS; VANTAGE PAYMENTS,
LLC;  ALLIED WALLET, LTD; DOE INSIDE
PROMOTERS; DOE PROFESSIONAL SERVICES
PROVIDERS; DOE BANKS; DOE INVESTMENT
SERVICES PROVIDERS; DOE PAYMENT
PROCESSORS; and PARALEGAL DOE,

              Defendants.
_____

<u>**COMPLAINT**</u>

TABLE OF CONTENTS

I.    NATURE OF THE ACTION ...................................................................................1

II.   JURISDICTION AND VENUE .............................................................................6

III.  THE PARTIES.........................................................................................................7

   A.   PLAINTIFFS ................................................................................................7

   B.   THIRD-PARTY TELEXFREE BANKRUPT ENTITIES ...................................8

   C.   DEFENDANTS .............................................................................................9

        i.    Electric and Mobile.........................................................................9

        ii.   Founders, Officers, Directors, Owners and Businesses        Associated
              With Such Individuals...................................................................10

        iii.  Principals, Aiders and Abettors: Attorneys and Other        Professional
              Services Providers...........................................................................13

        iv.   Principals, Aiders and Abettors: Banks and Other Financial Service
              Providers .......................................................................................15

IV.   FACTS AND ALLEGATIONS.............................................................................19

   A.   The History of TelexFree's Formation and its Brazilian Connections ...............19

   B.   The Formation of The Bankrupt TelexFree Companies ...................................20

        i.    TelexFree, Inc. ..............................................................................20

        ii.   TelexFree, LLC..............................................................................21

        iii.  TelexFree Financial, Inc. ................................................................22

   C.   Relationship of the Bankrupt TelexFree Companies .........................................23

   D.   Defendants Electric and Mobile...........................................................................24

   E.   TelexFree's Brazilian-Based Operations:  Ympactus.........................................25

   F.   TelexFree's Unlawful, Unfair and Deceptive Pyramid Scheme........................26

   G.   TelexFree's Fraudulent and Deceptive Use of Best Western Hotel ..................35

   H.   Investigation of, and Injunctions against, Telexfree's Brazilian Operations in
        Brazil.....................................................................................................................35

   I.    TelexFree's Continued United States' Operations .............................................38

   J.    Collapse of TelexFree's United States' Operations............................................39

   K.   TelexFree's Belated Efforts to Legitimize Its Scheme ......................................40

   L.   Events Since TelexFree's Bankruptcy Filing .....................................................41

   M.   TelexFree's Founders Controlled TelexFree, Knowingly Perpetrated  the
        Unlawful, Unfair, and Deceptive Pyramid Scheme, and Made False
        Representations about TelexFree........................................................................43

|  | N. | TelexFree's Inside Promoters Played an Integral Role in and  Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme | 49 |
|---|---|---|---|
|  | O. | TelexFree's Attorneys Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme | 57 |
|  | P. | Telexfree's Accountants and Professional Services Providers Played       an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme | 68 |
|  | Q. | Banks and Financial Service Providers Knowingly Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme, Knowingly Received and Executed Fraudulent Fund Transfers, and Violated Mandated Bank Reporting and "Know Your Customer" Requirements | 71 |
|  | R. | Doe Inside Promoters who Acted as Defendants' Agents | 92 |
| V. | | CLASS ACTION ALLEGATIONS | 93 |
| VI. | | CLAIMS FOR RELIEF | 96 |

FIRST CLAIM FOR RELIEF
VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,
CHAPTER 93A, SECTIONS 2 AND 11
(Against All Defendants Except Katia Wanzeler) .......................................... 96

SECOND CLAIM FOR RELIEF NEGLIGENCE
(Against All Defendants) ................................................................................ 97

THIRD CLAIM FOR RELIEF
NEGLIGENT MISREPRESENTATION
(Against All Defendants Except Katia Wanzeler) .......................................... 98

FOURTH CLAIM FOR RELIEF
FRAUD
(Against Defendants Electric and Mobile, Defendant Founders Inside       Promoters, Retained Licensed Professionals and IPS) .................................... 99

FIFTH CLAIM FOR RELIEF
UNJUST ENRICHMENT
(Against All Defendants) .............................................................................. 101

SIXTH CLAIM FOR RELIEF
TORTIOUS AIDING AND ABETTING
(Against All Defendants) .............................................................................. 101

SEVENTH CLAIM FOR RELIEF
CIVIL CONSPIRACY
(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG, IPS and Katia Wanzeler) .............................................................................................. 103

EIGHTH CLAIM FOR RELIEF
VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters,
Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce) ..........104

NINTH CLAIM FOR RELIEF
VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)
(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters,
Certain Retained Licensed Professionals) ..................................................................110

TENTH CLAIM FOR RELIEF
VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)
(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters,
Certain Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG, and
IPS) ..........................................................................................................................111

ELEVENTH CLAIM FOR RELIEF
VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters,
Certain Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG and
IPS) ..........................................................................................................................114

TWELFTH CLAIM FOR RELIEF
VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,
CHAPTER 110a, SECTION 410(b)
(Against Defendants Mobile and Electric, Defendant Founders, Inside Promoters, and
Certain Retained Licensed Professionals) ..................................................................114

VII.    PRAYER FOR RELIEF ...........................................................................................116

## I.      <u>NATURE OF THE ACTION</u>

1.      This litigation arises out of a pyramid scheme through which TelexFree, Inc., TelexFree, LLC and TelexFree Financial, Inc. ("TelexFree") and the Defendants (as defined herein), defrauded hundreds of thousands of individuals out of hundreds of millions of dollars by promising them a jumbo-sized return on investment in excess of 200% annually, purportedly in exchange for promoting TelexFree's business.  Largely targeting the Brazilian and Dominican communities, TelexFree purported to sell internet telephone services, when in actuality it generated its income exclusively by recruiting "Members," also called "Promoters," and promising returns through a passive income scheme.  These memberships, known as "AdCentral" packages, entitled Promoters to be paid for cutting-and-pasting spam advertisements on the Internet, creating the illusion that they were performing valuable services in exchange for compensation.  Promoters were also encouraged to recruit and "build" a network of new Members, for which they would receive additional compensation.  Ultimately, Members were not required, or even expected, to perform any sales, and were compensated solely for recruiting new Promoters and for performing the passive activity of cutting-and-pasting spam advertisements.

2.      A pyramid scheme is a fraudulent business operation whereby an individual or organization pays returns to its investors from new money paid into the operation by new victims, rather than from profit earned by the operator.  Operators of pyramid schemes usually entice new victims by promising higher returns than available from other (legal) investments, in the form of short-term returns that are either abnormally high or unusually consistent. Inevitably, the pyramid scheme fails when new victims of the scheme are not recruited quickly

enough to pay the promised returns to the earlier investors, and the scheme is finally revealed to be an illegal fraud.

3.      The template for TelexFree's pyramid scheme was laid out years ago, in Brazil, by Carlos N. Wanzeler ("Wanzeler"), James M. Merrill ("Merrill"), Steven Labriola ("Labriola") and Carlos Costa ("Costa").  In 2010, Wanzeler, Merrill and Costa together formed and jointly controlled Ympactus Comercial Ltda ("Ympactus").

4.      Ympactus was formed under the laws of, and operated in, Brazil.

5.      Ympactus also operated out of offices in Massachusetts.

6.      Ympactus purported to sell internet telephone services, but primarily sold "memberships" to investors.  These memberships offered investors high returns in exchange for promoting the company online and recruiting new investors.

7.      The mid-2013 shut-down of Ympactus was widely reported in both the financial and popular press.

8.      Anticipating the demise of Ympactus, and with an eye towards using the same fraudulent model in another market, in February 2012, one step ahead of the Brazilian authorities, Wanzeler and Merrill formed TelexFree, Inc. in the United States.

9.      While TelexFree was purported to be a separate and distinct legal entity from Ympactus, Wanzeler, Labriola, Merrill and Costa used the TelexFree entity to re-create in the United States the same massive pyramid scheme that they had earlier conducted in Brazil, even to the extent, for example, that both companies provided the same information on their websites.

10.     When their Brazilian operation shuttered in mid-2013, Wanzeler, Merrill, Labriola and Costa, with the participation and assistance of the other Defendants named in this Complaint, rapidly expanded their fraud in the United States under the name TelexFree.

Operating out of its headquarters in Marlborough, Massachusetts, TelexFree advertised itself as a "multi-level marketing" company selling local and international telephone service plans that falsely claimed to use unique groundbreaking "voice over internet protocol" ("VoIP") technology.

11.    The bait for the TelexFree's scheme was the right to promote and profit from TelexFree's VoIP product.  Despite the false, unfair, and deceptive representations made by TelexFree, the TelexFree VoIP service was not groundbreaking, and offered nothing more than what was and is otherwise available for free.  In fact, the TelexFree VoIP technology was not patented or proprietary.

12.    Wanzeler, Merrill, Labriola and Costa, and those working with them, specifically targeted immigrant communities, for whom English was not spoken or spoken only as a second language, with their pyramid scheme, selling unwitting purchasers (the Promoters) memberships that promised high returns (TelexFree promised annualized returns of over 200%) solely for placing duplicative internet advertisements and recruiting new members.

13.    TelexFree used these membership fees to fund its unlawful and fraudulent scheme and line the pockets of Wanzeler, Merrill, Costa and the other Defendants – some of whom were early Promoters with massive influence over the fraud, and others of who earned handsome fees for proving services to the fraud while turning a blind eye to the earlier shutdown of the nearly identical Ympactus and many other "red flags" surrounding the fraud.

14.    TelexFree's revenue from sales of its VoIP service plans accounted for only approximately $1.3 million of the nearly $1.1 billion (or approximately 0.1%) needed to honor its outsized promises to Promoters.

3

15.     TelexFree had virtually no true 'business,' and virtually all of its receipts were simply new investments of people duped into expecting sizeable returns.

16.     On March 9, 2014, TelexFree changed its compensation plan, thereby requiring Promoters to sell its VoIP product in order to qualify for the payments that TelexFree had previously promised to pay them.  The rule change generated a storm of protests from Promoters who were unable to recover their money.  On April 1, 2014, dozens of Promoters descended upon TelexFree's Marlborough, Massachusetts office to protest this change and attempt to regain access to their money.

17.     In an effort to advance the illusion that TelexFree had made payments to investors, TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to investors; many such forms were provided long after the mandated January 31, 2014 deadline, and some after the April 15, 2014 filing deadline.  In doing so, TelexFree falsely represented that investors had received income that they had in fact never received.

18.     Eventually, as happens in every pyramid scheme, TelexFree was unable to maintain its deception and the pyramid crumbled.  Revenues were insufficient to meet obligations and TelexFree, Inc. along with two affiliated companies, TelexFree, LLC and TelexFree Financial, Inc. (together, the "Bankrupt Companies") filed for Chapter 11 bankruptcy protection in Nevada on April 14, 2014.

19.     Criminal and regulatory proceedings were quickly commenced, the operations were shuttered, and the full extent of the great harm that TelexFree, its founders and the many other Defendants caused is only now being fully revealed, with investor losses totaling perhaps $1 billion dollars.  With hundreds of thousands of victims, TelexFree appears to be one of the

largest, if not the largest, pyramid scheme in history.  This Complaint seeks redress against the wrong-doers on behalf of those victims.

20.     The Bankrupt Companies executed their fraud with the participation to varying degrees of the following entities and individuals (collectively, "Defendants"):

- TelexElectric LLLP ("Electric");

- Telex Mobile, Holdings, Inc. ("Mobile");

- Wanzeler, Merrill, Labriola, Costa, and Joseph H. Craft a/k/a Joe H. Craft (collectively, the "Defendant Founders");

- Sanderley Rodrigues de Vasconcelos, WWW Global Business, Inc., Santiago de La Rosa, Daniil Shoyfer, Randy N. Crosby, Faith R. Sloan, and the Doe Inside Promoters (collectively, the "Inside Promoters");

- Gerald P. Nehra, Esq., individually and doing business as the Law Offices of Nehra and Waak, Gerald P. Nehra, Attorney at Law, PLLC, Richard W. Waak, individually and doing business as the Law Offices of Nehra and Waak, Richard W. Waak, Attorney at Law, PLLC, Paralegal Doe, Joe. H Craft individually and doing business as Certified Public Accountant, Craft Financial Solutions, LLC, PricewaterhouseCoopers, LLP, as well as the Doe Professional Services Providers (collectively, the "Retained Licensed Professionals");

- Bank of America Corporation, Bank of America, N.A., TD Bank, N.A., Fidelity Co-Operative Bank, Middlesex Savings Bank, Wells Fargo & Company, Wells Fargo Bank, N.A., Synovus Financial Corporation, Synovus Bank, and the Doe Banks (collectively, the "Banking Institutions");

- FMR, LLC, also known as Fidelity Investments, and the Doe Investment Services Providers (collectively, the "Investment Services Providers");

- and Global Payroll Gateway, Inc., International Payout Systems, Inc., Propay, Inc., doing business as Propay.com, Base Commerce, LLC, doing business as Phoenix Payments, Vantage Payments, LLC, and Allied Wallet, Ltd. (collectively, the "Payment Process Services Companies").

21.     The fact that TelexFree was operating an illegal pyramid scheme was known to Defendants as early as 2013, following the Brazilian authorities' seizure of Ympactus' assets.

22.     TelexFree's operations had many signs of fraud and other wrongdoing and were highly suspicious to law enforcement, banking, and payment processing authorities from the

outset.    After Brazilian authorities shut down TelexFree's Brazilian unlawful predecessor, Ympactus, the Banking Institutions, Investment Services Provides, and Payment Processing Services Companies turned a blind eye to the fact that TelexFree was nothing other than a new entity created by the same principals to engage in the same fraud on new victims.   TelexFree even used the same fraudulent methods and promotional materials.   Said Defendants chose to blithely continue to participate in and aid and abet TelexFree's fraud by providing critical financial services that allowed TelexFree's pyramid scheme to thrive in the United States.

23.    Plaintiffs Putative Class Representatives Esam Abdelgadir, Rita Santos, and Joseph Shikhman, on behalf of themselves and all others similarly situated ("Plaintiffs") seek compensation for the economic loss they suffered as a result of Defendants' participation in TelexFree's illegal pyramid scheme (the "TelexFree Program" or the "Pyramid Scheme").

## II.    JURISDICTION AND VENUE

24.    This Court has original subject-matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331.

25.    This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some of the Defendants, and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

26.    This Court also has jurisdiction over this action under Section 1121 of the Lanham Act [15 U.S.C. § 1121], and Section 1965 of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. § 1965].   Defendants have, directly or indirectly, made use of the

means of instrumentalities of interstate commerce and of the mails with the transactions, acts, practices, and courses of business alleged.

27.     Venue is proper under 28 U.S.C. § 1391 since (i) substantial part of the acts, omissions and transactions giving rise to this  action occurred in this district, and (ii) certain Defendants reside in this district.

28.     Venue is proper under Section 1965 of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. § 1965], as the Defendants reside, have agents, or otherwise transact business material to this Complaint in this district.

### III.     THE PARTIES

**A.     PLAINTIFFS**

29.     Plaintiff Esam Abdelgadir ("Abdelgadir") is an individual who resides in Massachusetts.  Abdelgadir, like many other victims of TelexFree's Pyramid Scheme, tendered an amount exceeding $300,000 for memberships in TelexFree (a "TelexFree Membership") and its promised pre-March 9, 2014 return on investment (the "Original Return on Investment").

30.     Plaintiff Rita D. Dos Santos ("Dos Santos") is an individual who resides in Massachusetts.  Dos Santos, like many other victims of TelexFree's Pyramid Scheme, tendered funds for a TelexFree Membership and its promised Original Return on Investment.

31.     Plaintiff Joseph Shikhman ("Shikhman") is an individual who resides in New York.  Shikhman, like many other victims of TelexFree's Pyramid Scheme, tendered funds for a TelexFree Membership and its promised Original Return on Investment.

B.      **THIRD-PARTY TELEXFREE BANKRUPT ENTITIES**

32.     TelexFree, Inc., TelexFree, LLC and TelexFree Financial, Inc. are not currently Defendants due to their Chapter 11 bankruptcy protections, but they are third-party participants in the unlawful activities described in this Complaint.

33.     TelexFree, Inc is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, registered with the Corporations Division of the Secretary to the Commonwealth of Massachusetts (Identification Number 000832397), having a last known principal place of business at 225 Cedar Hill Street, Suite 200, in Marlborough, County of Middlesex, Commonwealth of Massachusetts 01752 (the "TelexFree Marlborough Office"). [1]

34.     TelexFree, LLC is a limited liability company duly organized and existing under the laws of Nevada, having a purported place of business at 4705 S. Durango Drive, #100-J51 (a post office box), Las Vegas, Nevada 89147 (the "Nevada Post Office Box"). [2]  TelexFree, LLC also maintained offices in the Commonwealth of Massachusetts at the TelexFree Marlborough Office between 2012 and late April 2014.  At all material times, TelexFree LLC was identified as a limited liability company as registered with the Corporations Division of the Secretary to the Commonwealth of Massachusetts (Identification Number 001105166).   TelexFree, LLC registered with the Secretary of State for the Commonwealth of Massachusetts on April 18, 2013.

---

[1] *See* Office of the Secretary of the Commonwealth of Mass., Corporations Div., Corporate Summary for TelexFree, Inc., attached hereto as Exhibit 1.

[2] *See* Office of the Secretary of the Commonwealth of Mass., Corporations Div., Corporate Summary for TelexFree, LLC, attached hereto as Exhibit 2.

35.     Defendant Paralegal Doe served as TelexFree, LLC's Nevada agent, servant or employee at all times relevant to this complaint.  Her true identity and whereabouts remain unknown.

36.     The last unnamed TelexFree entity is TelexFree Financial, Inc. ("TelexFree Financial").  TelexFree Financial, Inc. is a corporation duly organized and existing under the laws of the State of Florida, having its last known principal place of business at 2321 NW 37th Avenue, in Coconut Creek, Florida 33063.  TelexFree Financial is a wholly-owned subsidiary of TelexFree, LLC.[3]

## C.     DEFENDANTS

### i.     Electric and Mobile

37.     Defendant TelexElectric, LLLP ("Electric") is a limited liability limited partnership duly organized and existing under the laws of the State of Nevada, and having its registered agent as BWFC Processing Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.[4]

38.     Defendant Telex Mobile, Holdings, Inc. ("Mobile") is a corporation duly organized and existing under the laws of the State of Nevada, and having its registered agent as BWFC Processing Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.[5]

39.     These Defendants maintained only the Post Office Box, which was in an unnamed combination mini-mart and smoke shop in a strip mall in Las Vegas, Nevada.  They maintained

---

[3] *See* Florida Department of State,, Div, of Corporations, Corporate Summary for TelexFree Financial, Inc., attached hereto as Exhibit 3.

[4] *See* Nevada Corporate Summary for TelexElectric, LLLP, attached hereto as Exhibit 4.

[5] *See* Nevada Corporate Summary for Telex Mobile Holdings, Inc., attached hereto as Exhibit 5.

no sales force or sales support in Nevada relevant to the Complaint other than Paralegal Doe who is only known at this time to have retrieved mail from the mailbox.

### ii.     Founders, Officers, Directors, Owners and Businesses Associated With Such Individuals

40.     Merrill is an individual with a last known usual place of abode of 1 Coburn Drive in Ashland, County of Middlesex, Commonwealth of Massachusetts  01721.   At all material times, Merrill was President, Secretary and Director of Defendant Mobile and a General Partner of Defendant Electric.   At all material times, Merrill was a Founder, President, Secretary, and Director of third-party TelexFree, Inc.  At all times material, Merrill was a Founder and Manager of third-party TelexFree, LLC, and was listed with the Massachusetts Secretary of State Corporations Division as an authorized person to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property.   Merrill was also a Founder, President, Secretary, and Director of third-party TelexFree Financial.

41.     Wanzeler is an individual with a last known usual place of abode of 373 Howard Street, in Northborough, County of Worcester, Commonwealth of Massachusetts 01532.  At all material times, Wanzeler was a Founder and General Partner of Defendant Electric and Founder, Treasurer and Director of Defendant Mobile.  At all material times, Wanzeler was also Founder, Treasurer and Director of third-party TelexFree, Inc. and Founder and Manager of third-party TelexFree, LLC.   Wanzeler was a Founder, Vice-President, Treasurer, and Director of third-party TelexFree Financial and was listed with the Massachusetts Secretary of State Corporations Division as an authorized person to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property.

42.     Labriola is an individual with a last known usual place of abode of 21 Kiwanis Beach Road, in Upton, County of Worcester, Commonwealth of Massachusetts 01568.  Labriola

is identified as a Director of Common Cents Communications, Inc., the predecessor of TelexFree, Inc., in its filed Articles of Incorporations with the Massachusetts Secretary of State Office.  Labriola also functions as the International Sales Director of TelexFree.

43.     Joseph H. Craft, also known as Joe H. Craft ("Craft") is an individual with a last known usual place of abode at 825 E. Main Street in Boonville, Indiana 47601-1885.  Craft is a certified public accountant and maintains offices in Boonville, Indiana, 47601-1885, at 825 E. Main Street and in Kentucky under the name Joe H. Craft, CPA/PFS, CFP.  At all material times, Craft served as the Chief Financial Officer of third parties TelexFree, Inc. and TelexFree, LLC and prepared and approved their financial statements.  According to TelexFree's former Chief Restructuring Officer, William H. Runge, by April 2012, Craft was retained to serve as TelexFree's accountant and prepared its financial statements and taxes.[6]  Further, Craft was hired to serve as TelexFree, LLC's Chief Financial Officer on or before December, 2013.[7]

44.     Craft is the sole member, manager and registered agent of Defendant Craft Financial Solutions, LLC ("Craft Financial"), a limited liability company duly organized and existing under the laws of Indiana, having a principal place of business at 825 E. Main Street in Boonville, Indiana 47601-1885, engaged in the business of providing accounting services and financial advice.

45.     Costa is an individual with an unknown last known usual place of abode.  Costa is a Founder of, and was listed as Manager of TelexFree, LLC with the Massachusetts Secretary of State Corporations Division.

-----

[6] *See* Omnibus Declaration of William H. Runge, Case 14-1552-abl, Doc. 13, ¶ 31, attached hereto as Exhibit 6.

[7] *Id.*

46.     Katia Wanzeler is an individual with a last known usual place of abode of 373 Howard Street, in Northborough, County of Worcester, Commonwealth of Massachusetts 01532.

47.     Sanderley Rodrigues de Vasconcelos ("Rodrigues") is an individual with a last known usual place of abode of 100 Stockton Street, Apt. 49, in Chelsea, County of Suffolk, Commonwealth of Massachusetts 02150.  At no time has Rodrigues been registered with the Commonwealth of Massachusetts as a broker or dealer of securities.  Rodrigues had been charged by the United States Securities and Exchange Commission (the "SEC") with operating a fraudulent pyramid scheme under the name of Universo FoneClub Corporation, another Massachusetts corporation formed by Rodrigues, in which he acted as Officer and Director. Rodrigues settled these charges in 2007 and as condition of this settlement he was permanently enjoined from violating Section 10(b) of the Exchange Act and Rule 10b-5, and Sections 5(a), 5(c) and 17(a) of the Securities Act.  He was further disgorged of about $1.8 million in ill-gotten gains.

48.     Rodrigues is the sole Officer, Director, and Registered Agent of Defendant WWW Global Business, Inc. ("WWW Global Business"), a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having a principal place of business at 189 Squire Road, Suite 40, in Revere, County of Suffolk, Commonwealth of Massachusetts.  WWW Global Business was organized by Rodrigues on or about February 7, 2013, to market and sell TelexFree Memberships.

49.     Santiago de la Rosa ("De La Rosa") is an individual with a last known usual place of abode of 189 Beacon Hill Avenue, Unit 2, in Lynn, County of Essex, Commonwealth of Massachusetts  01902.  De La Rosa appears in internet videos promoting the TelexFree Program

and is one of its most successful Promoters, having recruited numerous other Promoters within the Dominican Community in Massachusetts and elsewhere.

50.     Randy N. Crosby ("Crosby") is an individual with a last known usual place of abode of 30 Club Court, in Alpharetta, Georgia  30005.  Crosby appears in internet videos promoting the TelexFree Program and is one of its most successful Promoters, having recruited numerous other Promoters – especially through a website known as "everybodygetspaidweekly.biz", in Massachusetts and elsewhere.

51.     Faith R. Sloan ("Sloan") is an individual with a last known usual place of abode of 515 E. End Avenue, Unit 105, in Calumet City, Illinois 60409.  Sloan appears in internet videos promoting the TelexFree Program, and is one of its most successful Promoters, having recruited numerous Promoters – especially through a website known as "telexfreepower.com", in Massachusetts and elsewhere.

52.     Daniil Shoyfer ("Shoyfer") is an individual with a last known usual place of abode of 123 Arbutus Avenue, in Staten Island, New York 10312.  Shoyfer was one of the TelexFree Program's most successful Promoters, managing a large network of TelexFree members based primarily in New York City, but with connections in other states as well, including Massachusetts.  Shoyfer is known to have recruited numerous Promoters through public meetings that he arranged and held in New York City.

**iii.     Principals, Aiders and Abettors: Attorneys and Other Professional Services Providers**

53.     Gerald P. Nehra ("Nehra") is an individual now or formerly of Muskegon, Michigan.  Nehra maintains a second place of abode at 2149 Tall Oak Court, Sarasota, Florida 34232.  Nehra is an attorney duly licensed to practice law in the State of Michigan with offices at 1710 Beach Street in Muskegon, Michigan 49441.

54.     Nehra is the sole member, manager, and registered agent for Defendant Gerald P. Nehra, Attorney at Law, PLLC ("Nehra Law Firm"), a professional limited liability company engaged in the practice of law and duly organized and existing under the laws of Michigan, having a principal place of business at 1710 Beach Street in Muskegon, Michigan 49441.

55.     Richard W. Waak ("Waak") is an individual now or formerly of Muskegon, Michigan.  Waak is an attorney duly licensed to practice law in the State of Michigan with offices at 11300 East Shore Drive, Delton, Michigan 49046.

56.     Waak is the sole member, manager and registered agent for Defendant Richard W. Waak, Attorney at Law, PLLC ("Waak Law Firm"), a professional limited liability company engaged in the practice of law and duly organized and existing under the laws of Michigan, having a principal place of business at 11300 East Shore Drive, Delton, Michigan 49046.

57.     Defendant Nehra is engaged in the practice of law with Co-Defendant Waak under the name Law Offices of Nehra and Waak.

58.     Defendant Law Offices of Nehra and Waak has primary offices at 11300 East Shore Drive, Delton, Michigan 49046, and secondary offices at 1710 Beach Street, in Muskegon, Michigan 49441.  Defendant Waak is the "Principal Attorney"[8] of the Law Offices of Nehra and Waak.  The Law Offices of Nehra and Walk is a general partnership between Defendants Nehra, Waak, Nehra Law Firm, and Waak Law Firm (collectively "Nehra and Waak Law Firm").

59.     PricewaterhouseCoopers, LLP ("PricewaterhouseCoopers") is a Registered foreign limited liability partnership, organized and existing under the laws of the State of Delaware, having a principal place of business in New York, New York, and having a place of business at 125 High Street, in Boston, County of Suffolk, Commonwealth of Massachusetts

---

[8] *See* Law Offices of Nehra and Waak website:  http://www.mlmatty.com/2014/02/firm-transition-news-gerry-has-not-retired/.

02110.   At times material herein, PricewaterhouseCoopers provided accounting services and other professional services to TelexFree.

### iv.  Principals, Aiders and Abettors: Banks and Other Financial Service Providers

60.    TD Bank, N.A. ("TD Bank") is a national banking institution in the United States chartered and supervised by the federal Office of the Comptroller of the Currency with its principal place of business at 15 Broad Street in Boston, County of Suffolk, Commonwealth of Massachusetts 02109.   At all times material herein, Defendant TD Bank provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

61.    Bank of America Corporation ("Bank of America") is a publicly traded corporation duly organized and existing under the laws of the State of Delaware.   Bank of America is a national banking institution in the United States chartered and supervised by the federal Office of the Comptroller of the Currency, with offices at 175 Federal Street, in Boston, County of Suffolk, Commonwealth of Massachusetts 02110.   At all times material herein, the Defendant Bank of America provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

62.    Bank of America, N.A. is a national banking institution in the United States chartered and supervised by the federal Office of the Comptroller of the Currency, with a principal place of business in Charlotte, North Carolina.  Bank of America, N.A. is a subsidiary of Bank of America, and conducts business in the Commonwealth of Massachusetts at, *inter alia*, 100 Federal Street, in Boston, County of Suffolk, Commonwealth of Massachusetts 02110. At all times material herein, the Defendant Bank of America, N.A. provided banking services,

15

maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

63.     Fidelity Co-operative Bank, doing business as Fidelity Bank, ("Fidelity Bank") is a Massachusetts Chartered Banking Institution, having its principal offices at 675 Main Street, in Fitchburg, County of Worcester, Commonwealth of Massachusetts 01420.  At all times material herein, Defendant Fidelity Bank provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

64.     Middlesex Savings Bank ("Middlesex Savings") is a Massachusetts Chartered Banking Institution, having its principal offices at 6 Main Street, in Natick, County of Middlesex, Commonwealth of Massachusetts 01760.  At all times material herein, Defendant Middlesex Savings provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

65.     Wells Fargo & Company ("Wells Fargo") is a publicly traded corporation duly organized and existing under the laws of the State of Delaware, having its principal office in San Francisco, California; and conducting business within the Commonwealth of Massachusetts.  At all times material herein, Wells Fargo provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

66.     Wells Fargo Bank, N.A. ("Wells Fargo Bank") is a national banking institution in the United States chartered and is supervised by the federal Office of the Comptroller of the Currency, with a principal place of business in Sioux Falls, South Dakota.  Wells Fargo Bank is a subsidiary of Wells Fargo, and conducts business in the Commonwealth of Massachusetts at, *inter alia*, 201 Washington Street, in Boston, County of Suffolk, Commonwealth of Massachusetts.  At all times material herein, Defendant Wells Fargo Bank provided banking

16

services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

67.     Synovus Financial Corporation  ("Synovus ) is a publicly traded corporation duly organized and existing under the laws of the State of Georgia.  Synovus is a financial services and bank holding company operating in the United States, chartered by the State of Georgia, with offices at 1111 Bay Avenue, Suite 500, Columbus, Georgia 31901.  At all times material herein, the Defendant Synovus, provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

68.     Synovus Bank, ("Synovus Bank") is a Georgia Chartered Banking Institution, having its principal offices at 1148 Broadway, in Columbus, County of Muscogee, Georgia 31901.  At all times material herein, Defendant, Synovus Bank, provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

69.     FMR, LLC, also known as Fidelity Investments ("Fidelity Investments") is a Foreign Limited Liability Company, organized and existing under the laws of the State of Delaware, having its principal offices at 245 Summer Street, Suite F7B, in Boston, County of Suffolk, Commonwealth of Massachusetts 02110.  At all times material herein, Defendant Fidelity Investments provided investment and asset management services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree.

70.     Global Payroll Gateway, Inc. ("GPG") is a corporation duly organized and existing under the laws of the State of California, having its principal offices at 18662 MacArthur Boulevard, Suite 200, in Irvine, California 92612.  Defendant GPG provides payment

processing services for companies and acted as a conduit for payment between TelexFree and its Promoters, including those in Massachusetts.

71.     International Payout Systems, Inc. ("IPS") also doing business as i-Payout, is a corporation duly organized and existing under the laws of the State of Florida, having its principal offices at 2500 East Hallandale Beach Boulevard, Suite 800, Hallandale Beach, Florida 33009.   Defendant IPS provides payment processing services for companies and acted as a conduit for payment between TelexFree and its Promoters, including those in Massachusetts.

72.     Propay, Inc. ("ProPay") is a corporation duly organized and existing under the laws of the State of Utah with its principal offices at 3400 North Ashton Boulevard, Lehi, Utah 84043 and also does business as PROPAY.COM.   Defendant ProPay provides payment-processing services for companies and acted as a conduit for payment between TelexFree and its Promoters, including those in Massachusetts.

73.     Base Commerce, LLC ("Base Commerce") formally known as Phoenix Payment, LLC, is a limited liability company duly organized and existing under the laws of the State of Arizona with its principal offices at 7910 S. Kyrene Road, Suite 106, Tempe, Arizona 85284, and it also does business as Phoenix Payments.   Defendant Base Commerce provides payment-processing services for companies and acted as a conduit for payment between TelexFree and its Promoters, including those in Massachusetts.

74.     Vantage Payments, LLC ("Vantage Payments") is a limited liability company duly organized and existing under the laws of the State of Arizona, having its principal offices at 8300 N. Hayden Road #A207, Scottsdale, Arizona 85251.   Defendant Vantage Payments provides payment-processing-related services for companies, and performed services for TelexFree including acting as a TelexFree's broker in obtaining processing services, negotiating

with banks and/or payment processors on TelexFree's behalf, registering a "shell" company for TelexFree in the United Kingdom, and providing Cardholder Dispute Resolution Network ("CDRN") Portal access services.

75.    Allied Wallet, Ltd. ("Allied Wallet") is a limited company having its central office in the United Kingdom, and having its United States office at 900 Sunset Boulevard, Suite 820, West Hollywood, California 90069.   Defendant, Allied Wallet, provides payment processing services for companies and acted as a conduit for payment between TelexFree and its Promoters, including Promoters in Massachusetts.

76.    It is believed that additional payment processing services participated and aided and abetted in TelexFree's Pyramid Scheme but their identities are as yet unknown.  For ease of reference, they can only be referred to herein at this time as Defendant Payment Processing Services Doe.

77.    The Putative Class Representatives seek to obtain damages, restitution and injunctive relief for the Class, as defined below, from Defendants.

## IV.    FACTS AND ALLEGATIONS

### A.    The History of TelexFree's Formation and its Brazilian Connections

78.    In or about 2007, Wanzeler began operating purported telecommunications businesses in the United States and Brazil, under the names "Brazilian Help" and "Disk A Vontade Telefonia," respectively, charging $49.90 monthly for VoIP service.

79.    Disk A Vontade Telefonia, Ltd., also known as Diskavontade, also known as Disk ("Disk A Vontade"), is a Brazilian limited liability company, now or formerly having its principal offices as Rua Jose Luiz Gabeira, NRO 170, APTO 103 Barro Vermelho,.

80.    Defendant Wanzeler is the Chief Executive Officer of Disk A Vontade.

81.    Defendant Merrill is Vice President and a signatory of Disk A Vontade.

82.     Disk A Vontade's domain ("discavontade.com") is registered to Defendant Wanzeler.

83.     Brazilian Help, Inc. ("Brazilian Help") is a domestic profit corporation, organized and existing under the laws of the Commonwealth of Massachusetts, now or formerly having a principal place of business at 225 Cedar Hill Street, Suite 118, in Marlborough, Massachusetts 01752.

84.     Brazilian Help's Massachusetts office is in the same building in Marlborough, Massachusetts as the Bankrupt TelexFree Companies.

85.     Defendant Wanzeler is the President, Secretary, Treasurer, and registered agent of Brazilian Help.

86.     Brazilian Help and Disk A Vontade were the American and Brazilian branches, respectively, of the same enterprise.

87.     Costa, a longtime friend of Wanzeler, was employed by Disk A Vontade and was Wanzeler's top sales agent in Brazil.

**B.     The Formation of The Bankrupt TelexFree Companies**

88.     In early 2012, Costa suggested to Wanzeler that they solicit customers through online advertisements.

**i.     TelexFree, Inc.**

89.     Common Cents Communications, Inc., the predecessor to TelexFree, Inc.,  was formed by Merrill, Wanzaler and Labriola in December 2002.

90.     Acting on Costa's proposal, Wanzeler and Merrill changed the name of Common Cents Communications, Inc. to TelexFree, Inc. on February 15, 2012, and Wanzeler and Costa together created a website, "telexfree.com."

91.     Disk A Vontade was the registered owner of the telexfree.com domain name.

92.     At least between February 15, 2012 and approximately April 15, 2014, TelexFree, Inc. maintained a principal office at TelexFree's Marlborough Office.

93.     Co-Defendants Merrill and Wanzeler are officers and directors of TelexFree, Inc.,[9] a domestic profit corporation.

94.     At least between February 15, 2012 and approximately April 15, 2014, Defendant Merrill was TelexFree, Inc.'s registered agent, who listed an address at TelexFree's Marlborough Office.

95.     And more particularly, since February 15, 2012, Co-Defendants Merrill, Wanzeler, Labriola, Craft and Costa conducted the business of TelexFree, Inc. in TelexFree's Marlborough Office.

**ii.      TelexFree, LLC**

96.     In July 2012, Wanzeler, Merrill and Costa together formed TelexFree, LLC purportedly to conduct their TelexFree-related transactions occurring outside of Massachusetts.

97.     Telex Free, LLC was organized under the laws of the State of Nevada on July 19, 2012.

98.     There is no distinction between the business operations of TelexFree, LLC and TelexFree, Inc.

---

[9] Paragraph 2.1.2 of the standard TelexFree contract states "TELEXFREE INC, from its headquarters in, Marlboro [sic], Massachusetts (U.S.), on the basis of an operating contract between the latter and the CONTRACTOR (YMPACTUS), has as its primary activity VOIP telephony, using its equipment installed at its headquarters in Massachusetts, where it makes the necessary connections for these calls; it also provides virtual media, through the website www.telexfree.com to associates and to the PROMOTERS that YMPACTUS/TELEXFREE coordinates and controls, including the respective publicity channels."

99.     At all material times, TelexFree LLC was identified as a limited liability company as registered with the Corporations Division of the Secretary to the Commonwealth of Massachusetts (Identification Number 001105166).

100.    TelexFree, LLC registered with the Secretary of State for the Commonwealth of Massachusetts on April 18, 2013.

101.    TelexFree, LLC maintained an address at the Nevada Post Office Box.

102.    At least between February 15, 2012 and approximately April 15, 2014, TelexFree, LLC operated a Massachusetts office at TelexFree's Marlborough Office.

103.    At all material times, Co-Defendants Costa, Merrill and Wanzeler were the Managers of TelexFree, LLC.

104.    At least between February 15, 2012 and approximately April 15, 2014, Merrill was TelexFree, LLC's registered agent for the Commonwealth of Massachusetts whose address is identified as TelexFree's Marlborough Office.

105.    At least between February 15, 2012 and approximately April 15, 2014, Co-Defendants Merrill, Wanzeler, Labriola, Craft and Costa conducted the business of TelexFree, LLC in TelexFree's Massachusetts Office.

106.    Since mid-November 2013, TelexFree, Inc. and TelexFree, LLC have transferred approximately $30 million from their operating accounts to accounts owned and controlled by TelexFree, its affiliated companies or the individual Defendants.

107.    Class Members pumped hundreds of millions of additional dollars into those coffers.  The Class Members' funds remain unaccounted for to date.

**iii.     TelexFree Financial, Inc.**

108.    Defendant Craft incorporated TelexFree Financial on December 26, 2013.

109.    TelexFree Financial was fraudulently set up to shelter funds rightfully belonging to Plaintiffs and the putative class.

110.    At all material times, Co-Defendants Merrill and Wanzeler were officers and directors of TelexFree Financial, and Co-Defendant Wanzeler is its registered agent.

111.    On December 30 and December 31, 2013, TelexFree Financial received wire transfers totaling $4,105,000 from TelexFree, Inc. and TelexFree, LLC.

112.    On April 14, 2014, Defendants TelexFree, Inc., TelexFree, LLC and TelexFree Financial abruptly sought bankruptcy protection in Nevada under United States Bankruptcy Code, Chapter 11, admitting that they could not meet their obligations from VoIP revenues and seeking  authority to reject all their current obligations to Promoters.

## C.    Relationship of the Bankrupt TelexFree Companies

113.    Since at least February 15, 2012, there has been a high degree of operational interdependence among TelexFree, LLC, TelexFree, Inc., TelexFree Financial, and the operations of these entities are indistinguishable.

114.    TelexFree, LLC, TelexFree, Inc. and TelexFree Financial shared common management and ownership.

115.    More particularly, and at least since February 15, 2012, Defendants Merrill, Wanzeler, Labriola, Craft and Costa have together owned, managed and/or operated TelexFree, LLC, TelexFree, Inc., and TelexFree Financial with no distinction among these entities.

116.    At least between February 15, 2012 and approximately April 15, 2014, funds were freely transferred between and among TelexFree, LLC, TelexFree, Inc., and TelexFree Financial with no distinction among these entities.

117.    TelexFree, LLC, TelexFree, Inc., and TelexFree Financial have also shared common financial, strategic, legal, and human resources.

118.    More particularly, upon information and belief, and at least between February 15, 2012 and approximately April 15, 2014, TelexFree, LLC, TelexFree, Inc., and TelexFree Financial:

a.   conducted business from the same business addresses;

b.   retained the same employees;

c.   conducted business using the same telephone lines;

d.   utilized the same copy machines in business;

e.   utilized the same banks and bank accounts in business;

f.   utilized the same payment processing services companies in business;

g.   sought and received professional services from the same accountants;

h.   sought and received professional services from the same attorneys;

i.   used the same postage; and

j.   shared all expenses.

119.    TelexFree, LLC, TelexFree, Inc., and TelexFree Financial are alter ego entities that combine to form a single enterprise.

**D.    Defendants Electric and Mobile**

120.    Mobile is a Nevada corporation formed on November 26, 2013.

121.    According to its filings with the State of Nevada Secretary of State Office, Mobile identifies its officers and directors as follows:

a.   Defendant Merrill is President, Secretary and Director, having an address at the Post Office Box; and

b.   Defendant Wanzeler is Treasurer and Director, having an address at the Nevada Post Office Box.

24

122.   TelexFree, Inc. and TelexFree, LLC made a $500,870 "loan" to Mobile during the class period, as indicated by financial statements prepared by Craft.[10]

123.   Wanzeler and Merrill formed Electric in December 2013 as a Nevada limited liability partnership.

124.   According to its filings with the State of Nevada Secretary of State Office, Co-Defendants Merrill and Wanzeler are its General Partners.

125.   Defendants Merrill and Wanzeler further list their addresses as the Nevada Post Office Box.

126.   Electric also lists as its address as the Nevada Post Office Box.

127.   TelexFree, Inc. and TelexFree, LLC made a $2,022,329 "loan" to Electric during the class period, as indicated by financial statements prepared by Craft.[11]

128.   Electric and Mobile possess funds rightfully belonging to the putative class.

**E.    TelexFree's Brazilian-Based Operations:  Ympactus**

129.   Ympactus is a Brazilian limited liability company, which serves as TelexFree's Brazilian branch.

130.   Ympactus has been jointly controlled by Wanzeler, Costa, and Merrill.

131.   According to the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth (the "SOC"), there is no distinction between U.S. TelexFree operations and Brazilian operations.  As described by TelexFree management, the ownership interests in TelexFree, Inc. (Massachusetts-based), TelexFree LLC (Nevada-based) and Ympactus (Brazilian-based) overlap.

---

[10] *Id.*

[11] *See* TelexFree, LLC Balance Sheet as of December 31, 2013, attached herewith as Exhibit 13

132.   All these TelexFree entities use the same website and back office support, merely providing identical information in multiple languages.

133.   In January, 2013, Ympactus came under legal scrutiny in Brazil by the Brazilian Bureau of Consumer Protection (known as Procon).   Suspicious of the company's rapid recruitment of new investors and lack of substantial sales, Brazilian authorities opened an investigation against Ympactus.

134.   In late 2013, Costa withdrew his ownership in Ympactus for what Merrill characterized as "legal reasons."[12]

135.   Both Merrill and Wanzeler provided testimony to the SEC stating that they transferred at least $3 million to Costa long after Brazilian authorities shut down Ympactus operations.[13]

F.     **TelexFree's Unlawful, Unfair and Deceptive Pyramid Scheme**

136.   TelexFree and its officers, directors and partners as well as several of its high-profile Promoters are currently under state and federal investigation and the subjects of suits by the SEC and the SOC for operating a pyramid scheme as detailed herein.

137.   Formed by Defendants Merrill, Wanzeler and Labriola in July 2012 at the suggestion of Defendant Costa, TelexFree presented itself as a marketer of telecommunications and advertising primarily, though not exclusively, targeting the hard-working Brazilian-American and Dominican-American communities beginning in or about November 2012.

138.   Using technology borrowed from Disk A Vontade, TelexFree rebranded Disc A Vontade's VoIP program, offering it for a flat monthly fee of $49.90.

---

[12] *See* Administrative Complaint of instituted by the Commonwealth of Massachusetts, Office of the Secretary of the Commonwealth Securities Division, Docket No. 2014-0004, page 7.

[13] *Id.*

139.   TelexFree used that program, "99TelexFree" VoIP service, as its purported business even though Defendant Merrill testified to having limited knowledge of VoIP services and never working in the telecom business.

140.   Unlike Disk A Vontade[14] operations, however, TelexFree coupled the VoIP Program with a wildly lucrative and fraudulent scheme (the "Passive Income Scheme").

141.   The VoIP Program acted as a façade for TelexFree's actual business:  recruiting new Promoters and paying them to place advertisements on the Internet and recruit new Promoters, acts which themselves generated no revenue.

142.   In a March 1, 2013 press release, Merrill admitted that "We [TelexFree] pay our representatives weekly if they follow our system and advertise our service on the Internet."  This obviously required no sales of the VoIP product.

143.   Unrealistically consistent returns are a typical trait of pyramid schemes.

144.   The TelexFree website presented marketing materials that contained only one slide mentioning the VoIP service; the remainder of the materials centered on the payment for posting of ads, such as "Work over the Internet Posting ads daily," and the commission structure.

145.   The website emphasized the simplicity of its advertising system, stating "TelexFree turnkey marketing system makes internet advertising simply & duplicatelable [sic]."

146.   It also stated "[w]e have it all computerized [sic], with only 3 steps, in your virtual office."

147.   As with all Ponzi or pyramid schemes, TelexFree's operations were untenable without a continuous influx of new capital.

---

[14] Wanzeler, Merrill and Costa's Disk A Vontade's phone service was unprofitable.

148.    That new capital was financed through TelexFree's scheme of recruiting additional participants to place online advertisements – not through actual sales of VoIP Programs.

149.    The core of the Passive Income Scheme was that individuals had to pay either $289 or $1,375 to become a Promoter."

150.    The first option, known as the "AdCentral" program, cost $289 plus a fifty dollar membership for a one-year contract.

151.    Promoters under this program received ten one-month packages of the VoIP service and had to place one internet advertisement a day.

152.    For every week that they placed these advertisements, they received one additional VoIP package and were promised a weekly payment of $20 ($1040 for the entire year), a 207% return on the original amount paid.[15]

153.    The second option, known as the "AdCentral Family" program, cost $1375 plus the $50 membership fee for a one-year contract.[16]

154.    Promoters in this program received fifty one-month VoIP packages and had to post five advertisements on the internet daily.[17]

155.    Those who posted the required advertisements received five additional VoIP packages and a promised weekly payment of $100 ($5,200 over the year), an annual return of 265%.[18]

156.    The TelexFree advertisement kit enabled participants to be paid for posting pre-written advertisements, to pre-determined websites, through an automated TelexFree system.

---

[15] *See* TelexFree Promotional Advertisements, attached herewith as Exhibit 7.

[16] *Id.*

[17] *Id.*

[18] *Id.*

157.    A participant's daily posting of advertisements generated payments regardless of whether or not Promotors sold any VoIP Programs.  TelexFree's promotional material clearly states "(y)ou just place your Ad and get paid weekly regardless of if anyone buys what you are selling or regardless of if you ever recruit a single person into this opportunity or not…Sounds good doesn't it?"[19]

158.    Posting advertisements was an effortless process that took only a few minutes per advertisement.  As TelexFree touted, "We will take care of your add posting and teach you the trick to submit your five ad (sic) in one click."[20]

159.    In fact, the posting of advertisements was virtually meaningless.

160.    Promoters were merely posting a massive volume of nearly identical ads in an already saturated market.

161.    For example, in early April 2014, Adpost.com had in excess of 33,000 TelexFree ads, and ClassifiedsGiant.com had in excess of 25,000 ads posted since February 1, 2014.

162.    The participant could sell the additional VoIP Programs obtained back to TelexFree for $20.

163.    The Passive Income Scheme generated even further returns for participants through various bonus structures and recruitment commissions.

164.    TelexFree and the Defendant Founders unfairly and deceptively tailored each of the additional income streams to incentivize recruitment.

165.    TelexFree and the Defendant Founders provided marketing materials on its website that current Promoters could download and use to recruit new members.[21]

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

166.    To incentivize recruitment, Promoters were promised a one-time bonus of $20 for each recruited "AdCentral" member and $100 for each recruited "AdCentral Family" member.

167.    Promoters who recruited two additional Promoters were promised a bonus of $20 for each direct and indirect participant in their "network," up to a maximum of $440.

168.    This payment model is consistent with a pyramid scheme,

169.    Under a "Team Builder Plan," AdCentral Family Promoters who recruited ten other AdCentral Family members, each of whom sold five VoIP packages (to themselves or others), were promised 2% of TelexFree's net billing in the following month, up to $39,600.

170.    Further, Promoters were promised commissions based on sales of the VoIP service – 90% for the initial VoIP package sold to a customer he/she recruited, 10% monthly for direct participants who renewed the service, and 2% monthly for each indirect participant who renewed their service down to the sixth level of the Promoter's network.

171.    Promoters were also promised 2% of *all* VoIP package sales by direct or indirect participants in their network down to the sixth level of their network.

172.    Hidden among TelexFree's bonus structure and recruitment commissions is the fact that TelexFree participants could self-qualify for sales and commissions.

173.    As represented in the TelexFree website and promotional materials mailed out and handed to participants at TelexFree's "Extravaganzas" by Defendant Founders and the Inside Promoters, a Promoter was allowed to invest in more than one advertisement kit and purchase the VoIP Program to earn bonuses. A Promoter was allowed to purchase a VoIP Program, never use the program, and still qualify for additional income. Therefore, without ever selling any VoIP Programs, the Promoter could receive a return far over the 200-250% guaranteed return.[22]

---

[22] *Id.*

174.   TelexFree's revenue from sales of VoIP Programs alone was entirely inadequate to satisfy the payments promised to Promoters.

175.   During the course of TelexFree's scheme, revenue from sales of VoIP Programs constituted only a tiny fraction of TelexFree's revenue and funds promised to Promoters.

176.   According to an investigation conducted by the SEC, between August 2012 and March 2014, TelexFree received slightly more than $1.3 million from the sale of approximately 26,300 VoIP Programs, while receiving more than $302 million in investments by Promoters.

177.   TelexFree received less than one-half of one percent of total revenue during this period derived from sales of TelexFree's purported product.

178.   During this period, TelexFree, the Defendant Founders and Inside Promoters promised to pay Promoters over $1.1 billion – nearly a thousand times the revenue derived from sales of the VoIP Programs – an amount TelexFree has not produced in revenue.

179.   According to an investigation by the SOC, in 2012 and 2013 TelexFree identified 4,845,576 VoIP Program transactions totaling $238,395,353.80.

180.   Net revenue received by TelexFree from VoIP Program sales was inhibited by substantial commission payments.

181.   In his statement to the Massachusetts SOC, TelexFree founder Wanzeler could not identify the number of individuals who purchased only a VoIP Program without also becoming a participant.

182.   Wanzeler provided wildly varied estimates when challenged to identify the number of VoIP Programs sold to non-participants.

183.   Over the same period, TelexFree received 783,771 package purchases of either $289 or $1,375 totaling $880,189,455.32.

184.   Assuming that each of the 783,771 Promoters invested only in one AdCentral package at $289 and only posted one advertisement per day, TelexFree would have owed Promoters $799,446,420.

185.   Alternatively, if each Promoter invested in the AdCentral Family package at $1,375 and only posted five advertisements per day, TelexFree would have owed $3,997,232,100 to its participants.

186.   According to data provided by TelexFree, the $1,375 AdCentral Family memberships accounted for 88% of the transactions by Massachusetts-based participants.

187.   Even assuming that only 50% of all participant memberships were at the AdCentral Family level, TelexFree would still have owed $2,398,897,200 – a number that far exceeds TelexFree's reported total revenues over the same period.

188.   This figure of almost $2.4 billion does not even include further bonuses, recruitment commissions, and revenue sharing.

189.   Including these additional payments would create an even greater disparity between the VoIP Program revenue and the guaranteed money paid out of the Passive Income Scheme to participants.

190.   TelexFree did not generate sufficient funds from sales of their phone service to make the payments they had contracted to pay.

191.   The funds TelexFree used to pay the amounts owed to Promoters came from the registration fees of subsequent TelexFree Promoters.

192.   Plaintiffs and all other members of the putative class are "Investors" under Massachusetts state securities law.

193.    Yet, upon the advice of their legal counsels, TelexFree referred to the members of the putative class as "*Associates,*" "*Members,*" and "*Promoters.*"

194.    TelexFree's Contract at Section 2.6.5(m) mandates that Promoters are not to use the term investment regarding the registration costs.

195.    Defendant and Company Counsel Attorney Nehra, through his affiliated companies (Nehra and Waak Law Firm), and under the direct supervision of Defendants Attorney Waak and Waak Law Firm provided the deceitful advice to include this Section to further perpetuate the unlawful, unfair, and deceptive Pyramid Scheme.

196.    Specifically, TelexFree's Contract at Section 2.6.5(m) provides that the Promoter must not "use terms that distort the real meaning of products or the mechanism and functioning of multilevel marketing, including, without limitation, expressions that convey the idea of instant wealth for nothing in exchange, as well as speaking of registration costs as a 'financial investment.' Similarly, it is expressly prohibited to use the term 'INVESTMENT' at meetings and in promotional materials in general, orally or in writing."

197.    Defendant and Company Counsel Attorney Nehra, through his affiliated companies (Nehra and Waak Law Firm) and under the direct supervision of Defendants Attorney Waak and Waak Law Firm provided the deceitful advice to include this Section to further perpetuate the unlawful, unfair, and deceptive Pyramid Scheme.

198.    Nevertheless, promotional materials posted online by TelexFree and the Defendant Founders specifically referred to income received by Promoters for placing ads as part of the AdCentral Packages as "*passive income.*"[23]

---

[23] *See* TelexFree Promotional Advertisements, attached herewith as Exhibit 7.

199.    These same promotional materials also falsely represented that TelexFree was a "*clean & scam free business.*"  (emphasis in original).

200.    To drum up interest in recruitment, TelexFree, the Defendant Founders and Inside Promoters also used videos on YouTube and other websites in which the Defendant Founders and Inside Promoters appeared and presented unfair, deceptive and false facts and advise to promote the TelexFree Programs and persuade others to join the Pyramid Scheme.

201.    TelexFree and the Defendant Founders and Inside Promoters   prominently highlighted one participant, Defendant Rodrigues, as the top Promoter in the world on the TelexFree website.

202.    Rodrigues, a self-proclaimed millionaire, had previously operated a similar multi-level marketing phone card fraud shuttered by the SEC in 2006.

203.    TelexFree and the Defendant Founders allowed Rodrigues to join and market the Program despite prior run-ins with the law.

204.    To further increase recruiting, TelexFree held extravaganzas complete with a rock concert atmosphere and wild cheering, including the "wave."

205.    Until recently, the TelexFree website and TelexFree presentations included pictures of cash and luxury property.

206.    In one such presentation, TelexFree and the Defendant Founders touted the Passive Income Scheme as "the opportunity of a lifetime."

207.    Through such fantasies, reserved only for those at the top of the Passive Income Scheme, TelexFree, the Defendant Founders and Inside Promoters induced payments drawn from participants' earnest earnings and savings.[24]

---

[24] *See* TelexFree, LLC Balance Sheet as of December 31, 2013, attached herewith as Exhibit 13

34

G.     **TelexFree's Fraudulent and Deceptive Use of Best Western Hotel**

208.     In addition to the Passive Income Scheme described above, TelexFree falsely and deceptively represented that it had a connection with Best Western Hotel in South America that it could offer to its Promoters.

209.     As falsely described by TelexFree's president Merrill, the Best Western Hotel opportunity was an important marketing tool to bolster TelexFree credibility worldwide.

210.     TelexFree's management facilitated the offer of the Best Western Hotel opportunity by including the "Hotel Best Western Opportunity" on the front page of the TelexFree website accessible in the Commonwealth.

211.     Through a prominently placed website banner and video on the TelexFree website, TelexFree and the Defendant Founders presented this Best Western Hotel opportunity as having a guaranteed yearly return of over 8%.

212.     Defendant Crosby also stated in an April, 2013 internet video that "[t]his company has a joint venture with Best Western."

213.     TelexFree did not have the above-described business relationship with Best Western.

214.     The closest discernible link between TelexFree and Best Western is Ympactus Commercial's promotional agreement with a Brazilian company partnering with Best Western on a new hotel.

215.     The Best Western Hotel opportunity video remained on the United States-based TelexFree website for months although the president of Best Western knew of the video and requested TelexFree's website staff to remove it.

H.     **Investigation of, and Injunctions against, Telexfree's Brazilian Operations in Brazil**

216.     In or about January 2013, the Brazilian Bureau of Consumer Protection (known as Procon), began to investigate TelexFree.

217.     In its January 11, 2013 press release, Procon indicated that it had "detected evidence of crimes":

> The investigation initiated by civil prosecution of Consumer Protection (no. 01/2013) shows several controversial issues and possible crimes that put consumers at risk in time to accept that kind of deal.
>
> Among the possibilities, there is a breach in the Federal Law No. 1.521/51, art. 2, according to which it is a crime:
>
>> "Obtaining or attempting to obtain illicit gains at the expense of the people or of undetermined number of people through speculation or processes fraudulent ('snowball', 'chains', 'pichardismo' and any other equivalent)" including Ponzi pyramid".
>>
>> There is also the possible violation of the Code of Consumer Protection (CDC), with false advertising, failure of product information and company, abuse of weakness or ignorance of consumers and conditions unreasonable disadvantage, among others.[25]

218.     Procon subsequently initiated an official complaint and notified the "State Prosecutors Office, the Minister of Finance and the Federal Police."[26]

219.     The Ministry of Finance, after its investigation, declared that:

> The TelexFree business of selling packages of internet telephony (VoIP, its acronym in English), is not sustainable and suggests a Ponzi scheme, which is a crime against the popular economy.
>
> That is the conclusion of the Secretariat for Economic Monitoring of the Ministry of Finance (Seae / MF) in a statement on Thursday (14).[27]

---

[25] "*TelexFree under criminal investigation in Brazil*", Behind MLM (Feb. 15, 2013), http://behindmlm.com/companies/telexfree-under-criminal-investigation-in-brazil/, attached herewith as Exhibit 8.

[26] "*Ministry of Finance: TelexFree 'not sustainable'*" Behind MLM (Mar. 17, 2013), http://behindmlm.com/companies/ministry-of-finance-telexfree-not-sustainable/, attached herewith as Exhibit 9.

[27] *Id.*

36

220.    On March 14, 2013, the Ministry of Finance, after its investigation, declared that:

> The Telexfree business of selling packages of internet telephony (VoIP, its acronym in English), is not sustainable and suggests a Ponzi scheme, which is a crime against the popular economy.
>
> That is the conclusion of the Secretariat for Economic Monitoring of the Ministry of Finance (Seae / MF) in a statement on Thursday (14).[28]

221.    As the matter processed through the Brazilian court system, the Ministry of Finance was ordered not to issue further statements about the matter.

222.    Seizing upon that fact, in a blatantly misleading and deceptive act, TelexFree and the Defendant Founders circulated through its affiliates the following misrepresentation of the order:

> It's official!  The investigation on TelexFree has been absolved of what Behind MLM has researched and posted.[29]

223.    On June 19, 2013, the Brazilian Court in Acre issued an injunction putting "a stop to TelexFree's business operations, including the registration of new affiliate investors, acceptance of new investments and paying any returns owed on existing affiliate investments."30

224.    In addition, following a court order in Brazil by Judge Borges for TelexFree to turn over "data relating to the registration and operation of the accounts of each of the affiliates, including twelve months of retroactive data," TelexFree claimed it had no access to registrations and transfer accounts of the company's Promoters.  This claim directly contradicts an internet

---

[28] *Id.*

[29] "*Brazilian Court suspends TelexFree operations,*" Behind MLM (June 20, 2013), http://behindmlm.com/companies/telexfree/brazilian-court-suspends-telexfree-operations/, attached herewith as Exhibit 10.

[30] *Id.*

video in which Costa is surrounded by stacks of books claiming he holds the requested affiliate data.[31]

I.      **TelexFree's Continued United States' Operations**

225.    After the Brazilian government's seizure of Ympactus in June 2013, TelexFree continued to operate its Pyramid Scheme in the United States.

226.    TelexFree received advice from its counsel, Jeffrey Babener of Babener & Associates, who markets himself as having extensive multi-level marketing ("MLM") experience, that its business plan was a pyramid scheme.

227.    In late summer or fall of 2013, TelexFree retained a consulting group, The Sheffield Group, which also markets itself as having extensive MLM experience, to review its business plan to comply with the relevant laws.  At this time the advice provided and whether it was followed is unknown.

228.    Despite this knowledge, TelexFree and its Defendant Founders continued its operations the same until March 2014.  Despite the availability of this knowledge and the findings of the Brazilian Court, the other Defendants continued to participate in, aid and abet, and otherwise advance the TelexFree Pyramid Scheme.

229.    Each Defendant knew or should have known that TelexFree was an illegal Pyramid Scheme, but continued to participate in or aid, abet and further such illegal activities. Each Defendant knew or should have known that TelexFree was shut down in Brazil, but continued to participate, aid, abet in further operations and activities.

230.    Despite the foregoing knowledge, TelexFree and Defendants continued to participate in the attraction and processing of new Promoters, continued to allow payments to

---

[31] *See "TelexFree claim no affiliate data, fined again,"* Behind MLM (Jan. 1, 2014) (explaining Judge Borges' request and TelexFree's contentious response).

process through TelexFree's accounts, allowed TelexFree to continue to further its illegal Pyramid Scheme, and otherwise continued to further TelexFree's illegal activities.

**J.     Collapse of TelexFree's United States' Operations**

231.    On or about February 5, 2014, the Commonwealth of Massachusetts, Securities Division in connection with an investigation of its operations served TelexFree with subpoenas.

232.    Over several years of operations, TelexFree employed multiple financial accounts, including domestic and international bank accounts and various online payment processors, to facilitate its fraudulent and deceptive scheme in the Commonwealth of Massachusetts.

233.    Almost all financial institutions eventually terminated their relationship with TelexFree as their operations became a risk that financial institutions were no longer willing to bear.

234.    Frantic emails between TelexFree management and financial institutions painted a bleak picture of continuing TelexFree's financial operations.

235.    As described by John Hughes, President of Base Commerce, "[n]o US Bank or Processor . . . will accept your [TelexFree] business given that you are on month five of the Visa Chargeback monitoring program.  You are one of only three merchants in the USA on month five so you are a real hot-potato as they say."[32]

---

[32] *Id.*

236.    On February 20, 2014, authorities in the United Kingdom issued a public warning alerting that TelexFree UK was a Ponzi scheme and that its Brazilian operation had been shut down.[33]

**K.    TelexFree's Belated Efforts to Legitimize Its Scheme**

237.    On March 9, 2014, TelexFree abruptly changed its compensation plan, requiring Promoters to sell its VoIP product to qualify for the payments that TelexFree had previously promised to pay them.

238.    A central component of the new change affected the ease of participant withdrawals.

239.    TelexFree participants could no longer withdraw money, even money already "earned," without making a specified number of retail sales and recruiting several new investors.

240.    Following these changes, numerous TelexFree participants frantically contacted the Office of the Secretary of the Commonwealth, correctly suspecting these changes were the harbinger of TelexFree's collapse.   The changes also generated a storm of protests from Promoters who could not recover their money.

241.    Not only was it more difficult to withdraw money from TelexFree, TelexFree also switched its compensation plan from one that paid participants in dollars to one that operated on TelexFree "credits," which were nothing more than IOUs.

242.    On April 1, 2014, dozens of Promoters descended upon TelexFree's Marlborough Office to protest the changes and to attempt to regain access to their money.   Local media

---

[33] *See* States of Jersey Police, "*Scam targeting Madeiran community*," attached herewith as Exhibit 11; *see also* "*Madeirans targeted in online Ponzi scam,*" The Guernsey Press (February 21, 2014), http://guernseypress.com/news/2014/02/21/madeirans-targeted-in-online-ponzi-scam/, attached herewith as Exhibit 12.

covering the chaos interviewed one Promoter who admitted that the VoIP service is "almost impossible to sell."[34]

243.    On April 14, 2014, TelexFree, Inc., TelexFree, LLC and TelexFree Financial abruptly sought bankruptcy protection in Nevada under Chapter 11, admitting that they could not meet their obligations from VoIP revenues and seeking authority to reject all its current obligations to Promoters.

244.    Thereafter, in furtherance of their unlawful enterprise, TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to Promoters in or about mid-April, possibly to create the illusion they had made payments to Promoters when no such payments were made.

245.    The 1099 forms were provided long after the mandated January 31, 2014 deadline, and some after the April 15, 2014 filing deadline.

246.    TelexFree falsely represented that Promoters had received income that they had not received.

247.    Indeed, TelexFree's former officers or employees have stated to the TelexFree bankruptcy transition team that under the pre-March 2014 standard form contract, TelexFree owes its Promoters over $5 billion dollars.

**L.     Events Since TelexFree's Bankruptcy Filing**

248.    On April 15, 2014, the SOC filed an Administrative Complaint against TelexFree, Inc. and TelexFree, LLC, alleging violations of the Massachusetts Uniform Securities Act, Mass. Gen. Laws, ch. 110A.

---

[34] Scott O'Connell, "*Upset customers look for answers at TelexFREE offices,*" Wicked Local-Dennis (April 1, 2014 (updated April 17, 2014)), http://dennis.wickedlocal.com/article/20140401/NEWS/140409503?sect=More&map=0.

249.    The SOC sought injunctions and orders requiring TelexFree, Inc. and TelexFree, LLC to cease and desist from further conduct violating Massachusetts securities laws and regulations, to provide an accounting of all proceeds received because of TelexFree's fraud, to provide restitution to Promoters for losses attributable to the fraud operations, and to disgorge all profits.

250.    Also on April 15, 2014, the SEC filed a civil Complaint and Jury Demand against TelexFree, Inc. and TelexFree, LLC as well as Merrill, Wanzeler, Labriola, Craft, Rodrigues, De La Rosa, Crosby, and Sloan, alleging violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and SEC Regulations.  The SEC requested and was granted a preliminary injunction and an order freezing the assets of TelexFree.  The SEC is also seeking disgorgement of profits and additional civil penalties.

251.    Additionally on April 15, 2014, the Federal Bureau of Investigation (the "FBI") and the U.S. Department of Homeland Security (the "DHS") conducted a raid of TelexFree's Marlborough Office.

252.    During this raid by the FBI and DHS, Defendant Craft was caught by federal agents attempting to leave the building with a laptop and approximately $38 million in cashier's checks in a bag.

253.    When questioned, Craft misrepresented to the federal agents he was merely a "consultant," and claimed that the checks and computer were "personal."

254.    On or about May 1, 2014, the Montana Securities Commissioner filed a cease and desist order against TelexFree.

255.    The following day, the Nevada Bankruptcy Court, on motion by the SEC, transferred the matter to the Federal District Court in Massachusetts, Central Division.

256.    During hearings conducted on May 2, 2014, William H. Runge, III, former Chief Restructuring Officer of TelexFree, estimated that as of TelexFree's bankruptcy filing TelexFree had assets of $31 million in its bank accounts, $28 million in brokerage accounts, and nearly $30 million held by payment processing companies.

257.    A TelexFree spin-off is now active and operating their Pyramid Scheme in Canada, with offices in Richmond, British Columbia ("B.C.").  The B.C. Securities Commission is closely monitoring it.

258.    Over $300 million of funds received by TelexFree from Promoters remain unlocated.

## M.    TelexFree's Founders Controlled TelexFree, Knowingly Perpetrated the Unlawful, Unfair, and Deceptive Pyramid Scheme, and Made False Representations about TelexFree

259.    Defendants Merrill, Wanzeler, Labriola, Craft and Costa (collectively, the "Defendant Founders") were responsible for the control and operation of TelexFree.

260.    TelexFree's Founders not only controlled the activities and operations of TelexFree, but also knowingly and willfully conspired to perpetrate, and did perpetrate, the TelexFree Pyramid Scheme with full awareness of its fraudulent and illegal nature.

261.    Defendant Merrill served as the President, Secretary, and Director of TelexFree, Inc., a Manager of TelexFree, LLC, President, Secretary and Director of TelexFree Financial, General Partner of Defendant Electric, and President, Secretary and Director of Defendant Mobile.

262.    In his capacities as Officer, Director, Manager and General Partner of the foregoing interrelated companies, Merrill exercised significant control over TelexFree's business operations.

263.    More particularly, Merrill exercised significant control over the TelexFree Pyramid Scheme.

264.    Defendant Merrill has appeared in videos posted to the internet, in which he can be seen promoting TelexFree as a revenue opportunity for Promoters.

265.    In a March 21, 2014 press release, Merrill is quoted as representing that TelexFree had been in the VoIP business for more than a decade.  That representation was false.

266.    As of March 28, 2014, the TelexFree website included a biography of Merrill, which stated that Merrill was a 1985 graduate of Westfield State University in economics.  That representation was false.

267.    Also, as of March 28, 2013, the TelexFree website stated that Merrill is "well versed in one of the new technologies of the era (VoIP) [sic]."  That representation was false.

268.    As of April 28, 2014, the TelexFree Canadian website continued to state that Merrill is a 1985 graduate of Westfield State University in economics and "[k]nowledgeable about a new era of technology (VOIP)."  That representation was false.

269.    According to testimony obtained by the SOC, Merrill attended Westfield State University for a mere two years, without either receiving a degree or declaring a major.

270.    In direct contravention to the representations on the TelexFree websites, Merrill testified to the SOC that he had only a basic understanding of VoIP technology.

271.    According to the SEC, Defendant Merrill received $3,136,200 on December 26 and 27, 2013.

272.    With respect to Defendant Wanzeler, he served as Treasurer and a Director of TelexFree, Inc., a Manager of TelexFree, LLC, Vice President, Treasurer, and a Director of TelexFree Financial, General Partner of Electric and Treasurer and Director of Mobile Holdings.

44

273.    According to corporate filings on record with SOC, Wanzeler has also served as the Chief Executive Officer of TelexFree, Inc.

274.    In his capacities as Officer, Director, Manager and General Partner of the foregoing interrelated companies, Wanzeler exercised significant control over TelexFree's business operations.

275.    More particularly, Wanzeler exercised significant control over the TelexFree Pyramid Scheme.

276.    Defendant Wanzeler also participated in marketing TelexFree to potential investors, appearing in videos posted to the Internet in which he can be seen promoting TelexFree as a revenue opportunity for Promoters, detailing the fraudulent TelexFree Program and making false representations regarding returns.

277.    According to the SEC, Defendant Wanzeler received $4,317,800 on December 26 and 27, 2013.

278.    Also according to the SEC, Defendant Wanzeler wired $3.5 million to the Oversea-Chinese Banking Corporation in Singapore on January 2, 2014.

279.    Defendant Labriola served as the International Marketing Director for TelexFree, Inc.

280.    Labriola was one of the original Directors and founders of Common Cents Communications, Inc., and at all material times exercised significant control over TelexFree's business operations and the operations of its interrelated companies.

281.    Defendant Labriola also appeared in several videos posted on the Internet promoting TelexFree as a revenue opportunity for Promoters, detailing the fraudulent TelexFree Program and making false representations regarding returns.

282.    For example, he stated in a January 2014 video that "[t]here are some people that are making incredible money in this."

283.    Labriola has acted as TelexFree's spokesman to Promoters during post-bankruptcy petition conference calls.

284.    As a Director of TelexFree, Inc., Defendant Labriola has exercised significant control over the TelexFree Pyramid Scheme.

285.    As International Marketing Director for TelexFree, Inc., Labriola also actively and knowingly perpetrated the TelexFree fraud through the dissemination of false and misleading advertising and marketing communications.

286.    After the Brazilian court's suspension of TelexFree's activities, Merrill, Wanzeler and Labriola all posted a June 20, 2013 video to reassure Promoters in which they made deceptive and misleading statements.

287.    Merrill stated that "[i]nquires like this are very common in network marketing . . . . We have such unbelievable growth that we're going to draw attention."

288.    Labriola stated that "[t]hese things happen to network marketing companies over and over again…  Let's not worry about it."

289.    Finally, Wanzeler stated that "[w]e're still here.  We're going to stay here for a long time."

290.    Nevertheless, those Defendants have admitted in their April 14, 2014 bankruptcy filings that they began to plan their restructuring after Ympactus' enforcement action.

291.    Defendant Craft, also known as Joe H. Craft, is a certified public accountant and served as the Chief Financial Officer ("CFO") of Telex Free, Inc and TelexFree, LLC.

292.    In his capacity as CFO of TelexFree, Craft has been responsible for preparing or approving TelexFree's financial statements, overseeing TelexFree's accounting methods and records, and otherwise exercising significant supervision and control over TelexFree.

293.    According to the SEC, two companies controlled by Craft received more than $2 million between November 19, 2013 and March 14, 2014.

294.    On April 23, 2013, in response to a request for a profit-and-loss statement issued by the SOC, TelexFree produced a document purporting to be TelexFree's 2012 profit-and-loss statement.[35]

295.    TelexFree did not make use of usual and accepted MLM accounting practices. For example, they did not separate out income generated by sales of VoIP from income generated by other means.

296.    On February 5, 2014, the SOC requested a second profit-and-loss statement from TelexFree for 2012, which TelexFree produced on February 26, 2014.[36]

297.    A comparison of these two profit-and-loss statements – each purporting to be TelexFree's profit-and-loss statement for 2012 – reveals massive discrepancies (the "Conflicting Statements").

298.    The first statement provided by TelexFree lists total income for 2012 at $1,864,939.70, while the second lists total income for 2012 at $2,834,835.70.[37]

299.    As further examples, agent commission is listed at $520,582.95 in the first, versus $2,105,925.61 in the second; total expenses are listed as $784,899.22 in the first, versus $2,333,893.09 in the second; net operating income is listed as $1,080,040.48 in the first, versus

---

[35] *See* Administrative Complaint of instituted by the Commonwealth of Massachusetts, Office of the Secretary of the Commonwealth Securities Division, Docket No. 2014-0004, at 29.

[36] *Id.*

[37] *Id.*

$478,251.56 in the second; and net income is listed as $1,066,313.39 in the first, versus $477,652.23 in the second.[38]

300.    The existence of duplicative accounting records containing egregious discrepancies indicates TelexFree's falsification of accounting records and failure to adhere to Generally Accepted Accounting Principles ("GAAP").

301.    As CFO for TelexFree, Inc. and TelexFree, LLC, and a certified public accountant, Defendant Craft knowingly perpetrated the TelexFree fraud by:

    a.   overseeing TelexFree's creation of falsified accounting records;

    b.   failing to ensure that GAAP accounting methods were adopted and adhered to;

    c.   fraudulently certifying TelexFree's business operations and accounting practices as good and lawful, despite actual knowledge of their unlawful and illegitimate nature;

    d.   concealing that the AdCentral packages purveyed by TelexFree were securities; and

    e.   concealing and absconding with investor assets.

302.    Defendant Costa was listed as Manager of TelexFree, LLC with the Massachusetts Secretary of State Corporations Division.

303.    Costa is one of the original founders of TelexFree.

304.    Costa was involved in the day-to-day management and oversight of TelexFree and was actively involved in and managed its Brazilian operations.

---

[38] *Id.*

305.    Costa has appeared on numerous websites and videos posted on the Internet promoting TelexFree as a revenue opportunity for Promoters, detailing the fraudulent TelexFree Program and touting its huge financial return.

306.    Costa fraudulently and deceptively presented in an August 15, 2013 video that TelexFree "never was, never will be" an illegal pyramid scheme because of its VoIP sales.  He further misrepresented that "[w]e do not depend on everyone coming in in order to pay the people who are already in."

307.    Costa was an outspoken advocate against the Brazilian Court's decision to enjoin TelexFree's Brazilian activities, and publicly supported TelexFree's illegal and corrupt activities.

308.    Costa is videoed displaying an insurance notification representing that it was proof of coverage for Promoters' payments; however, in actuality, the document was a notification denying coverage.[39]

**N.      TelexFree's Inside Promoters Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme**

309.    TelexFree conducted its Pyramid Scheme through the use of several high profile Promoters, including Defendants Rodrigues, de la Rosa, Crosby, Sloan, and Shoyfer.

310.    Each Inside Promoter deceptively, fraudulently and misleadingly promoted the Pyramid Scheme with knowledge of its illegality.

311.    Defendant Rodrigues was touted on the TelexFree's website as its top Promoter in the world.

312.    Defendant Rodrigues intentionally concealed and otherwise never revealed his criminal history or his prior involvement in earlier schemes.

---

[39] *See* http://www.youtube.com/watch?v=q2A2IsAPd0I.

313.    Broadcasting his purported success in an internet video on March 13, 2013, Rodrigues falsely stated, "Just place your ads every day and everyone gets paid weekly."

314.    In that same video, he further promoted, "What company in the country, in the world, you can make money . . . you don't need to sell anything?  Now it exists.  TelexFree."

315.    In another internet video, he is shown driving a Ferrari, a typical pyramid scheme ploy.

316.    Defendant Crosby similarly appeared in videos touting the TelexFree Scheme, stating in an April 20, 2013 video "[w]hat if you were with a company that would pay you just to advertise the service?  . . .  They're paying us to advertise the service.  It's just that simple. . . [Members do not have to] worry about selling to the public."

317.    Crosby intended to deceptively hoodwink class members when he stated in that same video the ease of placing advertising, stating "[i]t takes less than thirty seconds to place each ad.  Most people do it in 15 to 20 seconds."

318.    Finally, Crosby falsely touted that "[d]ozens and dozens of people have become millionaires because of this . . . How deep does this go?  It pays down to infinity."

319.    On June 23, 2013, Promoters, including Crosby, Sloan, De La Rosa, and Julio Silva, together members of the "TelexFree Global Team," hosted an open conference call for TelexFree investors and potential investors.  During the call, Crosby can be heard:

> a.  stating that TelexFree had entered into an insurance contract (indeed, "a couple" of them), but that they were "not allowed" to discuss this online;
>
> b.  threatening "there will be actions" against anyone who does so;
>
> c.  stating that any online postings about this had to be removed, and "this is coming from corporate";

    d.   telling listeners that they are not permitted to call the insurance company;

    e.   stating that this was all "coming right from their legal department"; and

    f.   denying the validity of the Brazilian court injunction, claiming that it would be "cleared" within days.

320.   Defendant Sloan also made numerous unfair and deceptive misrepresentations in a June 2013 internet video.

321.   Promoting the Program's ease, Defendant Sloan stated "[p]lace your ads, and you go about your day.  You do that for seven days a week, you get paid every single week. . . . You don't have to build.  You don't have to sell."  He further urged, "You post your ads.  Take you a minute and a half.  Three minutes.  Five minutes max."

322.   On her Facebook page, Sloan touts, "I am plugged in where I make money passively every day while laughing and whistling.  Making money is not a privilege."

323.   Defendant De La Rosa also appeared in internet videos promoting the scheme, the ease of placing the ads and the payments that would be made.

324.   In furtherance of the Scheme, De La Rosa appeared in YouTube videos describing the TelexFree Program and the new TelexFree compensation plan.[40]

325.   In connection with the SEC's action, the district court in April 2014 ordered de la Rosa to sell about $150,000 worth of three high-end vehicles.

326.   Defendant Shoyfer was the creator and leader of a large network of TelexFree Promoters based primarily in New York City, but extending into other states as well, including Massachusetts, and he is believed to have been the largest single Promoter in the greater New

---

[40] *See* https://www.youtube.com/watch?v=Gp3xD52Nk30 and
https://www.youtube.com/watch?v=F-1I1Q9T7Co.

York area.  Under any view, Shoyfer funneled a portion of his ill-gotten gain up the food chain to TelexFree, its masterminds and other Defendants.

327.    At all times material herein, Shoyfer worked along with TelexFree and the Defendant Founders for the purpose of advancing and promoting TelexFree's illegal Pyramid Scheme, which included recruiting new Promoters, and marketing and selling AdCentral member packages.

328.    Much of Shoyfer's recruitment activity took place at the Salon Delacqua, located at 2027 86th Street, Brooklyn, New York, where Shoyfer organized and gave public presentations promising fabulous wealth to those who would join his network.

329.    Shoyfer also organized and presided over "Telexfree Superweekend" recruitment events, which were held at the Marriott Grand Hotel Ballroom in Flushing, New York, and at least one of which was co-hosted by Defendant Labriola.

330.    In frequent text messages to members of his network, Shoyfer promised his recruits that they would "*double and triple*" their investments, and frequently boasted of his own "*record*" profits, including a reported $142,320 in a single week in February 2014.

331.    More particularly, in December of 2013, Shoyfer, acting individually and upon the instruction of the Defendant Founders, sent a group text message to members of his network, stating:

> From my upper line "Happy New Year everyone!!! 2014 is gonna be the best year for Telexfree$$$! TelexMobil is about to be launched in January! ! And, on Thursday January 23rd at 6.30 pm I will be doing my first Telexfree Superweekend in NY with Steve Labriola (director of international marketing TF) at Marriott Hotel Grand Ballroom by La Guardia Airport at 102-05 Dimars Blvd, Flushing NY 11369 (parking available). Now is the time to meet with top corporate representative..and my top leaders in my rapidly growing team.. You MUST invite your people (forward this msg to them), especially those who r still sitting on sidelines, debating about legibility [sic] and future

52

of this company. .Trust me after this event, all negativity will disappear. .and you will double and triple you earnings in this busine$$ venture in 2014…

Shoyfer followed-up this group text by mass-mailing marketing materials to members and potential members of his network.

332.    On February 24, 2014, acting individually and upon the instruction of the Defendant Founders, Shoyfer sent a group text message inviting the recipients to three public marketing meetings that he would be hosting in New York City during the following that week, which group text Shoyfer followed-up by mass-mailing marketing materials to members and potential members of his network.

333.    On February 26, 2014, acting individually and upon the instruction of the Defendant Founders, Shoyfer sent the following group text message:

I just received checks from everyone but will wait for u to bring it until 2 p.m… then I'm going to FedEx.

334.    On February 28, 2014, acting individually and upon the instruction of the Defendant Founders, Shoyfer sent the following group text message:

Bring me certified checks now I will send them to ewallet by federal express and they will post it immediately

335.    On March 3, 2014, acting individually and upon the instruction of the Defendant Founders, Shoyfer again sent a group text message inviting the recipients to three public marketing meetings that he would be hosting in New York City during the following that week, which group text Shoyfer followed-up by mass-mailing marketing materials to members and potential members of his network.

336.    On March 4, 2014, acting individually and upon the instruction of the Defendant Founders, Shoyfer sent the following group text message:

> I just received checks from everyone but will wait for u to bring it until 2 pm… then Im [sic] going to FedEx..I will send to ewallet it going to be posted right away

337.   On March 6, 2014, acting individually and upon the instruction of the Defendant Founders, Shoyfer sent the following group text message:

> I just received checks from everyone but will wait for u to bring it until 2 pm… then Im [sic] going to FedEx..I will send to ewallet it going to be posted right away

338.   After the institution of the new TelexFree compensation plan in March of 2014, Shoyfer took part in a closed meeting with TelexFree's Directors and Owners in Marlborough, Massachusetts, at which Shoyfer was instructed not to discuss the new TelexFree compensation plan with other, non-insiders, as the new compensation plan was detrimental to Promoters and was adopted to forestall filing bankruptcy.

339.   Thereafter, despite his awareness of the disadvantages that the new compensation plan posed to Promoters, individually and at the instruction of TelexFree and the Defendant Founders, Shoyfer continued aggressively recruiting new Promoters right up until TelexFree's bankruptcy filing.

340.   More particularly, on March 24, 2014, individually and acting upon the instruction of the Defendant Founders, Shoyfer sent the following group text message to members of his network:

> Hey..my team Telexfree! ! And here we go again..Come to check out and learn about new compensation plan TF 2.0.. and how to grow it even faster and MUCH more aggressively and efficiently than the one we had before….Here is this week's schedule. . Monday 03/24 at Salon Delacqua (2027 86 str) at 8.00 pm (in English) ..Wednesday 03/26 at SOHO launch(2213 65th street) at 7.45 pm ( in Russian) and Thursday 03/27 at 7.30 pm at 63-112 Woodhaven Blvd in a real estate office. In my case, since I have started from absolute zero during this passed week Mon 03/17- Sun 03/23/14 I

booked 11,500 from new one and 21,600 still coming from old plan..A total of 31,100 in 7 short days... Go Telex!!!"

Shoyfer followed-up this group text by mass-mailing marketing materials to members and potential members of his network.

341. On March 30, 2014, individually and acting upon the instruction of the Defendant Founders, Shoyfer sent the following group text message to members of his network:

> Hey..my team Telexfree! ..Come and learn about new compensation plan TF 2.0.. and how to grow it even faster and MUCH MUCH more aggre ively and efficiently than the one we had before…Here is this week's schedule. . Monday 03/31 at Salon Delacqua (2027 86 str) at 8.00 pm (in English) ..Wednesday 04/02 at SOHO launch (2213 65th street) at 7.45 pm ( in Russian) and Thursday 04/03 at 7.30 pm at 63-112 Woodhaven Blvd in a real estate office. Bring your laptops to Delacqua salon on Monday..we will demonstrate how to correctly sign up yourself and your new people under new plan. In my case, since I have started new cokp plan from absulute zero only 13 days ago, this passed wk Mon 24/17- Sun 03/31/14 I booked 19,500 from new one and 20,700 still coming from old plan..A total of 40,300 in 7 short days... Please forward this message to your leaders in your downline... Go Telex!!!

Shoyfer followed-up this group text by mass-mailing marketing materials to members and potential members of his network.

342. On April 2, 2014, individually and acting upon the instruction of the Defendant Founders, Shoyfer sent the following group text message to members of his network:

> "Hey..my team Telexfree! ..Come and learn about new compensation plan TF 2.0.. and how to grow it even faster and MUCH MUCH more aggressively and efficiently than the one we had before…Here is this week's schedule. . Monday 03/31 at Salon Delacqua (2027 86 str) at 8.00 pm (in English) ..Wednesday 04/02 at SOHO launch (2213 65th street) at 7.45 pm ( in Russian) and Thursday 04/03 at 7.30 pm at 63-112 Woodhaven Blvd in a real estate office. Bring your laptops to Delacqua salon on Monday..we will demonstrate how to correctly sign up yourself and your new people under new plan. In my case, since I have started new cokp plan from absulute zero only 13 days ago, this passed wk Mon 24/17- Sun 03/31/14 I booked 19,500 from

new one and 20,700 still coming from old plan..A total of 40,300 in 7 short days... Please forward this message to your leaders in your downline... Go Telex!!!

Shoyfer followed-up this group text by mass-mailing marketing materials to members and potential members of his network

343.   On April 7, 2014, acting upon the instruction of the Defendant Founders, Shoyfer sent the following group text message to members of his network

> Hey..my team Telexfree! ..Come and learn about new compensation plan TF 2.0.. and how to grow it even faster and MUCH MUCH MUCH more aggre$$ively and efficiently than the one we had before…Here is this week's schedule. . Monday 04/07at Salon Delacqua (2027 86 str) at 8.00 pm (in English) ..Wednesday 04/09 at SOHO launch (2213 65th street) at 7.45 pm ( in Russian) and Thursday 04/10 at 7.30 pm at 63-112 Woodhaven Blvd in a real estate office. Bring your laptops to Delacqua salon on Monday..we will demonstrate how to correctly sign up yourself and your new people and a brand new technology on how to create 100s of clients in a matter of minutes (NOT HOURS) under new plan. In my case, since I have started new comp plan from absulute zero only 20 days ago my downline grew up to around 900 centers..and this passed week alone Mon 04/01- Sun 04/06/14 I booked $36,500 from new one and $18,900 still coming from old plan..A total of $55,400 in 7 short days...Go Telex! !! $$$$

Shoyfer followed-up this group text by mass-mailing marketing materials to members and potential members of his network.

344.   Upon information and belief, each of the other sixty-four attendees at the aforesaid closed meeting held in March, 2014 in Marlborough, Massachusetts carried on similar practices of marketing, promotion and recruitment of new members, both before and after said meeting.

345.   The Inside Promoters flouted their fortunes with intent to deceive and scammed from the Pyramid Scheme.  As part of a joint effort they knowingly made misleading, deceptive

and fraudulent statements to recruit others to join the program and to guarantee the securing of additional capital for the scheme.

**O.      TelexFree's Attorneys Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme**

346.    TelexFree's Attorney Defendants were also a critical cog in the TelexFree Pyramid Scheme and their representation of TelexFree went beyond giving legal advice on how to avoid detection and extended into being an outspoken supporter of the fraudulent Scheme to lend legitimacy to its operations and to recruit new members.

347.    Defendants Nehra and Waak, with the entities Law Offices of Nehra and Waak, Gerald P. Nehra, Attorney at Law, PLLC, and Richard W. Waak, Attorney at Law, PLLC ("Attorney Defendants") are self-proclaimed MLM specialist attorneys.[41]

348.    During TelexFree's fraudulent scheme, the Attorney Defendants acted as legal counsel to TelexFree.  They intentionally used their positions of authority, education and bar license to further the Pyramid Scheme, a typical pyramid scheme ploy.

349.    Attorney Nehra had previously acted as counsel to other MLM firms, which were forced to be closed by federal and/or state authorities due to fraudulent pyramid and Ponzi schemes, including ZeekRewards and AdSurfDaily.[42]

---

[41] "*Gerry Nehra gives 'legal blessing' to TelexFree*," Behind MLM (Aug. 2, 2013), http://behindmlm.com/companies/telexfree/gerry-nehra-gives-legal-blessing-to-telexfree/.  The full length tape of his legal opinions and presentation can be found at: http://www.psquad.com/gerald-nehra.html (herein, "Nehra Endorsement") ("After I left Amway in 1991, I had a very brief period as the vice-president and general counsel for Fuller Brush. Fuller Brush did not make it in attempting to convert from direct selling to multi-level direct selling.  And when that job wasn't going to work out I ended up returning from Colorado back to Michigan and opening up a private law practice.  Since 1992, I have practiced law exclusively in multi-level direct selling law.  That is all that I do.")

[42] *Id.*

350.    During the investigation of the AdSurfDaily scheme, Attorney Nehra filed an affidavit in court representing that AdSurfDaily was "not a Ponzi Scheme."[43]  Subsequently, in 2008, AdSurfDaily was forced to cease operations by federal authorities after being found to be a Ponzi scheme, a fact later admitted to by its principal.[44]

351.    Attorney Nehra also previously served in an advisory capacity to ZeekRewards. ZeekRewards was later found to be an unlawful Ponzi scheme and was shut down by federal authorities.

352.    Attorney Nehra's extensive experience in MLM, and particularly his involvement with the Ponzi schemes involving AdSurfDaily and Zeek Rewards, armed him with the knowledge of what constitutes violations of United States securities law.  Attorney Nehra was well aware that the use of semantics and obscured phraseology to obfuscate securities laws failed to legitimize TelexFree's illegal Pyramid Scheme.

353.    Attorney Waak also claims to have over thirty years of experience in counseling MLM and direct-selling enterprises.[45]

354.    Attorney Waak claims to have managed the legal defense of multiple class action lawsuits involving claims for "pyramiding, securities fraud, false advertising and civil RICO."

355.    Attorney Nehra and Attorney Waak are together the general partners of the Law Offices of Nehra and Waak.

356.    On the website of the Law Offices of Nehra and Waak, Defendant Attorneys Nehra and Waak claim to specialize in counseling "domestic and foreign companies operating MLM (multi-level marketing) businesses in the United States."[46]

---

[43] *Id.*

[44] *Id.*

[45] *See* http://www.mlmatty.com/meet-mlm-attorneys/.

357.    Also, on the website of the Law Offices of Nerha and Waak, Attorneys Nehra and Waak boldly boast that "[n]o Company that retained this firm BEFORE LAUNCH has been shut down by a regulator."[47]

358.    As general partners of the Law Offices of Nehra and Waak, Attorney Nehra and Attorney Waak are jointly and severally liable for torts and obligations of the firm.

359.    While the Law Offices of Nehra and Waak provided legal counsel to TelexFree, Attorney Waak was principal attorney of the law firm.

360.    Attorney Waak, as principal attorney of the Law Offices of Nehra and Waak, was charged with oversight of the daily activities of the law firm.

361.    Attorneys Nehra and Waak also maintained the Defendant professional limited liability companies Gerald P. Nehra, Attorney at Law, PLLC and Richard W. Waak, Attorney at Law, PLLC, which, upon information and belief, also provided legal and counseling services to TelexFree.

362.    Among the Attorney Defendants, and during TelexFree's scheme, there was no clear distinction among the services provided to TelexFree by the Law Offices of Nehra and Waak, the individual Attorney Defendants, and their respective professional limited liability companies.

363.    The Attorney Defendants' role and involvement in the TelexFree Pyramid Scheme exceeded merely providing legal counsel since they knowingly acted to further and perpetuate TelexFree's illegal Pyramid Scheme, which caused Plaintiffs and the similarly situated putative class members to suffer economic loss.

---

──────────────────────────────── (continued)

[46] *Id.*

[47] *Id.*

364.   The Attorney Defendants had actual knowledge that the TelexFree business model was a fraudulent Pyramid Scheme.

365.   Seeking to profit from TelexFree's exploitation of the members of the putative class, Defendant Nehra drew upon his prior experience to aid, abet and play an integral part in TelexFree's unlawful, unfair and deceptive acts and practices during times relevant to this complaint.

366.   Attorney Nehra counseled TelexFree on methods to evade United States securities laws intended to offer, in part, protection from pyramid schemes, all to enrich himself financially and serve his own selfish interests.

367.   Attorney Nehra further unfairly, deceptively and falsely advised and encouraged TelexFree Promoters (except the Inside Promoters) to unknowingly participate in the evasion of federal and state securities laws.

368.   Defendant Nehra accomplished this by representing that his extensive experience as an MLM expert and his thorough research of TelexFree's business model allowed him to form a legal opinion that TelexFree was a legitimate business.

369.   In making this professional opinion, Defendant Nehra misrepresented TelexFree as a legitimate business concern.

370.   For instance, by instructing Investors to avoid using the terms "investment" regarding AdCentral Packages, *see* TelexFree Contract, Paragraph 2.6.5(m), he attempted to conceal, and encouraged others to conceal, that TelexFree was involved in the sale of securities, and attempted to strip Promoters of the rights afforded them by federal and state securities laws.

371.   In company videos intended to provide false advice to TelexFree Promoters to act to avoid the protections offered by federal and state securities laws, Attorney Nehra never once

advised the putative class member TelexFree Promoters that so acting presented a risk to them, including the risk of participating in an unlawful scheme.

372.    Attorney Nehra intentionally perpetuated and enhanced the fraud by exploiting his superior position as a licensed attorney and an attorney who specialized in multi-level marketing.

373.    Attorney Nehra intentionally perpetuated and enhanced the fraud by never once advising the Putative Class Member TelexFree Promoters that following his advice was against their own interests.

374.     Attorney Nehra intentionally perpetuated and enhanced the fraud by never once advising the Putative Class Member TelexFree Investors that his web published purported professional advice was intended to serve the interests of TelexFree and himself.

375.    Attorney Nehra's unfair and deceptive acts, aiding and abetting the Pyramid Scheme and played an integral part in TelexFree's unlawful acts and practices exceed the scope of zealously representing TelexFree.

376.    Defendant Nehra contributed in an indispensable way to TelexFree's continued unlawful operation in the United States because, as a duly licensed member of the bar, he publicly stated to Promoters and prospective members that, in his professional opinion, TelexFree's business model and operations complied with federal and state laws.

377.    Defendants knowingly used Attorney Nehra's false legal opinions and misrepresentations as a marketing tool to unfairly and deceptively further and advance their illegal Pyramid Scheme.

378.    Attorney Nehra knew that his legal opinions were false, and that his representations would be used by TelexFree as a marketing tool to further and advance their business model and illegal activities.

379.    Attorney Nehra's opinions were packaged and promoted as part of TelexFree's total "post Brazilian shut down package" to the members of the putative class.[48]

380.    In spring 2013, TelexFree was forced to focus on new markets, including new members from the United States and Canada because their Brazilian operation had been shuttered and all Brazilian assets were frozen.  To enhance the credibility and marketability of their United States operation, TelexFree employed the Attorney Defendants to make their illegal and fraudulent methods, operation and business plan appear legitimate.

381.    On the weekend of July 26th and 27, 2013, TelexFree held an event, which they dubbed a "super weekend," in Newport Beach, California.  The focus of TelexFree's "super weekend" event included considerable efforts intended to reassure Promoters that its United States operations and program were legitimate, lawful and worth putting their money behind.

382.    Although TelexFree's Brazilian bank accounts were frozen and all their Brazilian recruiting and payments had been suspended by court order in their largest affiliate market, Attorney Nehra advised attendees that the shutdown in Brazil would not affect TelexFree's U.S. operations.

383.    At this "super weekend" event, Attorney Nehra spoke at length to attendees, assuring them of the legality of TelexFree's operation, stating "It is legally designed…you are on very solid legal ground," and that TelexFree's operation had been "vetted by the Nehra and Waak law firm."[49]

---

[48] As described in greater detail throughout, in the early spring of 2013 TelexFree Brazil was found to be an illegal pyramid and Ponzi scheme.

[49] "*Gerry Nehra gives 'legal blessing' to TelexFree,*" Behind MLM (Aug. 2, 2013), http://behindmlm.com/companies/telexfree/gerry-nehra-gives-legal-blessing-to-telexfree/.  The full length tape of his legal opinions and presentation can be found at: http://www.psquad.com/gerald-nehra.html (herein, "Nehra Endorsement")

384.    When asked by a concerned affiliate about the injunction granted against the company, Attorney Nehra first deflected its relevance by stating:   "Okay, I am the MLM specialist and attorney for TelexFree in the United States only.  So I gotta duck the question."[50]

385.    Attorney Nehra left no doubt that he and his firm acted as legal counsel to TelexFree to assist them in insuring their U.S. operations were lawfully conducted, knowing that these operations were nothing more than an illegal Pyramid Scheme.

386.    In addition, on an internet video posted on August 2, 2013, Attorney Nehra provided false and deceptive assurances to Promoters and potential Promoters, stating that "[t]he special ingredient is that you have a real product."

387.    Although Attorney Nehra emphatically assured Promoters and potential Promoters that, in his professional opinion, the TelexFree business model was legitimate and lawful, he had actual knowledge that TelexFree's operation was unlawful and illegitimate.

388.    Attorney Nehra assured Promoters on internet and website postings, in writing, and in person at marketing promotions that, in his professional opinion, the TelexFree business model was legitimate despite the fact he had actual knowledge that TelexFree MLM Network "*Partnerships*"[51] involving TelexFree's AdCentral marketing packages were unlawful.  Attorney Nehra even advised them there on how to unlawfully circumvent federal and state laws.

---

[50] *Id; see* Nehra Endorsement, at 24:20.

[51] Paragraph 2.2.1 of the standard TelexFree Contract states "*Synthesis of the legal relationship: The user, by accessing the website of TELEXFREE.COM can become a member through payment of the respective fee, which will provide access to the TelexFree Multilevel Marketing network for the period of one year, without extension or renewal.  At this stage, the member is called a PARTNER.  The PARTNER will have the right to acquire, at an exclusive discount, products that are offered on the website www.telexfree.com, with the principal VOIP telephony accounts called 99TELEXFREE.  The PARTNER, upon acquiring them in the form of a kit (ADCENTRAL or FAMILY kit) assumes the title of PROMOTER and, as such, receives a space on the site www.telexfree.com to promote the products/services that he has acquired.  He also receives training and access to materials also made available on the TELEXFREE website so*

389.    In addition, Attorney Nehra advised Promoters and potential Promoters that, in his professional opinion, the TelexFree business model was legitimate and lawful, even though Attorney Nehra had knowledge of the ruling of the Brazilian Court and knowledge of and access to TelexFree's United States operations and their composition.

390.    More particularly, Attorney Nehra knew that:

   a.   TelexFree used the exact same business model in Brazil as they do in the United States and throughout the world;

   b.   the Brazilian court had made a finding of fraud and that TelexFree's United States operations and composition was an unlawful venture;

   c.   the Brazilian court described Telex business operations in terms of the quintessential pyramid scheme after TelexFree's own lawyers unwittingly admitted as much;

   d.   TelexFree's lawyer Djacir Falcão stated to the Brazilian court that if the injunction continues the company may enter into bankruptcy:  "Running the company really becomes difficult because of the court decision, so we will appeal," said Falcão[52];

─────────────────────── (continued)

*that he can undertake to promote the latter and avail himself of the opportunity to be a PARTNER and PROMOTER to others in his circle of relationships.  All activities are performed by the PARTNER/PROMOTER without any employment relationship, and they are able individually to manage the team and the resources it seeks to make available for such purpose, of their own free will.  For the promotion of products/services he will receive a bonus in direct proportion to his results, based on the levels explained in a separate section in these GENERAL REGULATIONS.*

*He must obey all the clauses of these GENERAL REGULATIONS so that the name of TELEXFREE and the juridical persons associated with it remain unblemished.*"

[52] This is alleged upon information and belief based upon quote in the newspaper Rio Branco, <u>Tribune da Bahia</u> so reported.

e.   Falcão tried to appeal to the Brazilian judges because "should the company spend a few more days being prohibited from signing up new investors, they would have no money to pay the old ones;"

f.   a Brazilian judge rejected this argument and denied TelexFree's injunction appeal;

g.   TelexFree's other appeals were rejected by the Brazilian courts;

h.   one Brazilian judge remarked that the issue is that the earnings will be exhausted when the main source of revenue of the group (new affiliate registrations) stops;

i.   the above scenario is typically the result of a pyramid scheme;

j.   Judge Samoel Evangelista, 2nd Civil Chamber of the Court of Acre (TJ-AC), entered an order to keep the TelexFree funds frozen, to block future payments to TelexFree in Brazil and to enjoin TelexFree from signing on new investors in Brazil;

k.   according to Brazilian Judge Thais Kalil, how TelexFree earnings are paid out was advantageous to the prosecutor's argument, in that adding publishers to the network is of more importance than trying to sell the VoIP product; and

l.   Judge Thais Kalil also wrote that "(t)he issue is that the earnings will be exhausted when the main source of revenue of the group (new affiliate registrations) stops.  Many (affiliates) do not even have the opportunity to recover their initial investment (minimum U.S. $339) and this is detrimental."

391.   Defendant Nehra's own comments clarify that he knew that TelexFree was an unlawful pyramid scheme.

392.    Defendant Nehra knew when providing legal opinions and counsel at the request of Defendant Founders and TelexFree that TelexFree's conduct constituted a breach of duty to its Promoters.

393.    Defendant Nehra knew when his providing legal opinions and counsel at the request of TelexFree that his role would give substantial assistance or encouragement to TelexFree to continue its unlawful business model.

394.    Defendant Nehra knew when providing legal opinions at the request of TelexFree and Defendant Founders that TelexFree intended to use Nehra prominently as a marketing tool on both their localized Brazilian (Portuguese) and Spanish (Spanish) website portals, in an effort to make TelexFree's illegal Pyramid Scheme appear legitimate, continuing and perpetuating the ongoing fraud.

395.    TelexFree used Nehra's false legal opinions as a marketing tool to promote its illegal Pyramid Scheme on Brazilian (Portuguese) and Spanish/Dominican (Spanish) website portals.

396.    Defendant Nerha and the other Attorney Defendants knew that these legal opinions were false and that these false opinions were used by TelexFree to promote and perpetuate TelexFree's illegal Pyramid Scheme.

397.    To serve his own selfish and pecuniary interests, Attorney Nehra willfully participated in, aided, abetted, counseled, induced, and/or procured TelexFree's violations of law regarding the proper segregation and maintenance of customer funds, and acted in concert and combination with TelexFree in such violations.

398.    Defendant Nehra gave substantial assistance to TelexFree and Defendant Founders in accomplishing a tortious and illegal result, and Nehra's own conduct, separately considered, constitutes a breach of duty to Promoters since he:

a.   knowingly misrepresented the legality and sustainability of TelexFree's operations to the detriment of Promoters, and received fees from TelexFree;

b.   knowingly obscured and obfuscated the illegal nature of TelexFree's scheme by the manipulative use of language, including, e.g., advising TelexFree that using the term "investment" must be avoided;

c.   breached his duty of professional care to Promoters by failing to exercise proper due diligence in investigating the legality of TelexFree's operations;

d.   breached his duty of care by encouraging individuals to become and remain Promoters despite his knowledge of the illegality of TelexFree's operations; and

e.   engaged in a civil conspiracy to defraud TelexFree's Promoters with a Pyramid Scheme, and took a leading role in the scheme.[53]

399.    Attorney Waak, as general partner and principal attorney of the Law Offices of Nehra and Waak, and the other Attorney Defendants knew of, oversaw, and, upon information and belief, participated in Attorney Nehra's tortious and illegal conduct regarding the TelexFree Pyramid Scheme.

---

[53] As stated by Justice William O. Douglas, "just as a fine natural football player needs coaching in the wiles of the sport, so, too, it takes a corporation lawyers with a heart for the game to organize a great stock swindle or income tax dodge and drill the financiers in all the precise details of their play."  William O. Douglas, *Directors Who Do Not Direct,* 47 Harv.L.Rev. 1305, 1329 (1934).

400.    Attorney Waak, as general partner and principal attorney of the Law Offices of Nehra and Waak, and the other Attorney Defendants, knew of, oversaw, and, upon information and belief, participated in TelexFree Pyramid Scheme.

**P.    Telexfree's Accountants and Professional Services Providers Played an Integral Role in and Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme**

401.    As detailed above, Defendant Craft is a certified public accountant and served as the CFO of TelexFree, Inc. and TelexFree, LLC.

402.    Defendant Craft is also the sole Member and Manager of Craft Financial, an Indiana-based limited liability company.

403.    Defendants Craft and Craft Financial are indistinguishable regarding their involvement with the TelexFree Pyramid Scheme.

404.    Defendants Craft and Craft Financial knowingly participated in and perpetuated TelexFree's illegal Pyramid Scheme.

405.    In his dual capacity as CFO and certified public accountant of TelexFree, Defendants Craft and his Craft Financial have been responsible for preparing or approving TelexFree's financial statements, overseeing TelexFree's accounting methods and records, and otherwise exercising significant supervision and control over TelexFree.

406.    In exercising these duties, Defendant Craft and Craft Financial participated in, supervised and controlled the Conflicting Statements which reveal massive discrepancies.

407.    The existence of duplicative accounting records containing egregious discrepancies is clear indicia of TelexFree's falsification of accounting records and failure to adhere to GAAP.

408.    As CFO and certified public accountant for TelexFree, Inc. and TelexFree, LLC, and a certified public accountant, Defendants Craft and Craft Financial, knowingly perpetrated the TelexFree fraud by:

   a.   overseeing TelexFree's creation of falsified accounting records;

   b.   failing to ensure that GAAP accounting methods were adopted and adhered to;

   c.   fraudulently certifying TelexFree's business operations and accounting practices as good and lawful, despite actual knowledge of their unlawful and illegitimate nature; and

   d.   conspiring with TelexFree's Officers to structure and perpetuate an illegal Pyramid Scheme designed to defraud Promoters and enrich themselves.

409.    Defendants Craft and Craft Financial disseminated, and otherwise allowed to be disseminated, false and inaccurate financial information among Promoters, knowing that such information was false an designed to continue and perpetuate the illegal Pyramid Scheme.

410.    Defendants Craft and Craft Financial knew or should have known that Promoters would rely upon their information.

411.    Defendants Craft and Craft Financial, with the assistance of Defendant PricewaterhouseCoopers, authorized TelexFree to provide Promoters with inaccurate and fraudulent 1099 (Miscellaneous Income) forms, in many cases long after the January 31, 2014 required deadline, and to misrepresent payments made to Promoters and conceal assets.  That these inaccurate 1099's are expected to be filed with the Internal Revenue Service and State Revenue Offices will impose further an undue and massive hardship upon Promoters who may be responsible for taxes on payments they never received.  Such Defendants also prepared false

financial documents for affiliated TelexFree entities and prepared false tax returns for the affiliated TelexFree entities.

412.    Defendants Craft and Craft Financial knew when providing their financial assistance that their role would give substantial assistance or encouragement to TelexFree to continue its unlawful business model and would further the illegal Scheme.

413.    Defendant PricewaterhouseCoopers also provided accounting and consulting services to TelexFree during the period of TelexFree's ongoing fraud. .

414.    More particularly, PricewaterhouseCoopers was retained by TelexFree in January, 2014, several months after TelexFree had been shuttered by government authorities in Brazil, to provide tax and financial consultation, including assistance with the development of international tax structures.

415.    PricewaterhouseCoopers also assisted TelexFree with the preparation and issuance of the aforesaid inaccurate and fraudulent 1099 (Miscellaneous Income) forms.

416.    PricewaterhouseCoopers also assisted TelexFree in responding to the Massachusetts SOC Securities Division's information requests.

417.    The Trustee in Bankruptcy has been granted permission to perform a Rule 2004 Examination of PricewaterhouseCoopers, through which it has obtained PricewaterhouseCoopers' records with respect to its involvement with TelexFree.

418.    PricewaterhouseCoopers provided TelexFree with these professional services despite having access to TelexFree's internal financial documents, which demonstrated that TelexFree received virtually no income from the sale of its VoIP product and was, in fact, an illegal Ponzi scheme.

419.     PricewaterhouseCoopers knew when providing their professional services to TelexFree that their role would give substantial assistance or encouragement to TelexFree to continue its unlawful business model and would further the illegal Scheme.

**Q.     Banks and Financial Service Providers Knowingly Aided and Abetted the Unlawful, Unfair, and Deceptive Pyramid Scheme, Knowingly Received and Executed Fraudulent Fund Transfers, and Violated Mandated Bank Reporting and "Know Your Customer" Requirements**

420.     During the TelexFree Pyramid Scheme, Defendants Bank of America, Bank of America, N.A., TD Bank, Fidelity Bank, Middlesex Savings, Wells Fargo, Wells Fargo Bank, Synovus, Synovus Bank, Fidelity Investments, GPG, IPS, ProPay, Base Commerce, Vantage Payments, Allied Wallet, and the Doe Banks and Doe Payment Processors provided crucial financial services to TelexFree and the Founder Defendants, which enabled them to carry on its unlawful, unfair, and deceptive Pyramid Scheme.

421.     TelexFree's financial services providers, including the aforesaid banking institutions, investment service providers, and payment processing services providers, knowingly participated in and aided and abetted TelexFree's Pyramid Scheme by:

a. receiving transfers of funds from, and on behalf of, TelexFree in TelexFree's fraudulent business, despite knowledge of the fraudulent nature of TelexFree's business enterprise;

b. processing payments to, and on behalf of, TelexFree, including its affiliated entities and Defendant Founders and management, in TelexFree's fraudulent business, despite knowledge of the fraudulent nature of TelexFree's business enterprise;

c. transferring funds from and out of TelexFree's accounts, despite knowledge of the fraudulent nature of TelexFree's business enterprise and

    d.   otherwise enabling the TelexFree Pyramid Scheme to expand and continue by providing necessary financial services to TelexFree, despite actual knowledge of fraud by TelexFree.

422.    The Banking Institution Defendants possessed actual knowledge of the fraudulent nature of TelexFree's business operation since at least June 2013, when the Brazilian authorities stopped TelexFree's activities.

423.    Despite knowledge of the fraudulent nature of TelexFree's business operations, the Banking Institution Defendants continued to provide TelexFree with banking services.

424.    Upon information and belief, the Banking Institution Defendants received funds from Promoters, which funds were then held for the benefit of TelexFree, its affiliated entities, and its Defendant Founders and management.[54]

425.    TelexFree's Promoters were directed by TelexFree, as part of TelexFree's "signup procedures," to transfer membership funds to accounts held by TelexFree at Bank of America and TD Bank.[55]

426.    As set forth in the TelexFree's "signup procedures," document, members were directed to transfer their membership fees to a "corporate" account under the name "TelexFREE LLC," and were provided with the applicable account and routing numbers.[56]

---

[54] *See, e.g.,* check deposited by TelexFree into its account with Fidelity Bank, to wit, account number 211370707, attached as Exhibit 14.

[55] *See* "*Signup procedures for TelexFREE,*" attached herewith as Exhibit 15, also available at http://www.buysellproducts.net/down/sign_up_procedures_for_telexfree.pdf; See also PatrickPretty.com, "*TelexFree Affiliates Gave AdSurfDaily-Like Coaching Tips, Instructed Prospects to Make Deposits at Bank of America[...]TelexFree Also May Have TD Bank Account,*" http://patrickpretty.com/2013/07/08/telexfree-affiliates-gave-adsurfdaily-like-coaching-tips-instructed-prospects-to-make-deposits-at-bank-of-america-and-to-copy-slips-to-team-leaders-gmail-address-for-expedited-service-t/ (July 8, 2013) (including screen shot of TelexFree bank transfer instructions).

[56] *Id.*

427. Members were separately instructed to transfer membership fees to an account at Bank of America under the name "TelexFree Inc.," and were provided with the Bank of America branch address, "188 Bosyon [sic] Tpke Shrewsbury Ma 01545".[57]

428. Bank of America also provided credit to TelexFree, via at least two credit cards, which are identified in TelexFree's 2013 balance sheet as "Bank of America Braz Help 0033" and "Bank of America Telexfree 2658".

429. On or about April 24, 2013, Defendant Labriola announced, in a mass email to TelexFree members that TelexFree would be "*pulling out*" of Bank of America.[58]

430. Upon information and belief, this announcement was made because Bank of America had indicated that it would cease doing business with TelexFree due to TelexFree's illegal business activities.

431. Nevertheless, Bank of America continued to act as a depository bank for TelexFree membership fees until about August, 2013.

432. On August 30, 2013, Defendant Labriola announced during a public conference call with TelexFree members that payments due-and-owing to members as of July 30, 2013 required manual sorting, since "*Bank of America didn't give them a sorted list*" as to which of the payments had already been made by Bank of America.[59]

---

[57] *See* PatrickPretty.com, *TelexFree Affiliates Gave AdSurfDaily-Like Coaching Tips*," July 8, 2013, http://patrickpretty.com/2013/07/08/telexfree-affiliates-gave-adsurfdaily-like-coaching-tips-instructed-prospects-to-make-deposits-at-bank-of-america-and-to-copy-slips-to-team-leaders-gmail-address-for-expedited-service-t/; *see also* TelexFree Recruitment Presentation, available at http://webopportunities.weebly.com/uploads/1/5/8/5/15857054/telex.pp.2.13.pdf;

[58] *See* http://telexfreeunitedkingdon.weebly.com/telexfree-updates.html (recruitment website of TelexFree 'Team Builder' Leonardo de Souza] and http://mytelexfree4u.blogspot.com/ (website of TelexFree Promoter).

[59] *See* http://teamstelexfree.blogspot.com/p/blog-page_7.html (recruitment website of TelexFree Promoter)

433.     Furthermore, Bank of America continued to provide credit, via at least two (2) credit cards, at least through December 31, 2013, as indicated on TelexFree's 2013 balance sheet.  In fact, the 2013 balance sheet does read "0.00" for these cards, but they are still present as items on the sheet, and no other credit cards are listed

434.     By document dated November 11, 2013, Defendant Merrill, on behalf of TelexFree, directed Allied Wallet, a payment processor, to transfer funds via international wire transfer to a TelexFree account with Bank of America.[60]

435.     Defendant TD Bank also maintained multiple accounts on behalf of TelexFree for deposit of TelexFree membership fees, including at least three that are listed on TelexFree's December 31, 2013 Balance Sheet.

436.     On or about September 6, 2013, TelexFree leadership instructed its members via a public conference call that the fastest way to send money to TelexFree was by direct deposit to TelexFree's accounts with TD Bank.[61]

437.     The person speaking on behalf of TelexFree during this conference call is believed to have been Brandon Bradshaw, a Promoter formerly active with the now-defunct pyramid schemes ZeekRewards and AddWallet.[62]

438.     TD Bank maintained deposit accounts on behalf of TelexFree at least through December 31, 2013, long after TelexFree's Brazilian operation had been publicly exposed as a pyramid scheme and shutdown, and after a scam warning against TelexFree had been issued in the United Kingdom.

---

[60] *See* Allied Wallet Bank Information Form for Bank of America, attached herewith as Exhibit 16.

[61] *See* BehindMLM.com, "*TelexFree US business plagued with 'rampant fraud'*", Sept. 7, 2013, http://behindmlm.com/companies/telexfree/telexfree-us-business-plagued-with-rampant-fraud/.

[62] *See id.*, reader comments.

439.    Wells Fargo Bank maintained a depository account for TelexFree until March 14, 2014, long after TelexFree's Brazilian operation had been publicly exposed as a pyramid scheme and shutdown, and after a scam warning against TelexFree had been issued in the United Kingdom.[63]

440.    Fidelity Bank's president, John Merrill, is the brother of Defendant Merrill and held his position during all times relevant to this Complaint.

441.    TelexFree made substantial deposits received from its illegal Scheme into accounts it opened and held at Fidelity Bank, and Fidelity Bank accepted its business, also long after TelexFree's Brazilian operation had been publicly exposed as a pyramid scheme and shutdown, and after a scam warning against TelexFree had been issued in the United Kingdom.

442.    In particular, Fidelity Bank opened three accounts for TelexFree, two on August 8, 2013 with initial deposits of $7,123,784.58 and one on September 12, 2013 with deposits of $2,951,337.12.

443.    Fidelity Bank even helped TelexFree to conduct its business more easily by using remote deposit capture.

444.    As alleged in a Consent Decree filed by the SOC, TelexFree was permitted to continue to deposit funds received from its illegal Scheme in Fidelity Bank's accounts between August 8 and December 26, 2013.[64]

445.    The SOC alleges that Fidelity Bank had insufficient controls in place and inadequate training and oversight to handle the large TelexFree accounts.[65]

---

[63] *See* Declaration of Stuart A. MacMillan, Case No. 14-125234-ABL, Doc. 121, par. 12, attached herewith as Exhibit 17.

[64] SOC Consent Order E 2014-0073, attached herewith as Exhibit 18

[65] *Id.*

446.   Fidelity Bank became aware of the Brazilian seizure on or about November 27, 2013, and was advised by an outside consultant that TelexFree was a high risk customer and needed to be monitored.[66]

447.   As early as February 28, 2014, two bank transfers at Wells Fargo totaling $3.5 million moved funds from a TelexFree account into one bearing Katia Wanzeler's name, according to the affidavit.  After that, $1.5 million of the money moved again, this time into her Wells Fargo brokerage account.

448.   Then, on April 11, 2014, Katia Wanzeler and Merrill allegedly traveled together to a Wells Fargo bank in Connecticut to fetch more than $27 million in cashier's checks.  Most of the checks were made payable to TelexFree entities, but one of them – for more than $2 million – was made out to Katia B. Wanzeler.

449.   That check surfaced during the office raid, when TelexFree's chief financial officer tried to leave with a bag stuffed with $38 million in checks.

450.   Nevertheless, Fidelity Bank continued to accept deposits from TelexFree until at least December 26, 2013.[67]

451.   According to the SOC's investigations, TelexFree deposited funds obtained from TelexFree victims in accounts at Fidelity Bank between August 8, 2013 and December 26, 2013.[68]

452.   As a result of the SOC's allegations, Fidelity Bank entered into a consent decree on September 22, 2014, establishing an escrow fund of $3.5 million for victims of the Scheme.[69]

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

453.   Middlesex Savings Bank maintained several large accounts on behalf of TelexFree, beginning on or about February, 2012, and continuing at least through December 31, 2013; long after TelexFree's Brazilian operation had been publicly exposed as a pyramid scheme and shutdown, and after a scam warning against TelexFree had been issued in the United Kingdom.

454.   TelexFree's 2013 Balance Sheet lists two accounts with Middlesex Savings Bank, one having a balance – as of December 31, 2013 – of $5,467,660.06, and the other having a balance of $2,000,000.

455.   FMR, LLC, also known as Fidelity Investments, maintained at least three investment accounts for the benefit of TelexFree, which remained active at least through December 31, 2013.

456.   Under the foregoing circumstances of this case, the Banking Institution Defendants owed a duty to plaintiffs and the putative class requiring the exercise of due care in their opening and monitoring of the TelexFree accounts.

457.   The Banking Institutions had sufficient notice of wrongdoing in this case that gave rise to a duty on their part to monitor the TelexFree accounts, inquire further and to take reasonable steps to prevent a diversion of funds.

458.   The Investment Service Provider Defendants possessed actual knowledge of the fraudulent nature of TelexFree's business operation since at least June 2013.

459.    Despite knowledge of the fraudulent nature of TelexFree's business operations, the Investment Service Provider Defendants continued to provide TelexFree and the Officer Defendants with both personal and business investment services.[70]

460.    The Banking Institution Defendants and Investment Service Provider Defendants also received large transfers of funds from TelexFree, its affiliated entities, and the Defendant Founders, despite their knowledge of the fraudulent nature of TelexFree's business operations, and assisting TelexFree and the Defendant Founders in concealing assets.[71]

461.    Defendants GPG, IPS, Propay, Base Commerce, Vantage Payments, Allied Wallet, and the Doe Payment Processors (sometimes collectively referred to as "Payment Processing Services Companies" or "PPSC Defendants") possessed actual knowledge of the fraudulent nature of TelexFree's business operations since at least June 2013.

462.    Despite knowledge of the fraudulent nature of TelexFree's business operations, the PPSC Defendants continued to provide TelexFree with payment processing services, or otherwise knowingly assisted TelexFree in the processing and payment of illegal proceeds.[72]

463.    More particularly, the PPSC Defendants processed payments by Promoters to TelexFree in TelexFree's fraudulent business operations, which funds were then held for the benefit of TelexFree, its affiliated entities and its Defendant Founders.

464.    Upon information and belief, the PPSC Defendants also processed large transfers of funds from TelexFree, its affiliated entities and Defendant Founders to Banking Institution

---

[70] *See* TelexFree, LLC Balance Sheet as of December 31, 2013, attached herewith as Exhibit 13; *see also* Declaration of Stuart A. MacMillan, Case No. 14-125234-ABL, Doc. 121, par. 14, attached herewith as Exhibit 17.

[71] *Id.*

[72] *Id.*; *see also* Omnibus Declaration of William H. Runge, Case No. 14-125234-ABL, Doc. 13, par. 61, attached herewith as Exhibit 6.

Defendants and other receivers, despite their knowledge of the fraudulent nature of TelexFree's business operations, assisting TelexFree and Defendant Founders in concealing assets.

465.    The PPSC Defendants received payment of substantial fees in return for providing these services.

466.    Defendant, ProPay, which also does business as Propay.com, processed such electronic transfers of funds on behalf of TelexFree.

467.    Upon information and belief, ProPay processed transfers of funds by and on behalf of TelexFree, its affiliated entities, and Defendant Founders, despite their knowledge of the fraudulent nature of TelexFree's business operations, assisting TelexFree and Defendant Founders in concealing assets.

468.    Defendant, GPG, is a payment service provider that specializes in making outgoing payroll and commission payments for clients as well as processing credit card transactions for incoming payment.

469.    On April 17, 2013, GPG and TelexFree entered into a Corporate Client Payroll & Commission Processing and Payment Services Agreement.

470.    In April, 2013, Defendants Merrill and Wanzeler, on behalf of TelexFree, submitted an application for payment processing services to Base Commerce, LLC, which also does business as Phoenix Payments, GPG's credit card processing partner.

471.    Although the said application requested the Social Security number and date of birth of Wanzeler and Merrill as co-owners of TelexFree, Wanzeler refused to provide his Social Security number and date of birth, prompting Base Commerce to perform additional credit checks, or "pull credit," on both Merrill and Wanzeler.

472.    Base Commerce's additional credit check involved running a "FraudDefender" on TelexFree, which resulted in a score of 30/50 for TelexFree, indicating moderate risk, and score of 20/50 for Wanzeler, indicating moderately high risk.

473.    In an interoffice letter dated May 22, 2013, John Hughes, President of Base Commerce, noted that TelexFree was formerly known as Common Cents Communications, stating:

> "That program paid people residual commissions for placing ads online and the network marketing commentators accused them of being a Ponzi scheme as the commission advertised appeared unrealistically high and therefore fictitious."[73]

474.    At that time, TelexFree was widely and prominently marketed and advertised as a passive income scheme, in which members would be paid commissions for placement of online advertisements.

475.    Despite Base Commerce's knowledge of TelexFree's negative press and the accusations of operating a pyramid scheme, TelexFree's application was ultimately accepted.

476.    In the same interoffice letter dated May 22, 2013, Hughes indicated that TelexFree's "current primary market" was Brazil, and that they would receive a $19 million annual receivable from Ympactus Comercial, Ltda, "a Brazilian Company to whom they license their IOP System."

477.    In June, 2013, its pyramid scheme having been publicly exposed, Ympactus Comercial's business operations in Brazil were formally halted by public injunction of the Court of Acre, and the assets of the company were seized.

---

[73] *See* email from John Hughes to Lindsey Caspers, dated May 22, 2013, attached herewith as Exhibit 19.

478.    Beginning in June, 2013, Base Commerce provided TelexFree with payment processing services via an account held by Base Commerce's "sponsor bank," Synovus, from which Base Commerce deducted its monthly processing, chargeback, and other service fees.

479.    Base Commerce's total deductions from the TelexFree account for the months of June 2013 through January 2014, as follows:

| | |
|---|---|
| June 2013 | $340,106.76 |
| July 2013 | $565,582.16 |
| August 2013 | $1,164,038.56 |
| September 2013 | $113,672.76 |
| October 2013 | $99,326.90 |
| November 2013 | $61,438.21 |
| December 2013 | $108,181.78 |
| January 2014 | $98,903.07 |

480.    On August 13, 2013, Jay Borromei, a representative of GPG, co-hosted an open webinar with Defendant Labriola, which promoted GPG's payment system to TelexFree investors and potential investors and encouraged them to make further investments in TelexFree using GPG's system.

481.    On August 16, 2013, Borromei hosted an additional open webinar, in which he further promoted the payment system that GPG was providing to TelexFree, and encouraged further investments in TelexFree using GPG'

482.    In August, 2013, due to concerns regarding public accusations of running a Ponzi scheme and the possibility of an investigation by the Federal Trade Commission or other federal

agency, Defendant Synovus, the "sponsor bank" of Base Commerce and GPG, indicated that it would no longer hold funds on TelexFree's behalf.

483.    More particularly, Synovus instructed Base Commerce and GPG to cease performing payment processing services for TelexFree by August 31, 2013.

484.    Only due to this pressure from Synovus, John Hughes forwarded a letter to James Merrill on August 20, 2013, advising him that Base Commerce will terminate its services with TelexFree "as of 5:00 PM Pacific Standard Time on August 31, 2013."[74]

485.    In a subsequent email from Hughes to Defendants Merrill, Wanzeler, and Craft, as well as GPG, dated August 28, 2013, Hughes stated, regarding TelexFree

> "We have an MLM with a huge amount of negative news and serious accusations. Hence, banks and processors are running away based on what the FTC, Treasury Dept., FDIC and Justice Dept. has done to them lately to include suing them,,[sic] fining them and freezing their settlement funds".75

486.    In the same email, in which Hughes also characterized TelexFree as "a real hot-potato as they say," Hughes indicating that Base Commerce had worked to find a replacement processor for TelexFree "such that [TelexFree's] business was not interrupted" and that he had arranged, via the Co-Defendant Vantage Payments, LLC, for Allied Wallet, a United Kingdom-based payment processor, to take over payment processing services for TelexFree.

487.    Hughes also indicated that Base Commerce was actively applying to off-shore banks on TelexFree's behalf, noting "no US Bank or Processor, as evidenced by the email from PROPAY [sic], will accept your business…"

---

[74] *See* Letter from John Hughes to James Merrill, dated August 20, 2013, attached herewith as Exhibit 20.

[75] *See* email from John Hughes to James Merrill, dated August 28, 2013, attached herewith as Exhibit 21.

488.    Hughes also offered Merrill business planning advice, which included advising that TelexFree charge members for its $1,450 AdCentral membership packages by ACH instead of credit card.

489.    In a previous email from Defendant Merrill to Hughes, also dated August 28, 2013, Merrill indicated that he believed that Base Commerce's activity in soliciting off-shore banking services on TelexFree's behalf was connected with TelexFree's desire to separate its international, U.S.-based, and Brazil-based business among different banks and processors.

490.    Despite its previous correspondence indicating that it would cease doing business with TelexFree by August 31, 2013, and the explicit instructions from its "sponsor bank," Synovus, to cease performing any services for TelexFree by August 31, 2013, GPG continued to provide services to TelexFree well after this date.

491.    These services included permitting TelexFree GPG's electronic payment conduit, or "GPG Gateway," to transmit credit card processing data to Allied Wallet until approximately October 10, 2013.

492.    More particularly, in his email of September 27, 2013 to Jay Borromei and copied to Merrill, Jayme Amirie of GPG acknowledged that "TelexFree can continue to use the GPG gateway to transmit electronic data to Allied Wallet."[76]

493.    In an email from Hughes to Defendants Merrill and Wanzeler, dated September 27, 2013, Hughes indicated that, against the specific instructions of Synovus, he had authorized approximately $5 million in transfers on September 26, 2013, stating:

> The bank is clearly not happy with me but we are still trying to do the best
> job we can for you.  Their concerns are that if, god forbid, TelexFree came

---

[76] *See* email from Jayme Amirie to Jay Borromei dated September 27, 2013, attached herewith as Exhibit 22.

under a publicized FTC investigation, there could be an indeterminate wave of chargeback's…[77]

494.    In September, 2013, Base Commerce successfully applied to IPS, on TelexFree's behalf, for TelexFree to receive its ACH processing services through IPS.

495.    Thereafter, TelexFree's ACH processing was conducted by IPS, also doing business as e-Wallet.

496.    On or about October 10, 2013, Hughes reiterated to Merrill his concern over the possibility of a Federal Trade Commission investigation.

497.    In an email from Defendant Merrill to Hughes, dated January 16, 2014, Merrill indicated that TelexFree, which was continuing to do business with GPG, but was having "a great deal of issues with GPG," specifically, regarding TelexFree's reserve balance and cash flow in and out of GPG.

498.    Hughes, on behalf of Base Commerce, responded that Base Commerce was "happy to help" regarding TelexFree's issue with GPG.

499.    Despite these numerous "red flags" of which Base Commerce was aware, and despite being instructed by its sponsor bank, Synovus, to cease processing transactions for TelexFree by August 31, 2013, Base Commerce continued to provide services to TelexFree.

500.    These services included: processing transactions for TelexFree until at least January, 2014; connecting TelexFree with off-shore processors; applying for accounts at off-shore banks on TelexFree's behalf; and proving advice and guidance regarding TelexFree's business operations.

---

[77] *See* email from John Hughes to James Merrill, dated September 27, 2013, attached herewith as Exhibit 23.

501.    In an email from GPG to Defendants Merrill, Wanzeler, and Labriola, as well as Base Commerce, dated September 3, 2013, GPG's Jayme Amirie indicated that, against the specific instructions of its sponsor bank, which had instructed it to cease all services for TelexFree, GPG "sneaked" payouts from the bank on TelexFree's behalf.[78]

502.    Defendant Vantage Payments, which characterizes itself as an "Independent Sales Agent," served as a broker between TelexFree and other banks and processors for purposes of securing payment processing services.

503.    In approximately August 2013, Dustin Sparman, Managing Partner of Vantage Payments, was contacted by John Hughes of Base Commerce regarding TelexFree.

504.    More particularly, Vantage Payments was asked to act as a broker on TelexFree's behalf, and to contact banks and processors with whom it had a business relationship to secure payment processing services for TelexFree, which services Vantage Payments agreed to perform.

505.    Thereafter, Vantage Payments contacted Defendant Allied Wallet, and applied on TelexFree's behalf for Allied Wallet to provide payment processing services to TelexFree.

506.    Vantage Payments also contacted an additional payment processor based in the United Kingdom, who, at that time, refused to provide services to TelexFree due to known accusations of fraud regarding TelexFree's operations.

507.    However, upon Vantage Payments' application on behalf of TelexFree, Allied Wallet did agree to provide payment processing services to TelexFree, pursuant to which

---

[78] *See* Email from Jayme Amirie to James Merrill dated September 3, 2013, attached herewith as Exhibit 24.

agreement Allied Wallet would provide a "processing account" and process both incoming and outgoing payments for the benefit of TelexFree, among other services.[79]

508.    In connection with TelexFree's agreement with Allied Wallet, Defendant Merrill instructed Allied Wallet to transfer funds from TelexFree's processing account with Allied Wallet to accounts with Fidelity Bank.

509.    Vantage Payments, on behalf of TelexFree, also registered an entity in the United Kingdom, known as "TelexFree, LTD," to serve as TelexFree's EU-based operation.

510.    In fact, as Vantage Payments was aware, "TelexFree, LTD" was a shell company with no physical presence beyond a mere address.

511.    On or about October 10, 2013, Allied Wallet informed TelexFree that, due to an increase in both payment volume and chargebacks, it would be increasing the rolling reserve on TelexFree's processing account to 20%.

512.    Thereafter, Vantage Payments negotiated extensively with Allied Wallet on TelexFree's behalf, in order to have this rolling reserve reduced.

513.    These negotiations entailed, *inter alia*, Sparman meeting personally with the CEO of Allied Wallet in Los Angeles, California on TelexFree's behalf.

514.    Ultimately, after extensive lobbying by Vantage Payments on TelexFree's behalf, Allied Wallet agreed to reduce its rolling reserve on the TelexFree processing account to 10%, and also agreed to increase the maximum processing volume on the account.

515.    On or about November 13, 2013, Sparman, on behalf of Vantage Payments, and acting on behalf of TelexFree, once again contacted another United Kingdom-based payment processor in hopes of securing TelexFree additional payment processing volume.[80]

---

[79] *See* Allied Wallet Card Payment Processing Agreement, dated August 26, 2013, attached herewith as Exhibit 25.

516.    This effort was ultimately unsuccessful, as this additional United Kingdom-based payment processor declined to perform services for TelexFree in light of the accusations of fraud and illegality surrounding TelexFree.

517.    By agreement with TelexFree, Vantage Payments also provided TelexFree with access to its Customer Dispute Resolution Network ("CDRN") Portal to Verifi by Visa's CDRN, the purpose of which was to provide TelexFree with the capability to address issues relating to customer payment disputes.[81]

518.    In approximately December 2013, TelexFree entered into a further agreement with IPS for additional payment processing services, under the name and address of the "TelexFree, LTD" shell company established by Vantage Payments.[82]

519.    Thereafter, beginning in approximately January 2014, IPS provided TelexFree with a service titled "e-Wallet," which was used by TelexFree for additional processing of funds transferred by Promoters to TelexFree.

520.    IPS has a history of representing Ponzi schemes.  Prior clients include  Spinding (six-tiered Ponzi scheme that uses a global cycler business model); Wealth4AllTeam (long-running but now collapsed 10 day ROI Ponzi Scheme); Primus Hub (attempted reboot of Wealth4AllTeam once it collapsed); Funky Shark (planned Ponzi scheme that shut down during prelaunch following legal advice and a $40,000 fine); Team Vinh International (feeder co-op program for multiple recruitment-driven MLM schemes); MyAdvertisingPays (120% ROI advertising-based Ponzi scheme); Diamond Banners (matrix based recruitment scheme);

──────────────────────── (continued)

[80] *See* email from Dustin Sparman to James Merrill, dated November 13, 2013, attached herewith as Exhibit 26.

[81] *See* Vantage Payments CDRN Portal Agreement, attached herewith as Exhibit 27.

[82] *See* email from Dustin Sparman to James Merrill, dated December 27, 2013, attached herewith and marked as Exhibit 28.

Diamond Cycler (matrix based recruitment scheme); Argent Network (fifty-two week ROI Ponzi scheme, advertised as "a mixture of Zeek Rewards and TelexFree"); and 1BuckAdShare ($1 a position Ponzi scheme).

521.    In an October 2013 email to the news website *BehindMLM.com*, IPS stated that they had "done a complete due diligence on TelexFree" and "confirmed the product as compliance with all US laws."

522.    On or about February 12, 2014, IPS announced that they were partnering with MLM attorney Kevin Thompson of Thompson Burton, PLLC, to "provide up-to-date compliance guidance to their new and existing clients in the Direct Selling and Multi-Level Marketing industry."   Upon information and belief, TelexFree was a recipient of such "compliance guidance" services.

523.    In an email from Defendant Merrill to Sparman, dated January 15, 2014, Merrill stated, regarding dividing TelexFree's payment processing between Vantage Payments and IPS: "*[T]here will be plenty of business to go around.  You deserve your share for getting us started…Whomever treats us best will get most of the business.*"[83]

524.    According to a TelexFree balance sheet, dated December 31, 2013, posted by the Washington State Utilities and Transportation Commission, as of December 31, 2013, TelexFree claimed $31,640,192.30 in assets then held by IPS (under the brand name "e-Wallet") on behalf of TelexFree.[84]

525.    IPS continued to provide payment processing services to TelexFree until April 17, 2014, at which time IPS finally disabled its electronic services.

---

[83] *See* email from James Merrill to Dustin Sparman, dated January 15, 2014, attached herewith as Exhibit 29.

[84] *See* TelexFree, LLC Balance Sheet as of December 31, 2013, attached herewith as Exhibit 13.

526.     Thereafter, in place of the previous e-Wallet online interface, IPS posted a message online stating that TelexFree's payment processing services had been disabled, and suggested that this could be due to TelexFree having "violated Anti-Money Laundering policies."

527.     Despite having direct knowledge of the shutdown of TelexFree's Brazil-based affiliate, the United Kingdom scam warning against TelexFree, well-publicized accusations of fraud and illegality on the part of TelexFree, and an enormous number of "red flags" indicating the fraudulent and illegal nature of TelexFree's operations, Allied Wallet, Vantage Payments, and IPS continued to provide processing and processing-related services to TelexFree up to the time that TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc. declared bankruptcy in April 2014.

528.     Under the foregoing circumstances of this case, the Payment Processing Service Company Defendants owed a duty to plaintiffs and the putative class requiring the exercise of due care in their monitoring of the TelexFree accounts.

529.     The Payment Processing Service Company Defendants had sufficient notice of wrongdoing in this case that gave rise to a duty on their part to monitor the TelexFree accounts, inquire further and to take reasonable steps to prevent a diversion of funds.

530.     Each of the Defendant Banking Institutions, Defendant Investment Services Providers, and Defendant Payment Processing Services Companies is a "financial institution" under the terms of the Bank Secrecy Act, 31 U.S.C. § 5312.

531.     Each of the Defendant Banking Institutions, Defendant Investment Services Providers, and Defendant Payment Processing Services Companies has an affirmative obligation to file Suspicious Activity Reports with the Financial Crimes Enforcement Network of the U.S.

Department of the Treasury and other appropriate federal law enforcement agencies, pursuant to the terms of the Bank Secrecy Act and Regulations, 31 U.S.C. § 5312 and 12 CFR § 21.11.

532.   Each of the said Defendants is obligated by applicable federal statutes and regulations, including, without limitation, 31 C.F.R. § 103.121 (amended 31 C.F.R. § 1020, et seq.), to acquire information sufficient to know the true identities, nature of business activities, customer base, and product offerings of all entities to which it provides financial services or access to the national banking system.

533.   Pursuant to this required "know-your-customer" analysis, as required by 31 C.F.R. § 103.121 (amended 31 C.F.R. § 1020, et seq.), each of the said Defendants was required to collect information sufficient for the Defendant to determine whether TelexFree, or any other customer of the Defendant involved with TelexFree, posed a threat of criminal or other improper conduct.

534.   Each of the said Defendants is also obligated by applicable federal statutes and regulations, including, without limitation, the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the USA Patriot Act, § 326, 31 U.S.C. § 5318, and 31 C.F.R. § 1020 et seq., to implement effective procedures to prevent such Defendant from providing financial services or access to the national banking system, to entities engaged in illegal activities.

535.   Each of the said Defendants processed transactions in excess of $25,000 in the aggregate on behalf of TelexFree, which transactions facilitated TelexFree's criminal Pyramid Scheme operation.

536.   As set forth above, the Defendant Banking Institutions, Defendant Investment Services Providers, and Defendant Payment Processing Services Companies were confronted

with numerous "red flags" regarding the legality of TelexFree's operations, including, but not limited to:

    a.  the public governmental investigation and shutdown of TelexFree's Brazil-based affiliate;

    b.  the United Kingdom police scam warning against TelexFree;

       well-publicized accusations of fraud and illegality;

    c.  suspicious intra-company transfers and large transfers of funds from TelexFree accounts to accounts held in the name of individual Defendant Founders;

    d.  diversion of funds held in TelexFree accounts to personal investment and depository accounts;

    e.  TelexFree's lack of legitimate business operations;

    f.  TelexFree's unusually high rate of credit card chargebacks and credit card fraud; and

    g.  TelexFree's irregular accounting practices and documentation.

537.   Having been confronted with these "red flags," said Defendants had an affirmative obligation to file a Suspicious Activity Reports regarding TelexFree with the Financial Crimes Enforcement Network of the U.S. Department of the Treasury and other appropriate Federal law enforcement agencies.

538.   In violation of their obligations under the Bank Secrecy Act and Regulations, each of the Defendant Banking Institutions, Defendant Investment Services Providers, and Defendant Payment Processing Services Companies knowingly, or with willful ignorance, failed, refused or neglected to submit any report, including any Suspicious Activity Report, to the

Financial Crimes Enforcement Network of the U.S. Department of the Treasury, or any other federal or state agency, with respect to TelexFree, the Defendant Founders, and the Defendant Named Inside Promoters and Doe Inside Promoters

539.    Each of the Defendant Banking Institutions, Defendant Investment Services Providers, and Defendant Payment Processing Services Companies also knowingly, or with willful ignorance, failed, refused or neglected to perform proper "know-your-customer" analysis with respect to TelexFree, the Defendant Founders, and the Defendant Named Inside Promoters and Doe Inside Promoters, as required by 31 C.F.R. § 103.121 (amended 31 C.F.R. § 1020, *et seq.*).

540.    Furthermore, each of the Defendant Banking Institutions, Defendant Investment Services Providers, and Defendant Payment Processing Services Companies failed, refused or neglected to implement effective procedures to prevent such Defendant from providing financial services or access to the national banking system, to TelexFree, the Defendant Founders, and the Defendant Named Inside Promoters and Doe Inside Promoters, as required by the Bank Secrecy Act, 31 U.S.C. § 5311 et seq.; the USA Patriot Act, § 326, 31 U.S.C. § 5318; and 31 C.F.R. § 1020 et seq.

## R.    Doe Inside Promoters who Acted as Defendants' Agents

541.    Although they remain unknown to plaintiffs and the Putative Class Representatives and will remain unknown until discovery has been exchanged, certain promoters were provided with inside information by Defendants and acted as agents and servants of Defendants.

542.    Plaintiffs and the Putative Class Representatives seek to obtain damages, restitution and injunctive relief for the Class, as defined, below, from Defendants.

## V.     CLASS ACTION ALLEGATIONS

543.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs sue on their own behalf, and on behalf of all other persons similarly situated ("the Class"). The Class that Plaintiffs seek to represent is:

> All persons residing in the United States who purchased and had recorded in TelexFree's electronic registry, including, but not limited to, the so called "Back Office", TelexFree AdCentral packages in their name and suffered a net loss during the period from January 1, 2012 and April 16, 2014 (the "Class Period"). Excluded from the Class are the Defendants and their officers, directors, and employees; any entity in which any Defendant has a controlling interest; the coconspirators, the so called Inside Promoters, legal representatives, attorneys, heirs, and assigns of the Defendants.

544.    Plaintiffs meet the requirements of Federal Rules of Civil Procedures 23(a) because the members of the Class are so numerous that the joiner of all members is impractical. While the exact number of Class members is unknown to Plaintiffs based on information and belief, it is in the hundreds of thousands.

545.    Plaintiffs meet the requirements of Federal Rules of Civil Procedures 23(a) because there is a well-defined community of interest among the members of the Class, common questions of law and fact predominate, Plaintiffs' claims are typical of the members of the Class, and Plaintiffs can fairly and adequately represent the interests of the Class.

546.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3) because it involves questions of law and fact common to the member of the Class that predominate or questions affecting only individual members, including, but not limited to:

> a.   whether the contract under which TelexFree claims to invoke the application of Nevada law is illegal and unenforceable as a matter of law;
>
> b.   whether TelexFree ran an unlawful Pyramid Scheme or a legitimate business;
>
> c.   whether TelexFree ran a lawful Multi-Level Marketing program;

d.   whether Defendant Founders, Inside Promoters, Banks and Financial Service Providers, Payment Processing Services Companies and Retained Licensed Professionals knew that TelexFree was an illegal pyramid scheme, continued to aid, abet and further such illegal activities or are otherwise liable for the economic loss suffered by the Putative Class;

e.   whether TelexFree's financial services providers, including the aforesaid banking institutions and payment processing services providers, knowingly aided and abetted TelexFree's Pyramid Scheme;

f.   whether Massachusetts' Unfair Trade and Deceptive Acts, M.G.L. c. 93A will apply to the claims of the Putative Class;

g.   whether Massachusetts' Blue Sky Laws will apply to the claims of the Putative Class;

h.   whether certain Defendants used and employed manipulative and deceptive devices and contrivances in violation of MGL 110A, Sec. 410; used means and instrumentalities, directly and indirectly, for the purchase and sale of unregistered securities; and used and employed manipulative and deceptive devices and contrivances in violation of the Massachusetts Uniform Securities Act, MGL c. 110A, Section 410(b) and MGL 93A;

i.   whether Defendants violated Section 1965 of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. § 1965];

j.   whether TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to investors;

     k.  whether the 1099 (Miscellaneous Income) forms should be declared void as a matter of law;

     l.  whether Defendants' conduct violated any of the articulated Massachusetts state common laws; and

     m.  whether Plaintiff and the Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

547.    Plaintiffs' claims are typical of those of other Class members because Plaintiffs were defrauded by Defendants' scheme.

548.    Plaintiffs will fairly and accurately represent the interests of the Class.

549.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications regarding individual members of the Class, which would establish incompatible standards of conduct for the Defendants and would lead to repetitive adjudication of common questions of law and fact.

550.    Class treatment is superior to any other method for adjudicating the controversy. Plaintiffs know of no difficulty likely to be encountered in the management of this litigation that would preclude its maintenance as a class action under Rule 23(b)(3).

551.    Damages for any individual class member likely cannot justify the cost of individual litigation, so that absent class treatment, the Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

552.    Defendants have acted or refused to act on grounds that apply to the class, as alleged above, and certification is proper under Rule 23(b)(2).

## VI.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,**
**CHAPTER 93A, SECTIONS 2 AND 11**
**(Against All Defendants Except Katia Wanzeler)**

553.    Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

554.    Defendants were engaged in "trade" and "commerce" as defined by Massachusetts General Laws Chapter 93A, Section 1.

555.    Plaintiffs and the Putative Class were engaged in "trade" and "commerce" as defined by Massachusetts General Laws Chapter 93A, Section 1.

556.    The foregoing transactions, actions and inactions of Defendants constitute unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General Laws, Chapter 93A, §§ 2 and 11.

557.    In consequence of Defendants' unfair and deceptive acts and practices, Plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

## SECOND CLAIM FOR RELIEF
## NEGLIGENCE
### (Against All Defendants)

558.    Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

559.    Defendants owed a duty to Plaintiffs and the Putative Class to act with a level of reasonable care to avoid misstating, misrepresenting or being misleading about the true nature of TelexFree's operation and its financial information or its returns, and to comply with all laws.

560.    By misstating and omitting relevant information, including the source of and sufficiency of funds for payments to Promoters, Defendants breached their duty of care owed to Plaintiffs and the Putative Class.

561.    Defendant Retained Licensed Professionals owed Plaintiffs and the Putative Class a duty to act with reasonable care and to exercise the ordinary skill and ability commonly exercised by such professionals.

562.    Banking Institution Defendants and Payment Processing Service Company Defendants had sufficient notice of wrongdoing in this case that gave rise to a duty on their part to monitor the TelexFree accounts, inquire further and to take reasonable steps to prevent a diversion of funds or perpetration of a fraudulent scheme.

563.    Plaintiffs and the Putative Class relied upon Defendants' expertises and/or performance of their duties in becoming Promoters for the Pyramid Scheme.

564.    Plaintiffs and the Putative Class reposed faith, confidence and trust in Defendants' representations and advice.

565.    As a direct and proximate result of Defendants' negligence and carelessness, Plaintiffs and the Putative Class have been caused to suffer and sustain damages and losses.

97

## THIRD CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants Except Katia Wanzeler)

566.     Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

567.     Defendants directly, and through their agents, servants, employees and/or representatives, negligently made false misrepresentations of material fact and omissions to Plaintiffs and the Putative Class in the course of their businesses with the misrepresentations being made to obtain and/or wrongfully appropriating and converting money from Plaintiffs and the Putative Class.

568.     Defendants made negligent misrepresentations and omissions although said Defendants knew, or should have known, that such representations were false.

569.     Said representations and statements were material and were relied upon by Plaintiffs and the Putative Class, inducing them to furnish money to Defendants.

570.     Further, Retained Licensed Professionals failed to exercise proper due diligence in the discharge of their investigatory duties as certified public accountants and attorneys of TelexFree, and knew or should have known Plaintiffs and the Putative Class would have relied upon their expertise and misrepresentations.

571.     Plaintiffs and the Putative Class reposed faith, confidence and trust in Defendants Electric's and Mobile's, Defendant Founders', Inside Promoters', and Retained Licensed Professionals' representations and advice.

572.     In consequence of the reliance on the negligent misrepresentations of the said Defendants, Plaintiffs and the Putative Class have suffered great financial losses, have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

## FOURTH CLAIM FOR RELIEF
## FRAUD
**(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Retained Licensed Professionals and IPS)**

573.     Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

574.     Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Retained Licensed Professionals and IPS directly, and through their agents, servants, employees and/or representatives, did intentionally make false representations and omissions of material fact to Plaintiffs and the Putative Class with these misrepresentations being made to obtain and/or wrongfully appropriating and converting money from Plaintiffs and the Putative Class.

575.     Said Defendants' fraudulent misrepresentations and omissions are detailed above and include, but are not limited to:

    a.   providing false and misleading information on the nature of TelexFree's business operation;

    b.   misrepresenting the financial statements;

    c.   providing false and misleading information on the value of the AdCentral package;

    d.   providing false and misleading information on the method and source from which income was derived;

    e.   providing false and misleading information on the legality of TelexFree's business model;

    f.   providing false and misleading information on the sustainability of the returns to Promoter;

g. providing false and misleading information regarding the investigation in Brazil and subsequent closure of TelexFree's Brazilian operations;

h. knowingly participating in false and deceptive information televised over the internet and other media;

i. failing to comply with federal and state laws; and

j. employing legal and accountant counsel to mask their illegal and fraudulent activities to further and perpetuate such illegal fraudulent activities.

576. Said Defendants knew of the fraudulent and deceptive misrepresentations and omissions of material facts set forth.

577. Said Defendants made these intentional misrepresentations although Defendants knew that such representations were false for the purpose of inducing Plaintiffs and the Putative Class to purchase initially and to continue to purchase memberships and to recruit new members.

578. Such misrepresentations and omissions were done knowingly for the additional purpose and effect of concealing the true information about the TelexFree Program, including its financial condition and operations.

579. Said Defendants received information reflecting the facts regarding TelexFree's business practices and exercised control over the materially misleading misstatements.

580. Because of their control over and/or association with the TelexFree Program, said Defendants were active and culpable participants in the fraudulent scheme.

581. Said Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to Promoters and potential Promoters.

582. The ongoing fraudulent Pyramid Scheme could not have been perpetrated over a substantial period without the knowledge and complicity of said Defendants.

583.    These misrepresentations and statements were material and were relied upon by Plaintiffs as true, inducing them to furnish money, directly or indirectly, to said Defendants and recruit new members.

584.    In consequence of the reliance on the intentional misrepresentations, Plaintiffs and the Putative Class have paid artificially inflated prices for worthless membership interests, suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged during the Class Period.

## FIFTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (Against All Defendants)

585.    Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

586.    Plaintiffs and the Putative Class furnished funds, directly or indirectly, to Defendants, who accepted them without protest or defect and retained and benefitted from them.

587.    Defendants knew of such funds received by them.

588.    Defendants have unlawfully and in bad faith denied Plaintiffs and the Putative Class access to such funds, and have instead knowingly retained the benefit of such funds for themselves.

589.    As a direct and proximate result of Defendants' actions, as hereinabove set forth, Defendants are, and continue to be, unjustly enriched.

## SIXTH CLAIM FOR RELIEF
## TORTIOUS AIDING AND ABETTING
### (Against All Defendants)

590.    Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

591.   Each Defendant provided substantial assistance or encouragement to the other Defendants in committing the primary causes of action alleged herein, and did so with unlawful intent and knowledge that such parties were perpetuating an illegal Pyramid Scheme yet continuing to substantially assist or encourage.

592.   Defendants rendered this substantial assistance despite their knowledge that TelexFree's operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme and financial fraud.

593.   Such substantial assistance rendered by Defendants despite their knowledge of, or with reasonable diligence they should have known of, the illegal nature of TelexFree's operations, is detailed above and includes, but is not limited to:

      a.   managing and controlling TelexFree and its affiliated entities;

      b.   providing accounting services to TelexFree;

      c.   providing legal services to TelexFree;

      d.   publicly certifying that TelexFree's business model and operations were legal, proper, and economically viable and sustainable;

      e.   providing banking, investment and asset management services for TelexFree and its management;

      f.   promoting TelexFree AdCentral packages;

      g.   continuing to provide financial services following the Brazilian Court's injunction to stop TelexFree's business in Brazil;

      h.   processing payments to, from, and on behalf of TelexFree and its affiliated entities; and

i.   processing payments for transfers of funds which deepened TelexFree's insolvency.

594.   By each Defendant's actions participating in the Pyramid Scheme, as alleged above, each said Defendant aided and abetted the commission of the causes of action alleged herein.

595.   As a direct and proximate result of TelexFree's illegal Pyramid Scheme and all the activities performed in connection therewith, to which Defendants provided substantial assistance, Plaintiffs and the Putative Class sustained damages and losses.

**SEVENTH CLAIM FOR RELIEF**
**CIVIL CONSPIRACY**
**(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG, IPS and Katia Wanzeler)**

596.   Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

597.   Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG and IPS have combined by common design to enter into a civil conspiracy.

598.   Said Defendants agreed or commonly designed to engage in the unlawful Pyramid Scheme and further its activities.

599.   As detailed above, each of said Defendants engaged in a tortious act in furtherance of the agreement or common design to engage in the lawful Pyramid Scheme.

600.   Said Defendants, for an unlawful purpose and using unlawful means, with the intent of so combining, unlawfully defrauded Plaintiffs and the Putative Class out of funds.

601.   In consequence of the foregoing, Plaintiffs and the Putative Class sustained damages and losses.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce)**

602.    Plaintiffs incorporate by reference all allegations set forth in all previous paragraphs, as if the same were specifically set forth herein.

603.    For the purposes of this cause of action alone, PricewaterhouseCoopers is not included within the definition of Certain Retained Licensed Professionals.

604.    Beginning in at least as early as January 2012 and continuing thereafter to date, TelexFree constituted an "enterprise" (the "TelexFree Enterprise"), as defined in 18 U.S.C. § 1961(4).

605.    During or about the respective time periods, the TelexFree Enterprise engaged in interstate and foreign commerce, and its activities have affected interstate and foreign commerce.

606.    Beginning in at least as early as January 2012 and continuing thereafter to date, TelexFree, including Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce and others, being persons or entities associated in fact with the TelexFree Enterprise, conducted or participated, directly or indirectly, in the conduct of the TelexFree Enterprise's affairs through a pattern of racketeering activity, as set forth below, in violation of RICO, 18 U.S.C. § 1962(c).

607.    Additionally, beginning in at least as early as January 2012 and continuing thereafter to date, said Retained Licensed Professionals and Fidelity Bank and Base Commerce aided and abetted TelexFree, Defendants Electric and Mobile, Defendant Officers and the Inside Promoters in their conduct described in the previous paragraph, through a pattern of racketeering activity, as set forth below, in violation of RICO, 18 U.S.C. § 1962(c).

608.    The RICO Defendants are distinct from the TelexFree Enterprise.    Each Defendant has performed particular racketeering acts, but each Defendant is a separate individual or entity from the TelexFree Enterprise.

609.    One of the purposes of the pattern of racketeering was, through mail and wire fraud, and transportation and possession of converted funds to conduct the affairs, directly or indirectly, of the TelexFree Enterprise, or to aid and abet such conduct, and to further their own economic interests.

610.    The racketeering acts of mail and wire fraud and transportation and possession of converted funds also were part of the TelexFree Enterprise's goal to (a) purchase Advest memberships, (b) to recruit additional members, (c) promote the TelexFree Program, and (d) join the Pyramid Scheme and cause others to join and to reap financial gains for themselves.

611.    The pattern of racketeering activity alleged herein is distinct from the TelexFree Enterprise.

612.    The pattern of racketeering activity has included acts of mail and wire fraud and transportation and possession of converted funds, to wit:

613.    Beginning in at least January 2012, for the purpose of executing the Pyramid Scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, as set forth above, TelexFree, Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce Electric and Mobile unlawfully, willfully, knowingly and recklessly placed and caused to be placed in the United States mail, or took or received therefrom, or aided and abetted the placement or receipt of matters or things consisting of, among other things, TelexFree products and literature, correspondence related to the TelexFree Enterprise, invoices,

105

promotional literature, brochures, money, and checks to Plaintiffs and the Putative Class, in violation of 18 U.S.C. § 1341.  It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent Pyramid Scheme.

614.    Beginning in January 2012, for the purpose of executing the Pyramid Scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, as set forth above, TelexFree, Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce and others unlawfully, willfully, knowingly and recklessly have transmitted, caused to be transmitted, or aided and abetted the transmission by means of wire, radio, television, or internet communications in interstate or foreign commerce, certain materials promoting and executing the Pyramid Scheme on Internet web sites, by facsimile and telephone, including promotional materials, registration information, product information and invoices, and the execution of the purchase of memberships by Plaintiffs and the Putative Class, in violation of 18 U.S.C. § 1343.

615.    In addition, the foregoing individuals and entities knowingly and recklessly placed or caused to be placed, or aided and abetted the placement, of these and other misleading information and material on websites on the Internet and sent these misleading materials through interstate or foreign wire communications.

616.    Beginning in January 2012 and continuing thereafter to present, TelexFree, Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce have transported, transmitted or transferred in interstate and/or foreign commerce money in excess of $5000, knowing the same to have been stolen, converted and/or taken by fraud, in violation of 18 U.S.C. § 2314.

617.    Beginning in January 2012 and continuing thereafter to present, TelexFree, Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce possessed money of Plaintiffs and the Putative Class in excess of $5000, knowing the same to have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, in violation of 18 U.S.C. § 2315.

618.    Each such offense has constituted a separate predicate act of racketeering, which has been part of the pattern of racketeering activity through which said Defendants conducted the affairs, directly or indirectly, of the TelexFree Enterprise, or aided and abetted such conduct.

619.    The racketeering acts set forth below, and others all had the same pattern and similar purpose of defrauding Plaintiffs and the Putative Class for the benefit of said Defendants.

620.    More specifically, the conduct that comprised the racketeering includes, but is not limited to, all the acts alleged above, as well as the acts described below.

## Mail Fraud

621.    The Pyramid Scheme was furthered by the use of the United States mail. TelexFree, Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce each had a specific intent to defraud by devising participating in or abetting the Scheme.

622.    It was part of this pattern of racketeering activity that each said Defendant committed various acts of mail fraud, as described in detail above in violation of 18 U.S.C. § 1341, thereby directly and foreseeably injuring Plaintiff and the Putative Class.

## Wire Fraud

623.    The Pyramid Scheme was furthered by the use of interstate and international wire transmission facilities.  TelexFree, Defendants Electric and Mobile, Defendant Founders, Inside

Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce each had a specific intent to defraud by devising participating in or abetting the Scheme.

624.   It was part of this pattern of racketeering activity that each said Defendant committed various acts of wire fraud, as described in detail above in violation of 18 U.S.C. § 1343, thereby directly and foreseeably injuring Plaintiff and the Putative Class.

## Transportation and Possession of Stolen Property

625.   Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank and Base Commerce knew or recklessly disregarded that the proceeds obtained from the Promoters, as described in detail above, had been converted as of the time each was received into TelexFree's and/or said Defendants' accounts, because Defendants knew that Plaintiffs and the Putative Class had an immediate, superior right to possession or ownership of the funds and that the reception of such funds deprived Plaintiffs and the Putative Class of their possessory or ownership interests in them.

626.   It was part of this pattern of racketeering activity, as described in detail above, that on multiple occasions said Defendants transported, transmitted or transferred in interstate or foreign commerce money of a value in excess of $5000, knowing the same to have been stolen, converted or taken by fraud, thereby directly and foreseeably injuring Plaintiffs and the Putative Class, in violation of 18 U.S.C. § 2314.

627.   It was as part of this pattern or racketeering activity that said Defendants knew of the acts described in the previous paragraph, and knowingly and intentionally provided substantial assistance to TelexFree, thereby directly and foreseeably inuring Plaintiffs and the Putative Class, in violation of 18 U.S.C. §§ 2 and  2315.

628.   Such illegal and wrongful behavior constitutes "racketeering activity" as defined by 18 U.S.C. 1961(1).

629.     Said Defendants are associated with the TelexFree Enterprise.

630.     In violation of 18 U.S.C. § 1962(c), said Defendants conducted and/or participated in the conduct of the affairs of the TelexFree Enterprise, including, but not limited to, participation in activities in furtherance of the Pyramid Scheme, through a pattern of racketeering activity.

631.     In engaging in the foregoing mail and wire fraud and transportation and possession of stolen property, said Defendants knew Plaintiffs and the Putative Class would reasonably rely on their representations and omissions which would result in Plaintiffs and the Putative Class joining the fraudulent Pyramid Scheme.

632.     Said Defendants knew that the misrepresentations and omissions described above in promoting and executing the Pyramid Scheme were material because they caused Plaintiffs and the Putative Class to join and participate in the illegal pyramid scheme.

633.     Had Plaintiffs and the Putative Class known that said Defendants and TelexFree Doe were promoting a fraudulent pyramid scheme, they would not have joined it.

634.     Defendants' acts of mail and wire fraud and transportation and possession of stolen property were a proximate cause of injuries that Plaintiffs and the Putative Class suffered.

635.     In consequence of said Defendants' unlawful enterprise and pattern of racketeering activity Plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

## NINTH CLAIM FOR RELIEF
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)
### (Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals)

636.    Plaintiffs incorporate by reference all allegations set forth in all previous paragraphs, as if the same were specifically set forth herein.

637.    For the purposes of this cause of action alone, PricewaterhouseCoopers is not included within the definition of Certain Retained Licensed Professionals.

638.    Beginning in at least as early as January 2012 and continuing thereafter to date, Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals being persons or entities associated in fact with the TelexFree Enterprise and each other, have unlawfully, willfully and knowingly acquired and maintained, directly and indirectly, an interest in or control of the TelexFree Enterprise's affairs through a pattern of racketeering activity, or aided and abetted such conduct, as set forth below, in violation of 18 U.S.C. § 1962(b).

639.    Through the conduct of their racketeering activities, said Defendants were able to acquire, maintain, both directly and indirectly, an interest and /or control of the TelexFree Enterprise.

640.    One of the purposes of the pattern of racketeering was, through mail and wire fraud and transportation and possession of stolen property, to obtain and maintain for themselves an interest in and control of the TelexFree Enterprise entities, or to aid and abet such conduct, and to further their own economic interests.

641.    Another purpose of the pattern of racketeering was, through mail and wire fraud and transportation and possession of stolen property, to obtain and maintain for themselves an interest in and control of the TelexFree Enterprise to thereby obtain millions of dollars from

Plaintiffs and the Putative Class and others, or to aid and abet such conduct, and to further their own economic interests.

642.     It has been part of this pattern of racketeering activity that said Defendants committed acts of racketeering as set forth above.

643.     Each such offense has constituted a separate predicate act of racketeering, which has been part of the pattern of racketeering activity through which said Defendants have acquired or maintained their interest in and control of the TelexFree Enterprise, or aided and abetted such conduct.

644.     Said Defendants each received income, directly or indirectly, as a result of the enterprise and its pattern of racketeering activity.

645.     By reason of the foregoing violations of RICO, Plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged

**TENTH CLAIM FOR RELIEF**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)**
**(Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG, and IPS)**

646.     Plaintiffs incorporate by reference all allegations set forth in all previous paragraphs, as if the same were specifically set forth herein.

647.     For the purposes of this cause of action alone, PricewaterhouseCoopers is not included within the definition of Certain Retained Licensed Professionals.

648.     Beginning in at least as early as January 2012 and continuing thereafter to date, Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG, and IPS being persons or entities associated in fact with the TelexFree Enterprise, obtained substantial income and proceeds from

111

this pattern of racketeering activity and used and invested such income and proceeds, in violation of RICO, 18 U.S.C. § 1962(a).

649.    Substantial deposits of money were made into the TelexFree Enterprise as said Defendants were engaged in their illicit Pyramid Scheme.

650.    In addition, income was deposited in the form of a loan in both Electric and Mobile from money illegal obtained through the Pyramid Scheme.

651.    Additionally, beginning in at least as early as January 2012 and continuing thereafter to date, said Defendants aided and abetted TelexFree in its conduct described in the previous paragraph, through a pattern of racketeering activity, in violation of RICO, 18 U.S.C. § 1962(a).

652.    To further their goals, which were to (a) earn money through fraudulent means, (b) entice individuals to become Promoters for TelexFree, and (c) reap large profits for themselves based on false representations, members of the TelexFree Enterprise engaged in various forms of criminal activity, including mail and wire fraud, transportation and possession of stolen property and conspiracy.

653.    Each such offense has constituted a separate predicate act of racketeering, which has been part of the pattern of racketeering activity, through which said Defendants derived proceeds that they used and invested in the operations of the TelexFree Enterprise, and through which the other Defendants aided and abetted in that conduct.

654.    Without the repeated acts of mail and wire fraud, the fraudulent Pyramid Scheme would not have succeeded.

655.    Revenue gained from the pattern of racketeering activity was reinvested in the operation of the TelexFree Enterprise for the following purposes:  (a) to expand its operations

through additional false and misleading advertising and promotional materials aimed at recruiting new Promoters; (b) to facilitate the execution of the Pyramid Scheme; and (c) to convince current Promoters to recruit new Promoters.

656. Plaintiffs and the Putative Class were injured by the reinvestment of the racketeering income into the TelexFree Enterprise because they paid millions of their own dollars into the Enterprise.

657. In engaging in the foregoing mail and wire fraud and transportation and possession of stolen property, said Defendants knew Plaintiffs and the Putative Class would reasonably rely on their representations and omissions which would result in Plaintiffs and the Putative Class participating in the activities of the fraudulent Pyramid Scheme.

658. Said Defendants knew that the misrepresentations and omissions described above in promoting and executing the Pyramid Scheme were material because they caused Plaintiffs and the Putative Class to join and participate in the illegal pyramid scheme.

659. Had Plaintiffs and the Putative Class known that said Defendants were promoting a fraudulent pyramid scheme, they would not have joined it.

660. Said Defendants' acts of mail and wire fraud and transportation and possession of stolen property were a proximate cause of injuries that Plaintiffs and the Putative Class suffered.

661. In consequence of said Defendants' unlawful enterprise and pattern of racketeering activity Plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

## ELEVENTH CLAIM FOR RELIEF
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
### (Against Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Certain Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG and IPS)

662.    Plaintiffs incorporate by reference all allegations set forth in all previous paragraphs, as if the same were specifically set forth herein.

663.    Defendants Electric and Mobile, Defendant Founders, Inside Promoters, Retained Licensed Professionals, Fidelity Bank, Base Commerce, GPG, and IPS and others have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with each other to commit the foregoing violations of RICO, in violation of 18 U.S.C. § 1962(d).

664.    In accordance with that agreement, said Defendants conspired to violate 18 U.S.C. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

665.    It has been a part of this conspiracy that said Defendants each would and did commit the acts of racketeering specified above and agreed that each would commit at least two acts of racketeering in furtherance of the conspiracy.

666.    As a direct and proximate result of said Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs and the Putative Class were injured.

## TWELFTH CLAIM FOR RELIEF
## VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,
## CHAPTER 110a, SECTION 410(b)
### (Against Defendants Mobile and Electric, Defendant Founders, Inside Promoters, and Certain Retained Licensed Professionals)

667.    Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

668.    For the purposes of this cause of action alone, PricewaterhouseCoopers is not included within the definition of Certain Retained Licensed Professionals.

114

669.    At the time of the wrongs alleged, the Defendants Mobile and Electric, Defendant Founders, Insider Promoters and Retained Licensed Professionals were each a controlling person, partner, officer, director, person occupying a similar status, or employee materially aiding in the sale of securities, of TelexFree within the meaning of Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

670.    By their respective positions of authority, the Defendant Founders had the power and authority to influence and control, and influenced and controlled, the decision-making and activities of TelexFree and the affiliated TelexFree entities and caused them to engage in the wrongful conduct described and violations of Section 410(a) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

671.    The Defendant Founders actively participated in the leadership and decision-making process of the selling entity causing the dissemination of false and misleading statements and omissions of material facts.

672.    By their positions as controlling persons, partners and officers and directors of Telexfree, and because of the aforementioned conduct, said Defendants are liable under Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A .

673.    In addition, the Defendant Inside Promoters and Retained Licensed Professionals were agents who materially aided in the sales of the fraudulent securities in violation of Section 410(a) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

674.    Said Defendants made significant contributions toward making the sales to the Plaintiff and the Putative Class possible through their actions detailed above.

675.    Said Defendants prepared and provided information on, endorsed and actively promoted the opportunity regarding the securities on websites and at TelexFree events and

extravaganzas.  Each of the said Defendants provided print materials, electronic materials, and made oral representations to the Putative Class

676.     The stated Defendants are liable under 410(b) as a primary violation by TelexFree was under 410(a), Defendants materially aided in the sale of unregistered securities, and knew, or by reasonable diligence should have known, of the primary violation.

677.     Said Defendants are jointly and severally liable for the primary violations detailed under Section 410(a)(2) above.

678.     Plaintiffs and the Putative Class seek the award of actual damages on behalf of the Class.

### VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment:

1.     declaring this action to be a Class Action properly maintained under the Federal Rules of Civil Procedure and certifying Plaintiffs as the class representatives;

2.     awarding Plaintiffs and Class Members rescission and/or compensatory damages against Defendants for all damages sustained because of their wrongdoing, in an amount to be proven including interest;

3.     for an award of actual damages, compensatory damages, statutory damages, punitive damages, and statutory penalties, in an amount to be determined;

4.     for an award of punitive damages;

5.     for an award of costs of suit and attorneys' fees, as allowable by law;

6.     for an award of interest;

7.     to appoint a receiver selected by Class Counsel and an accounting; and

8.     for an award to Plaintiffs and the Class of such other and further relief as may be just and proper under the circumstances including injunctive and equitable relief. Including the voiding or declaring null of the 1099 forms issued by TelexFree.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Putative Class demand a jury trial of their claims to the extent authorized by law.  However, Plaintiffs and the Putative Class do not consent to trial by jury in the United States Bankruptcy Court.

Dated this 12th day of December, 2014

Respectfully submitted,

*William R. Baldiga* ← HC

William R. Baldiga, Esq.
(NY Bar. No. 4813846)
(BBO No. 542125)
Kiersten A. Taylor, Esq.
(BBO No.  681906)
Brown Rudnick LLP
7 Times Square
New York, NY 10036
Telephone: (617) 856-8200
Fax: (617) 856-8201
Email: wbaldiga@brownrudnick.com
        ktaylor@brownrudnick.com

Robert J. Bonsignore, Esq.
BBO #547880
BONSIGNORE, LLC
193 Plummer Hill Road
Belmont, NH  03220
Telephone:  781-856-7650
rbonsignore@classactions.us

Ronald A. Dardeno, Esq.
(BBO No. 548278)
Alexander D. Wall, Esq.
(BBO No. 688881)
Law Offices of Frank N. Dardeno
424 Broadway
Somerville, MA  02145
Telephone:  617-666-2600
Email: rdardeno@dardeno.com

118

Evans J. Carter, Esq.
(BBO No. 076560)
Evans J. Carter, P.C.
860 Worcester Road, 2nd Floor
P.O. Box 812
Framingham, MA  01701
Telephone:  508-875-1669
Email:  ejcatty1@verizon.net

D. Michael Noonan, Esq.
(NH Bar No. 8214)
(MA Bar No. 558247)
(VT Bar No. 4050)
(ME Bar No. 7240)
Shaheen and Gordon
140 Washington Street
P.O. Box 977
Dover, NH  03821
Telephone:  603-871-4144
Email: mnoonan@shaheengordon.com

R. Alexander Saveri, Esq.
(CA Bar No. 173102)
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, CA  94111
Telephone:  415-217-6810
Email: rick@saveri.com

Ronald P. Passatempo, Esq.
(BBO No. 632508)
Ronald P. Passatempo Law Offices
200 Broadway
Lynnfield, MA  01940
Telephone: 781-596-3100
Email: passatempolaw@comcast.net

Randall Renick, Esq.
Hadsell Stormer Richardson & Renick, LLP
128 N. Fair Oaks Avenue, Suite 204
Pasadena, CA  91103
Telephone:  626-381-9261
Email:  rrr@hadsellstormer.com

Adriana Contartese, Esq.
(FL Bar No. 89634)
Law Offices of Adriana Contartese
OCN Document Prep Suite 926
19W Flagler Street
Miami, FL  33130
Telephone: 617-268-3557
Email: adriana911@juno.com

Ihuoma Igboanugo, Esq.
(NC Bar No. 46618)
The Crescent Law Practice
183 Wind Chime Court, Suite 100
Raleigh, NC  27615
Telephone: 919-341-9707
Email: ihuoma2007@yahoo.com

Mark A. Tate, Esq.
(GA Bar No. 698820)
Tate Law Group, LLC
2 East Bryan Street, Suite 600
P.O. Box 9060
Savannah, GA  31412
Telephone:  912-234-3030
Email: marktate@tatelawgroup.com

Stephen M. Smith, Esq.
(NY Bar No. 277784)
Brain Injury Law Center
2100 Kecoughtan Road
Hampton, VA  23661
Telephone:  877-840-3431
Email:  ssmith@braininjurylawcenter.com