# EXHIBIT 6

NANCY A. MITCHELL *(pro hac vice pending)*
MARIA J. DICONZA *(pro hac vice pending)*
GREENBERG TRAURIG, LLP
The MetLife Building
200 Park Avenue
New York, New York 10166
Telephone:  212-801-9200
Facsimile:  212-801-6400
Email: mitchelln@gtlaw.com
      diconzam@gtlaw.com

GREGORY E. GARMAN, NV Bar # 6654
THOMAS H. FELL, NV Bar # 3717
TERESA M. PILATOWICZ, NV Bar # 9605
GORDON SILVER
3960 Howard Hughes Parkway, 9th flr.
Las Vegas, Nevada 89169
Telephone:  702-796-5555
Facsimile:  702-369-2666
Email:  ggarman@gordonsilver.com
      tfell@gordonsilver.com
      tpilatowicz@gordonsilver.com

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>TELEXFREE, LLC,<br><br>☐ Affects this Debtor<br><br>☒ Affects all Debtors<br><br>☐ Affects TELEXFREE, INC.<br><br>☐ Affects TELEXFREE FINANCIAL, INC | Case No.: BK-S-14-12524-abl<br>Chapter 11<br><br>**[PROPOSED]**<br>**Jointly Administered with:**<br><br>14-12525-abl   TelexFree, Inc.<br>14-12526-abl   TelexFree Financial, Inc<br><br>Date:  OST REQUESTED<br>Time: OST REQUESTED |

**OMNIBUS DECLARATION OF WILLIAM H. RUNGE, IN IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

**WILLIAM H. RUNGE, III,** hereby declares, under penalty of perjury, as follows:

    1.    I am the Chief Restructuring Advisor ("**CRA**") of TelexFree, LLC, a Nevada limited liability company ("**TelexFree Nevada**"), TelexFree, Inc., a Massachusetts corporation ("**TelexFree Massachusetts**") and TelexFree Financial, Inc., a Florida corporation ("**TelexFree Florida**" and together with TelexFree Massachusetts and TelexFree Nevada, "**TelexFree**," the "**Debtors**" or the "**Company**").  TelexFree Nevada was organized in August 2012.  TelexFree Massachusetts was incorporated in 2002 as Common Cents Communications, Inc.  TelexFree Florida was incorporated in 2013. Each of TelexFree Nevada and TelexFree Massachusetts are

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

1  owned by Carlos Wanzeler (50%) and James Merrill (50%). TelexFree Florida is a wholly-

2  owned subsidiary of TelexFree Nevada.

3         2.     I perform my duties out of the Debtors' headquarters in Marlborough,

4  Massachusetts. I submit this declaration (the"**Declaration**") in support of the Debtors' chapter

5  11 petitions and requests for relief contained in certain "first day" applications and motions filed

6  on or shortly after the date hereof (the "**First Day Motions**").

7         3.     I am a Managing Director with Alvarez & Marsal ("**A&M**"), a global leader in

8  business restructuring and reorganization, and head of its North American restructuring practice

9  for the Southern United States. I specialize in business diagnostics, business plan development

10  and financial strategies for corporate turnarounds and restructuring. My primary areas of

11  concentration are formulating and evaluating operational and organizational structures, and

12  developing and implementing new strategies in the heavy manufacturing, distribution,

13  telecommunications, and technology industries.

14         4.     I have more than 35 years of experience working in industry, operations,

15  financial and executive management, and turnaround consulting. I have worked primarily with

16  companies challenged by transitions resulting from rapid growth, acquisitions, changes in

17  financial structure and changes in market environments. In addition to holding positions as

18  officers and directors at several companies, I have led numerous debtor and creditor advisory

19  consulting engagements and have served as a federal receiver for the United States District Court

20  for the Northern District of Georgia.

21         5.     Recently I have served as the interim president of Clipper Windpower and the

22  CFO of PG&E National Energy Group. I also have served as the operational/financial advisor to

23  Flowers Floods, JGA Corp., Skinner Nurseries, Metromont Corp, Touch One Communications,

24  Star Telecommunications, Wheland Foundry, Pharr Yarns, Inc., Russell Corporation, Qimonda

25  Corp., Hayes Microcomputer, Inc., Sunshine-Jr. Stores and Laclede Steel Company, among

26  others. Additionally, I was an advisor to the senior creditors of Bellisio Foods, Pilgrim's Pride

27  Corporation, Allen's Family Foods, Cagle's Chicken, Dairy Production Systems LLC, Frozen

28  Specialties, Inc., Horizon Lines Inc., iGPS Pallet Logistics, and WorldPoint Logistics.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

2

6.     I received a bachelor's degree, with honors, in physics and engineering from Washington and Lee University.  I have a master's degree in business administration from Georgia State University.

7.     As the Chief Restructuring Advisor of the Debtors, I am authorized to submit this Declaration on behalf of the Debtors.  Except as indicated otherwise, all statements in this Declaration are based upon (a) my personal knowledge, (b) my review to date of the Debtors' books and records, or (c) other relevant documents and information prepared or collected by the Debtors' employees.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.  In making the statements herein, I have relied in part upon others to accurately record, prepare and collect necessary documentation and information.

8.     Part I of this Declaration provides a brief overview of the Debtors and a summary of these cases (the "**Cases**").  Part II of this Declaration describes in more detail the Debtors' business, the developments which led to the Debtors' chapter 11 filing and their goals in these Cases. Part III sets forth the relevant details of the various First Day Motions.

## I.
## INTRODUCTION

9.     The Company is a telecommunications business that uses multi-level marketing to assist in the distribution of voice over internet protocol ("**VoIP**") telephone services. TelexFree's retail VoIP product, 99TelexFree, allows for unlimited international calling to approximately seventy countries for a flat monthly rate of $49.90.  Customers of the Debtors' VoIP product ("**Customers**") used approximately 11 million minutes of the 99TelexFree VoIP service in February 2014.  Since 99TelexFree was introduced in 2012, Customer usage increased on a monthly basis until March 2014.

10.     In addition to the 99TelexFree VoIP service, TelexFree released a mobile phone "app" for I-Phones and Google phones in March 2014.  A joint venture which is partially owned by the Company's equity owners is developing a mobile phone service called TelexMobile, which the Company expects will be released within the next several months.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

3

11.     TelexFree is operated as a multi-level marketing company, and currently has over 700,000 associates or promoters (the "**Promoters**") worldwide.  Prior to the filing of these Cases, TelexFree compensated Promoters for the sales of the VoIP product, the placing of advertisements and the recruitment of other Promoters down line.  Because questions were raised about its compensation plan, the Company on March 9, 2014, discontinued its original compensation plan (the "**Original Comp Plan**") and replaced the Original Comp Plan with a revised compensation plan (the "**Revised Comp Plan**" and together with the Original Comp Plan, the "**Pre-Petition Comp Plans**").  At the time of the roll-out of the Revised Comp Plan, the Company decided to honor certain discretionary payments to Promoters under the Original Comp Plan.  These discretionary payments quickly became a substantial drain on the Company's liquidity.   The Company discontinued the Pre-Petition Comp Plans and ceased making discretionary payments under the Original Comp Plan prior to the date of the filing of these Cases (the "**Petition Date**").

12.     The Company believes the sales of the 99TelexFree product, the TelexFree "app," and other new products will ultimately prove successful and profitable.  The Company is struggling, however, with several factors that required it to seek chapter 11 protection by filing these Cases.  First, the Company experienced exponential growth in revenue between 2012 and 2013 (from de minimus amounts to over $1 billion), which put tremendous pressure on the Company's financial, operational and management systems.  Second, although the Company revised its Original Comp Plan in order to address certain questions that were raised regarding such plan, the Company believes that the Pre-Petition Comp Plans need to be further revised. Finally, the trailing liabilities arising from the Original Comp Plan are difficult to quantify and have resulted in substantial asserted liabilities against the Company, a number of which may not be valid.

13.     As a result, the Company filed these Cases to obtain the breathing room to address its operational and regulatory issues, revise the Pre-Petition Comp Plans, and quantify and address the claims against it. The Debtors believe that a restructuring of its debt, adoption of a post-petition revised compensation plan, unveiling of new products (including the TelexFree

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

4

app), and return to growing its Customer base will allow the Company to realize its full potential and generate significant value for its constituents.

14.     To minimize the adverse effects of the commencement of the Cases on their business, the Debtors request various types of relief in the First Day Motions.  The First Day Motions are described in greater detail in Part III below.  Pursuant to the First Day Motions, the Debtors seek, among other things, to: (a) continue the Debtors' operations with as little disruption as possible; (b) maintain the confidence and loyalty of the Debtors' associates, Promoters, customers, and employees; (c) comply with applicable state telecommunications authorities and public utility commissions; and (d) retain appropriate professionals.  Gaining and maintaining the support of the Debtors' key constituencies, as well as operating the Debtors' day-to-day business with minimal disruption and erosion, will be crucial to the success of the Debtors' efforts in these Cases to maximize the value of the Debtors' estates as they work through the Chapter 11 process.

15.     On the Petition Date, the Debtors commenced the Cases by filing voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**").

## II.
## BACKGROUND

### A.     Corporate Structure of the Debtors.

16.     The Company's operations are primarily booked through TelexFree Nevada, which according to the Company's pre-petition financial statements received approximately two-thirds of the approximately $1 billion in revenues recorded in 2013.  TelexFree Nevada is the contracting party to the terms and conditions contract with the Promoters (the "**Promoter Contract**").   TelexFree Florida is the owner of the Company's primary bank account. TelexFree Massachusetts was the original corporate entity but is being phased out.

. . .

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

5

**B.    Development of the TelexFree Product and Multi-Level Marketing Structure.**

17.    The Company's current business was started in 2012 by James Merrill and Carlos Wanzeler after both individuals worked for a long period within the telecommunications and multi-level marketing industries.  After working together in an unrelated business owned by Merrill through most of the 1990's, Merrill and Wanzeler in or around 1997 became agents of a multi-level marketing company selling international phone service called World Exchange. Wanzeler, who was born in Brazil, knew from experience that international telephone calls to Brazil were exceedingly expensive.  World Exchange sold international landline phone service at a significant discount to the major carriers, such as AT&T.  Recognizing an opportunity to sell international phone services to immigrants in the United States at a discount, Wanzeler and Merrill became successful agents for World Exchange, with Wanzeler building a network of approximately 100,000 agents selling the World Exchange product.  In 2002, Wanzeler and Merrill incorporated a company in Massachusetts called Common Cents Communications in connection with their distribution of the World Exchange product.  In or around 2003, World Exchange was purchased by another company and discontinued the distribution and marketing of its product through multi-level marketing.

18.    During roughly the same time period, Wanzeler and Merrill became aware of VoIP, which at the time was an emerging technology and represented an opportunity to offer international telephone service over the internet at prices even lower than those charged by World Exchange.   After World Exchange discontinued its multi-level marketing program, Wanzeler and Merrill began to develop their own VoIP services.  They contracted with LogiTel Corp. to assist in the development of the VoIP product and purchased the necessary servers and switches.

19.    In or around 2003, Wanzeler and Merrill formed another company doing business as Disk A Vontade and began selling their VoIP product. Customers of Disk A Vontade purchase the VoIP product over the counter at various convenience stores in the United States.  Wanzeler and Merrill marketed Disk A Vontade through television advertising at a significant cost.  Disk A Vontade continues to exist and offer VoIP telephone services to thousands of customers.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

6

20.     In 2012, Wanzeler and Merrill decided to use multi-level marketing to distribute their VoIP product.  With the assistance of a Brazilian associate named Carlos Costa, Wanzeler and Merrill began the current business of TelexFree in 2012.  TelexFree's services initially became popular in Brazil, but its popularity has since grown worldwide.

**C.     TelexFree's Multi-Level Marketing Compensation Plan *Before* March 9, 2014.**

21.     Under the Original Comp Plan, new Promoters were required to pay a $50 membership fee.  This fee set up a Promoter's account, and provided a Promoter with access to their own unique TelexFree website and accounting page (called the "back office"), informational materials, approved ads for placement, and other services related to helping the Promoter sell 99TelexFree packages.  A Promoter's contract lasted for one-year after the date of sign-up.  After they paid their $50 membership fee, Promoters had the option of purchasing two AdCentral packages:

- $289 AdCentral Package:   A Promoter purchased ten (10) 99TelexFree VoIP packages that they could re-sell for $49.90 each, and earn monthly commissions after the first month.

- $1,375 AdCentral Family Package:  A Promoter purchased fifty (50) 99TelexFree VoIP packages that they could re-sell for $49.90 each, and earn monthly commissions after the first month.

Each AdCentral package required the purchase of a Promoter membership.  By contract, a Promoter had one year to sell VoIP packages from the date of purchase.  Promoters could earn money through TelexFree's multi-level marketing program in several different ways, including commissions on sales, placement of internet advertisements for the TelexFree VoIP product, and the recruitment of new Promoters.

22.     After a Promoter purchased either the AdCentral or the AdCentral Family package, they became eligible to post advertisements for one-free hour of the TelexFree VoIP service.  The Company required a Promoter to place an ad on a free website recommended by TelexFree (such as Craigslist.org), or a website that they independently located.  When a potential customer clicked on the ad, they were taken to the Promoter's unique website where they could try the VoIP service for one-hour free.  If that potential customer chose to purchase

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

7

1   the 99TelexFree package, the Promoter that posted the ad received $49.90 paid by the potential

2   customer. The Promoter also received commissions if that potential customer chose to purchase

3   monthly VoIP services.

4        23.    For Promoters that purchased the $289 AdCentral Package, each Promoter who

5   posted one ad every day for one week received an additional 99TelexFree VoIP package at the

6   end of that week for sale to retail customers. If a Promoter was unable to sell that package to a

7   retail customer for $49.90, the Company had the option to repurchase the package for $20 if the

8   Promoter chose to sell it back to the Company (the **"Ad Buy Back"**).

9        24.    For Promoters that purchased the $1,375 AdCentral Family Package, Promoters

10   who posted five ads each day for one week received five additional 99TelexFree VoIP packages

11   at the end of that week for sale to retail customers. If a Promoter was unable to sell those

12   packages to a retail customer for $49.90 each, the Company had the option to repurchase the

13   package for $100 if the Promoter chose to sell it back to the Company under the Ad Buy Back.

14        25.    TelexFree has spent hundreds of millions of dollars buying back VoIP packages

15   through the discretionary Ad Buy Back.

16        26.    It is the Company's understanding that at or about the same time that TelexFree

17   commenced doing business, Carlos Costa set up a separate company in Brazil called Ympactus

18   Ltda. (**"Ympactus"**) to distribute the TelexFree product and create a multi-level marketing

19   network in Brazil. In July 2013, Brazilian authorities shutdown Ympactus and froze its assets

20   after accusing Ympactus of operating as a pyramid scheme. Investigations by state and federal

21   authorities continue in Brazil, and numerous lawsuits against Ympactus by Brazilian promoters

22   have been filed.

23        27.    The Secretary of the Commonwealth of Massachusetts, Securities Division

24   (**"MSD"**) issued subpoenas for documents and information to TelexFree Massachusetts on

25   January 22, 2014 and February 5, 2014. The Company timely responded to these subpoenas and

26   provided the requested information.

27   . . .

28   . . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

**D.    TelexFree Hires Several New Advisors And Develops A New Compensation Plan.**

28.    As a result of the concerns raised by Brazilian authorities in the proceedings against Ympactus, TelexFree hired new multi-level marketing advisors in or around August 2013 to develop a new compensation and network structure that went into effect March 10, 2014. Under the Revised Comp Plan, Promoters no longer had the option of purchasing AdCentral packages.  Instead, all individuals enrolled in TelexFree as an **"Associate"** by paying an annual membership fee of $149.95 and a monthly administrative fee of $19.90, which includes a replicated website, back office, and a financial platform.  Associates received commissions based upon their sales of 99Telexfree, as well as from the sales of associates they recruit.

29.    In the Revised Comp Plan, Associates may become TelexFree Promoters when they enroll ten non-affiliate customers.  Promoters earn money through the Revised Comp Plan in a variety of ways closely tied to the sales of 99Telexfree.  Promoters earn direct and indirect 99Telexfree sales commissions, bonuses for successful recruitment of new Promoters, and payments for ad placement.  A Promoter who becomes **"Ad Family"** or **"Ad Family Plus"** may earn $50 or $100 per week, respectively, for ad placement.

30.    The revenues generated from the Revised Comp Plan have been disappointing to the Company and do not allow the Company to meet its obligations.

**E.    TelexFree Hires New Management.**

31.    In December 2013, the Company hired Joseph Craft, CPA as acting Chief Financial Officer.  Beginning in or around April 2012, Craft served as the Company's accountant and prepared its taxes and financial statements.

32.    In February 2014, the Company hired Stuart MacMillan to act as its Interim Chief Executive Officer.  MacMillan has over 25 years of management experience, the last 15 of which have been in direct selling and multi-level marketing companies.  Among other management positions, MacMillan previously served as the first International President of Excel Communications, a multi-level marketing telecommunications company, and later as the President of Excel Communications in Canada.  MacMillan also acted as the first Managing Director of Arbonne Canada.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

9

1    33.    Mr. Craft and Mr. MacMillan are currently acting as the Debtors' Interim CFO

2 and CEO, respectively.

3 **F.    Events Leading Up to the Chapter 11 Filings.**

4    34.    The Company's growth in the period prior to the Petition Date had been

5 staggering.  Under the Original Comp Plan, the Company took in approximately $3 million in

6 revenue per day.  The Company's revenue growth occurred quickly and the Company's systems

7 were simply unable to handle the level of demand for its products and services.

8    35.    The legal actions in Brazil against Ympactus also raised issues for the Company

9 and caused the Company to determine that it needed to restructure its Original Comp Plan.  The

10 change from the Original Comp Plan to the Revised Comp Plan resulted in daily revenues

11 dropping to between $100,000 and $300,000 per day.  In addition, asserted claims by Promoters

12 for  weekly withdrawals increased dramatically.  In the week following the introduction of the

13 Revised Comp Plan, Promoters asserted claims for an aggregate of $8 million from their back

14 office accounts, then an aggregate of $20 million the following week, then an aggregate of $30

15 million each of the following two weeks, and in excess of $86 million in the aggregate the week

16 preceding the filing of the Cases.  The majority of these asserted claims were for amounts related

17 to the discretionary Ad Buy Back.

18    36.    The problems were exacerbated by the inability of the Company to quantify the

19 actual claims under the Original Comp Plan.  It appears that certain Promoters were abusing the

20 Original Comp Plan by buying tens and even hundreds of AdCentral Packages for the purpose of

21 earning funds through the discretionary Ad Buy Back, rather than selling VoIP packages as the

22 Company intended.  This practice is prohibited by the Promoter Contract.  As a result, the

23 Company could not quickly quantify the legitimate associate and Promoter compensation claims

24 against the Company.

25    37.    The Revised Comp Plan was better designed to require Promoters to sell the

26 99TelexFree VoIP product and acquire Customers.  However, it does not appear that the post-

27 Revised  Comp  Plan  will  produce  sufficient  revenues  to  sustain  the  Company's

28 telecommunications business.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

10

**G.      Efforts During the Chapter 11 Reorganization Period.**

38.      The Company hired A&M as its CRA on April 10, 2014 to safeguard existing cash, guide the Debtors through a Chapter 11 reorganization, and develop a profitable business plan based on a revised compensation arrangement.

39.      Early in the Cases, the Debtors (working with A&M and certain outside consultants) intend to quickly develop a new compensation plan that will replace the Pre-Petition Comp Plans.  The Company also intends to discontinue and reject the Pre-Petition Comp Plans and quantify the legitimate claims under those Plans.  Once the legitimate claims have been quantified and the Company has developed a new compensation program, the Debtors hope to reorganize and satisfy the claims against them.  The Company will continue to provide telecommunications services to new and existing customers during the pendency of these Cases.

40.      The Debtors further are implementing a new cash management system to safeguard funds for the benefit of all constituents.  After the Ympactus investigation, the Company had difficulty maintaining depository relationships with federally regulated banking institutions.  To address this issue and to provide assurances to creditors, regulators and the Court that the Debtors' funds have been protected, the Debtors have adopted board resolutions that have transferred exclusive signing authority for all banking accounts to the Interim CFO and CEO.  In addition, the Debtors, led by the CRA, are negotiating to have the Debtors' funds deposited in an escrow account with a regulated financial institution.  While the Debtors will need access to escrowed funds to operate, any withdrawal from such account would require Bankruptcy Court authority.

41.      The Debtors also anticipate that they will continue to cooperate with MSD in its investigation.  MSD issued an additional subpoena on April 2, 2014, and the Company is presently preparing its response.

## III.
## FIRST DAY MOTIONS

42.      Concurrent with the filing of the voluntary petitions to commence these Cases, the Debtors will be filing several First Day Motions.  The Debtors anticipate that the Bankruptcy

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc                              11

1   Court will conduct a hearing within a business day or two after the commencement of the Cases

2   (the "**First Day Hearing**"), during which the Bankruptcy Court will entertain the arguments of

3   counsel with respect to the relief sought in each of the First Day Motions.

4          43.     Generally, the First Day Motions have been designed to meet the immediate goals

5   of:  (a) establishing procedures for the efficient administration of the Cases; (b) continuing the

6   Debtors' operations during these Cases with as little disruption and loss of productivity as

7   possible;  and  (c)  maintaining  the  confidence  and  support  of  the  Debtors'  other  key

8   constituencies.  I have reviewed each of the First Day Motions, including the exhibits attached

9   thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to

10  meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve

11  success in these Cases.

12         44.     The First Day Motions are summarized below.

13  **A.      Emergency Motion of the Debtors for Entry of an Order Directing Joint
        Administration of Chapter 11 Cases.**

14

15         45.     By this motion, the Debtors request the joint administration of the Debtors'

16  related chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the

     Court maintain one file and one docket for the Debtors' cases under the TelexFree Nevada case

17  and also request that the caption of their cases be modified to reflect the joint administration of

18  the cases.

19
           46.     Joint administration of these cases (a) is warranted because the Debtors' financial
20
     affairs and business operations are closely related, and (b) will ease the administrative burden on
21
     the Court and parties-in-interest in these cases.  The Debtors anticipate that numerous notices,
22
     applications, motions, pleadings, hearings, orders, and other documents in these cases will affect
23
     all of the Debtors.  With three (3) affiliated Debtors, each with its own case docket, the failure to
24
     administer these cases jointly would result in numerous duplicative pleadings being filed and
25
     served upon parties identified in separate service lists.  Such duplication of substantially identical
26
     documents would be extremely wasteful and would unnecessarily overburden the Debtors, the
27
     Clerk of the Court (the "**Clerk**"), creditors, and other parties-in-interest in these Cases.
28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc                                              12

47.     I understand that if the Court approves joint administration of the Debtors' cases, the Debtors will be able to reduce fees and costs resulting from the administration of these Chapter 11 Cases and ease the onerous administrative burden of having to file multiple documents. I have also been advised that joint administration will ease the administrative burden for the Court and all parties to these cases and obviate the need for duplicative notices, motions, applications and orders, and thereby save time and expense for the Debtors and their estates.

48.     Based on the foregoing, the Debtors believe that joint administration of the cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**B.     Emergency Motion of the Debtors Pursuant to Sections 105(a), 363, 364, 503, 507(a)(4), 507(a)(5), 541, 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004(h) for Entry of an Order (a) Authorizing Debtors to Pay (I) All Prepetition Employee Obligations, (II) the Independent Contractors' Fees and (III) the Contracting Agencies' Fees and (b) Directing the Disbursing Bank to Honor Related Transfers.**

49.     The Debtors' employees (the "**Employees**") are essential to the continued operation of the Debtors' business, and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtors continue, in the ordinary course, any personnel policies, programs, and procedures that were in effect prior to the Petition Date. Accordingly, by this motion (the "**Employee Wage Motion**"), the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay (i) certain prepetition employee obligations described herein (collectively the "**Employee Obligations**"), (ii) the Independent Contractors' Fees (as defined below) and (iii) the Contracting Agencies' Fees (as defined below) and (b) directing PNC Bank, N.A. (the "**Disbursing Bank**") to honor the Debtors' prepetition checks or electronic transfers for payment of any of the foregoing, and prohibiting the Disbursing Bank from placing holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

**1.     The Employees.**

50.     TelexFree Massachusetts operates primarily out of its headquarters in Marlborough, Massachusetts, and employs fourteen (14) employees (the "**Employees**"), which

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

13

1   are paid by TelexFree Florida. TelexFree Massachusetts is the only Debtor that hires employees.

2       51.     Two (2) of the Employees are salaried and twelve (12) work on an hourly basis.

3   The Employees provide customer service support for the Debtors' independent representatives

4   and customers, as well as financial and marketing services for the Debtors. None of the Debtors'

5   insiders are employees of the Debtors.

6       **2.     The Employee Obligations.**

7       52.     To retain its Employees, TelexFree Massachusetts incurs certain obligations

8   discussed below in the ordinary course of business, which obligations are consistent with

9   similarly situated companies. The Employee Obligations are not owed to any of the Debtors'

10  insiders.

11          a.     Wages, Salaries and Payroll Obligations.

12      53.     All Employees are paid wages and salary (collectively, the **"Wages and**

13  **Salaries"**) on a weekly basis, on every Friday, for the work period ending the previous Friday.

14  Payroll averages approximately $9,878.00 per pay period in the aggregate, including the

15  Employee Taxes (as defined below). Eleven (11) of the Employees are paid through electronic

16  fund transfers, i.e. direct deposit, while the remaining Employees are paid by paper checks.

17      54.     The Debtors' last regular payroll date was April 11, 2014, and the next payroll

18  date is scheduled for April 18, 2014. The Debtors estimate that, as of the Petition Date,

19  approximately $12,000.00[1] in Wages and Salaries, commissions and payroll obligation have

20  accrued, and are owed to their Employees, with no employees owed in excess of $12,425.00. By

21  this Employee Wage Motion, the Debtors request the authority to pay all unpaid Wages and

22  Salaries to their Employees in the ordinary course of business.

23      55.     Harpers Payroll Services, Inc. (**"Harpers"**) processes payroll for TelexFree

24  Massachusetts. On average, Harpers is owed a total of approximately $160.00 per month on

25  account of payroll administration and certain other payroll related services. Harpers invoices

26  TelexFree Massachusetts on a weekly basis for services provided and obtains payment by

27  _____

28  [1] This figure includes the amount of Wages and Salaries owed for the week ending April 11, 2014 as well as amounts that have been paid to Employees by checks that have not yet been cashed.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

1   accessing the primary account at the Disbursing Bank.  The Debtors estimate that there are

2   $40.00 accrued and unpaid costs in connection with payroll processing services.  By this Motion,

3   the Debtors request the authority to continue to pay Harpers the weekly fee in the ordinary

4   course of business.

5        56.    TelexFree Massachusetts, as employer, is required by law to withhold federal and

6   state taxes from Wages and Salaries for remittance to appropriate tax authorities (the **"Employee**

7   **Taxes"**).  The Employee Taxes total approximately $2,300.00 per pay period.  In addition,

8   TelexFree Massachusetts is required to pay, from their own funds, the social security and

9   Medicare taxes and pay, based on a percentage of gross payroll and subject to state-imposed

10  limits, additional amounts for state and federal unemployment insurance (the **"Employer**

11  **Taxes,"** and together with the Employee Taxes, the **"Payroll Taxes"**) and remit the same to the

12  appropriate authorities (collectively, the **"Taxing Authorities"**).  Social Security and Medicare

13  taxes are collected under the Federal Insurance Contribution Act's authority (FICA).  Employer

14  Taxes total approximately $1,600.00 per pay period.  For permanent Employees, the Payroll

15  Taxes are paid to various Taxing Authorities in accordance with the Internal Revenue Code and

16  applicable state law.  TelexFree Massachusetts's average weekly total obligation for Payroll

17  Taxes is approximately $3,900.00.  The Debtors seek authority to honor, process and pay the

18  prepetition obligations with respect to the Payroll Taxes.

19        b.    <u>Vacation Time.</u>

20        57.    Full-time employees that have worked for the Debtors at least one year may

21  receive five (5) paid personal time off days to be used for vacation (**"PTO Days"**).  Upon

22  termination from TelexFree Massachusetts., employees forfeit all unused PTO Days.  As of the

23  Petition Date, the Debtors estimate that they owe approximately $8,450.00 for accrued and

24  unused PTO Days.  By this Motion, the Debtors request authority to continue to pay the PTO

25  Days and any other paid-time off obligations, to the extent required by law, and to honor all

26  prepetition obligations related thereto.

27        c.    <u>The Independent Contractors.</u>

28        58.    In addition, TelexFree Massachusetts engages four (4) independent contractors

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

15

1  (the "**Independent Contractors**").  One (1) of the Independent Contractors provides product

2  development services and three (3) provide customer service support to TelexFree

3  Massachusetts's independent representatives and customers.  The Independent Contractors are

4  engaged on an hourly or salary basis.  The Independent Contractors are paid on a weekly basis in

5  the aggregate amount of approximately \$3,054.73.  As of the Petition Date, the aggregate amount

6  outstanding to the Independent Contractors totals approximately \$7,500.00[2] (the "**Independent**

7  **Contractor Fees**").

8           d.    The Contracting Agencies.

9        59.    TelexFree Massachusetts also engages contracting agencies that engage other

10  independent contractors to provide IT and customer service support to TelexFree

11  Massachusetts's independent representatives and customers.  A list of the contracting agencies

12  (the "**Contracting Agencies**"), the labor provided, and the estimated monthly cost, is attached

13  the Employee Wage Motion as **Exhibit A**.  The Contracting Agencies are paid on a monthly

14  basis.  As of the Petition Date, the aggregate amount outstanding to the Contracting Agencies

15  totals approximately \$111,500.00 (the "**Contracting Agencies' Fees**").

16  **C.**    **Emergency Motion of the Debtors for Entry of an Order Authorizing the Debtors to**
**Honor Credit Card Transactions, Chargebacks, Discounts and Commissions in the**

17  **Ordinary Course of Business.**

18        60.    In the normal course of business, approximately twenty-five percent (25%) of the

19  Debtors' total sales are settled through credit card transactions.  During the post-petition period,

20  the Debtors expect to continue accepting credit cards as a source of payments for purchases in

21  the normal course of their day-to-day operations.  By this motion (the "**Credit Card Motion**"),

22  the Debtors seek entry of an order pursuant to sections 105(a), 363 and 553 of the Bankruptcy

23  Code authorizing the Debtors to continue to honor certain credit card transactions, chargebacks,

24  discounts and related expenses.

25      **1.**    **Debtors' Credit Card Processors.**

26        61.    The Debtors have approximately four (4) separate agreements with a number of

27

28

---

[2] This figure includes amounts owed for services performed during the week ending April 11, 2014, as well as checks that have not yet been cashed.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

1    credit card processors, including, but not limited to, Propay Inc., Phoenix Payments LLC, Allied

2    Wallet and Vantage Payments (collectively, the **"Debtor Credit Card Processors"**), governing

3    the terms and conditions of credit card payments, discounts, and commissions, all as more

4    specifically described herein (collectively, the **"Debtor Agreements"**).

5        62.    The Debtor Credit Card Processors provide the Debtors with credit card

6    transaction processing services for all credit cards accepted by the Debtors, including Visa,

7    Mastercard and American Express.  Pursuant to the Debtor Agreements, subject to certain fees,

8    commissions, and other costs of administration in processing credit card transactions, the

9    Debtors are permitted to accept the credit cards for purchases in connection with the Debtors'

10   businesses, including access to the Debtors' websites.

11       63.    Honoring the credit card charges and the commensurate expenses incurred

12   pursuant to the Debtor Agreements in the ordinary course of the Debtors' business operations is

13   absolutely necessary in the website-based business context.  Without the ability to assure the

14   Debtor Credit Card Processors that transactions will continue to occur in the ordinary course

15   after the Petition Date, the Debtor Credit Card Processors may attempt to adjust the reserve

16   amounts and the timing of payments to the Debtors.  Furthermore, under sections 363 and 553 of

17   the Bankruptcy Code, the Debtor Credit Card Processors are likely to seek a setoff of all such

18   charges against funds currently in their possession that they would otherwise remit timely to the

19   Debtors, rather than maintain the *status quo* and continue normal operations during these

20   Chapter 11 Cases.

21       64.    As a majority of the Debtors' revenues are generated from website-based

22   purchases, the use of credit cards is inextricably linked to the Debtors' ability to continue normal

23   postpetition operations.  Even a slight delay in implementing the relief requested herein could

24   cause the Debtor Credit Card Processors to refuse to do business with the Debtors on the terms

25   and basis of their ordinary course relationships, which could have a significant and material

26   adverse affect on the Debtors' business as the Debtors would be forced to identify and obtain

27   new credit card processors.

28       65.    The relief requested in the Credit Card Motion with respect to authorizing the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

17

1   Debtors to honor credit card charge backs, commissions and discounts in the ordinary course of

2   business, including any pre-petition amounts that may currently be outstanding, is necessary to

3   ensure and maintain credit card processing and the uninterrupted flow of revenue.

4       **2.**   **Non-Debtor Credit Card Processors.**

5       66.   In addition to the Debtors' Agreements, certain of the Debtors' non-debtor

6   affiliates (the "**Non-Debtor Affiliates**") have agreements with Argus Payments, a credit card

7   processor (the "**Non-Debtor Credit Card Processors**", and together with the Debtor Credit

8   Card Processors, the "**Credit Card Processors**"), governing the terms and conditions of credit

9   card payments, discounts, and commissions, as more specifically described herein (the "**Non-**

10   **Debtor Agreements**").  Like the Debtor Credit Card Processors, pursuant to the Non-Debtor

11   Agreements, subject to certain fees, commissions, and other costs of administration in processing

12   credit card transactions, the Debtors are permitted to accept the credit cards for purchases in

13   connection with the Debtors' businesses, including the Debtors' websites.

14       67.   The Non-Debtor Credit Card Processors process credit card transactions,

15   chargebacks, discounts, and commissions resulting from purchases made from the Debtors'

16   websites and other businesses.  The resulting funds are then reconciled by the Non-Debtor

17   Affiliates, which are then immediately transferred to the Debtors.  Accordingly, as credit card

18   transactions, chargebacks, discounts, and commissions are processed by the Non-Debtor Credit

19   Card Processors, it is absolutely necessary to the Debtors' ongoing business operations that the

20   Non-Debtor Affiliates and the Non-Debtor Credit Card Processors be permitted to continue to

21   operate pursuant to the Non-Debtor Agreements in the ordinary course of business.

22       68.   Non-Debtor Credit Card Processors may ultimately continue to operate in the

23   ordinary course, as they are unaffected by these Chapter 11 Cases and, thus, do not require any

24   additional approval to conduct business as normal or require additional reserves.  However, out

25   of an abundance of caution, the Debtors seek entry of an order authorizing the Debtors, in their

26   sole discretion, to continue honoring, in the ordinary course, any terms relating to the Non-

27   Debtor Credit Card Agreements and any credit card transactions, chargebacks, discounts,

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

18

1    commissions and related expenses resulting from the Non-Debtor Agreements with the Non-

2    Debtor Credit Card Processors.

3    **D.**    **Emergency Motion of the Debtors Pursuant to Section 105(a) of the Bankruptcy Code, Bankruptcy Rules 1007, 2002(l), 2002(m) and 9007, Local Rule 2002 for Entry**

4    **of an Order Approving Notice Procedures.**

5         69.    By this motion (the "**Notice Motion**"), the Debtors seek entry of an order

6    establishing notice procedures and establishing a master service list (the "**Master Service List**").

7         70.    TelexFree Nevada entered into various enrollment agreements (the "**Contracts**")

8    with over 700,000 parties allowing these parties to utilize and/or promote the Company's

9    services.  The Company can initiate communication with the counterparties to Contracts (the

10   "**Counterparties**") in two ways.  First, the Company can email the Counterparties directly to the

11   email addresses provided by the Counterparties.  Pursuant to the Contracts, each Counterparty

12   agrees that the Company can contact the Counterparties via email and that such email address is

13   "valid for legal purposes."  Second, the Company provides a virtual environment (the "**Back**

14   **Office**") which Counterparties use to access certain of the Company's services and obtain

15   information with respect to the counterparty's individual account.  Each Counterparty has a

16   unique user name and password to access the Back Office and in the ordinary course of business

17   the Company regularly posts messages to the Back Office.

18        71.    With such a large number of Counterparties, the service of pleadings on them via

19   traditional means would prove expensive, inefficient, and unduly burdensome.  The Debtors

20   therefore propose that, when the Debtors are obligated to notice the Counterparties, the Debtors

21   shall be authorized to serve the Counterparties via (a) electronic mail at the email address

22   provided to the Company and/or (b) utilizing the messaging services provided by the Back

23   Office, as described herein.

24        72.    The Debtors believe that the notice procedures set forth in the Notice Motion are

25   reasonably calculated to ensure that parties in interest receive notice of pleadings and are

26   appropriate in the circumstances of these Chapter 11 Cases.

27   . . .

28   . . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

19

**E.** **Emergency Motion of the Debtors For Entry of Interim and Final Orders Pursuant to Section 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment.**

73.     In connection with the operation of their businesses and management of their properties, the Debtors obtain telephone services and internet provider services (collectively, the "**Utility Services**") from certain utility companies (collectively, the "**Utility Providers**").

74.     In the ordinary course of business, the Debtors regularly incur utility expenses for Utility Services provided by the Utility Providers. The Debtors have a long and established payment history with the Utility Providers. The Debtors' aggregate average monthly cost for utility services is approximately $18,500.

75.     Uninterrupted utility services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of these Chapter 11 Cases. Should a Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their estates could be severely and irreparably harmed. For example, a lack of telephonic or internet services would render the Debtors' services inoperable, effectively corrupting the good-will of the Debtors' businesses with end users of the Debtors' products. Such a result could jeopardize the Debtors' reorganization efforts and ultimately, value and creditor recoveries. It is therefore critical that utility services continue uninterrupted.

**F.** **Emergency Motion of the Debtors For Entry an Order (I) Authorizing the Debtors to Pay Prepetition Income, Franchise and Similar Taxes and Regulatory Fees in the Ordinary Course of Business, and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto.**

76.     In connection with the normal operation of their business, the Debtors pay certain income, franchise and similar taxes (collectively, the "**Taxes**") to federal and state taxing authorities (collectively, the "**Taxing Authorities**") and pay various regulatory fees (the "**Regulatory Fees**," and together with Taxes, the "**Taxes and Fees**") to certain governmental agencies and authorities (together with the Taxing Authorities, the "**Taxing and Regulatory Authorities**"). These Taxes and Fees include, without limitation, the following:

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

20

1.    **Universal Service Administration Company Support Mechanism Charges.**

77.    The Debtors pay monthly contributions to the Universal Service Administration Company (the "**USAC**") which is a non-for-profit corporation designated by the Federal Communications Commission (the "**FCC**") as the administrator of the "Universal Service Fund," created by the FCC to accomplish the goals mandated by the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (Feb. 8, 1996).  The USAC receives contributions from all companies providing Voice over Internet Protocol services. The monthly contributions are based on projected quarterly earnings.  The Debtors estimate that the contribution due for the period ending on April 14, 2014 will be approximately $23,404.

2.    **Income/Franchise Taxes.**

78.    The Debtors pay income/franchise taxes (the "**Income/Franchise Taxes**") to applicable Taxing Authorities in many U.S. jurisdictions.  The Income/Franchise Taxes are established by the Debtors' income tax base, the capital employed by the Debtors' operations and/or a variety of other factors.  Timely payment of the Income/Franchise Taxes allows the Debtors to continue operating their business in such jurisdictions. The Debtors typically pay the Income/Franchise Taxes on a quarterly or annual basis, and are currently obligated to pay certain Income/Franchise Taxes post-petition based upon amounts that accrued prepetition.  The Debtors estimate that the aggregate approximate amount of $97,306 was accrued in respect of Income/Franchise Taxes as of the Petition Date.

79.    The Debtors seek authority to pay prepetition Taxes and Fees accrued for the benefit of the Taxing and Regulatory Authorities in an aggregate amount not to exceed $200,000.

**G.    Emergency Motion of the Debtors For Entry an Order Authorizing the Debtors to Honor Prepetition Prepaid Voice Over Internet Protocol Telephone Minutes.**

80.    As described above, the Debtors distribute a VoIP product, 99TelexFree, which allows a subscriber to make unlimited international calls to over forty countries.  A subscriber pays a monthly fee in order to obtain a month of service from the Debtors.  Prior to the Petition Date the Debtors sold their VoIP services to a number of customers who anticipated utilizing the Debtors' services for the month following their purchase (the "**Prepaid VoIP Minutes**").  The

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

21

1  Debtors failure to honor the Prepaid VoIP Minutes would severely and irreparably harm the

2  Debtors' customer relations, as many of the Debtors' customers would be deprived of the

3  services they purchased.

4     81.    The success and viability of the Debtors' business and the Debtors' ability to

5  successfully maximize value for the stakeholders in these cases are dependent primarily upon the

6  patronage and loyalty of the customers who purchase the VoIP product.  The ability to honor the

7  Prepaid VoIP Minutes is fundamental to the continued success of the Debtors' business; without

8  the ability to honor the Prepaid VoIP Minutes the Debtors business will be irreparably harmed.

9  Moreover, honoring the Prepaid VoIP Minutes will preserve customer satisfaction; this will

10  assist the Debtors in retaining current customers and assist the Debtors in their reorganizational

11  efforts.  Honoring the Prepaid VoIP Minutes is critical to the continuation of customer loyalty

12  and satisfaction, whereas failure to honor the Prepaid VoIP Minutes would severely and

13  irreparably impair the Debtors' customer relations and cause a severe loss in customer

14  confidence.  Accordingly, the Debtors submit that they should be authorized to honor the Prepaid

15  VoIP Minutes.

16     82.    The Debtors seek entry of an order authorizing the Debtors to honor the Prepaid

17  VoIP Minutes purchased by the Debtors' customers prepetition.

18  **H.    Emergency Motion of the Debtors For Entry an Order Authorizing the Debtors to Reject Certain Executory Contracts *Nunc Pro Tunc* as of the Petition Date.**

19

20     83.    By this motion (the "**Rejection Motion**"), the Debtors request entry of an order,

21  authorizing and approving the Debtors' rejection of all of agreements between the Debtors and

22  the Promoters under both the Original Comp Plan and the Revised Comp Plan (collectively, the

23  "**Rejected Contracts**").

24     84.    As of the Petition Date, the Debtors and the Promoters each had material

25  unperformed obligations pursuant to the Rejected Contracts. The Rejected Contracts require the

26  Promoters to comply with certain provisions to act in accordance with the agreement including,

27  among other things: (i) strictly adhering to the rules and schedules established by the Debtors'

28  system, (ii) indemnifying the Company for actions arising from the Promoters use of the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc                          22

1   Debtors' systems, (iii) agreeing to receive messages in their inbox maintained on the Debtors'

2   electronic messaging systems, (iv) respecting and complying with all local, municipal, state,

3   federal, and international laws and regulations, (v) refraining from soliciting other Promoters to

4   participate in other multilevel marketing businesses, (vi) providing true, accurate and complete

5   information and ensuring that information is current and accurate, (vii) refraining from engaging

6   in other multilevel marketing activities similar to the services provided by the Debtors, and (viii)

7   protecting the intellectual property of the Debtors.  In addition, the Debtors have material on-

8   going obligations pursuant to the Rejected Contracts, including, among other things, (i)

9   maintaining the virtual environment utilized by the Promoters and (ii) paying certain

10  compensation, bonuses and incentives to the Promoters for certain actions taken by the

11  Promoters which are authorized by the Agreements.

12       85.     Because neither of the Pre-Petition Comp Plans meets the needs of the Debtors

13  businesses. The Debtors intend to discontinue and reject the Pre-Petition Comp Plans and

14  quantify the legitimate claims under those Plans.   Once the legitimate claims have been

15  quantified and the Company has developed a new compensation program, the Debtors hope to

16  reorganize and satisfy the claims against them.

17       86.     As a result of the circumstances that led to the filing of these Chapter 11 Cases, as

18  set forth herein, the Debtors have determined that it is imperative that they reject the Rejected

19  Contracts as of the Petition Date so as to quantify claims thereunder and work on putting a new

20  program in place.   The Debtors believe that continuing to accrue claims under the Rejected

21  Contracts will not offer additional value to their estates but would instead result in the further

22  degradation of the Debtors' cash reserves.  Therefore, in the exercise of their business judgment,

23  the Debtors have determined that the Rejected Contracts are appropriate for immediate rejection..

24  **I.    Emergency Motion of the Debtors For Entry an Order Designating and Approving the Form and Manner of Notice of the Motion of the Debtors for Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts *Nunc Pro Tunc* as of the Petition Date.**

25

26

27       87.     By this motion (the "**Rejection Notice Motion**"), the Debtors seek approval of

28  procedures to provide notice to the Promoters of the hearing on, and objection deadline for, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

23

1    Rejection Motion.

2         88.    The Debtors believe that providing notice as set forth in the Rejection Notice

3    Motion is proper and sufficient under the existing circumstances.

4         89.    For the reasons described herein and in the First Day Motions, I believe that the

5    prospect for achieving these objectives for the benefit of creditors and other stakeholders will be

6    substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First

7    Day Motions and respectfully request the Bankruptcy Court to do so.

8         I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is

9    true and correct to the best of my information, knowledge and belief.

10   Dated: April 14, 2014

11

12                                        */s/ William H. Runge, III*
                                          William H. Runge III

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

104590-001/2260728.doc

24